UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MICAH ROEMEN, and TOM TEN EYCK, Guardian of Morgan Ten Eyck; and MICHELLE TEN EYCK, Guardian of Morgan Ten Eyck,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, ROBERT NEUENFELDT, individually and UNKNOWN SUPERVISORY PERSONNEL OF THE UNITED STATES, individually,<br><br>Defendants. | **4:19-CV-4006-LLP**<br><br>**MEMORANDUM OPINION AND ORDER DENYING MOTION TO STRIKE, GRANTING IN PART GOVERNMENT'S MOTION TO DISMISS** |

Pending before the Court is Defendant United States of America's Motion to Strike Expert Report of John Long (Doc. 128) and Motion to Dismiss (Doc. 90) under Rules 12(b)(h) and 12(b)(1) of the Federal Rules of Civil Procedure. The parties have also filed cross motions for summary judgment. (Docs. 83, 98). Pursuant to the Court's order from the bench during oral argument on August 9, 2022, the Government's Motion to Strike is denied. For the following reasons, the Government's Motion to Dismiss is granted in part and denied in part.

## BACKGROUND

The following is a recitation of the facts alleged by Plaintiffs in the Second Amended Complaint. In resolving any factual challenges to Plaintiffs' Second Amended Complaint made by the United States under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court may reference affidavits, deposition testimony and other matters outside the pleadings that were submitted by the parties in support of and in opposition to this motion to dismiss.

### I.    Facts

#### A. Flandreau Santee Sioux Tribe's 638 Contract for Law Enforcement Services

The Flandreau Santee Sioux Tribe ("the Tribe") and the United States, acting through the Bureau of Indian Affairs, Office of Justice Services ("BIA") entered into a contract wherein the Flandreau Santee Sioux Tribal Police Department was operated by the Tribe pursuant to an Indian

Self-Determination and Education Assistance Act ("ISDEAA") Contract ("638 contract").  (Doc. 93, Ex. 1).  In this section 638 contract, the provision of law enforcement services for the Flandreau Santee Sioux Indian Reservation was transferred from the BIA to the Tribe from October 1, 2015, through September 30, 2018.  (*Id.*).

### B. Mutual Aid Agreement and Dispatch Agreement

During this same time, the Moody County Sheriff's Office ("Moody County") and the Tribe entered into a Law Enforcement Assist Agreement in September of 2015.  (Doc. 91, Ex. 1, Wellman Dep. at 31:10-32:15; Doc. 93, Ex.1 at 2340-2342).  The City of Flandreau and Moody County had a similar agreement because "there's usually one [police officer] out for each department" and "[s]ometimes one person can't control the situation."  (Doc. 91, Ex. 1, Wellman Dep. at 35:13-18).  The Mutual Aid Agreement provided that "[i]n the event of or the threat of an emergency, disaster, or widespread conflagration which cannot be met with the facilities of one of the parties to this agreement, the other party agrees, upon proper request, to furnish law enforcement assistance to the party requesting the assistance upon either an actual or standby basis."  (Doc. 93, Ex. 1 at 2340).  A "proper request" from Moody County to the Tribe "shall only be communicated directly, either formally or informally, by the Sheriff's Office or the Sheriff's designee(s), to the Tribe's Chief of Police or the Chief's designee."  (Doc. 93, Ex. 1 at 2341).  While the furnishing party is rendering aid to the other, the responding officer "shall temporarily have the same powers and authority conferred by law on the members of the law enforcement of the party to which the assistance is rendered."  (Doc. 93, Ex. 1 at 2341).

As of June 17, 2017, Moody County provided dispatch services to the Tribe and the City of Flandreau.  (Doc. 93, Ex. 1 at 2344-2348).  Moody County's dispatch received and accepted "all calls for service within, or near, the jurisdiction of the Tribe, including emergency calls for fire, medical, and emergency situations."  (Doc. 93, Ex. 1 at 2344-45).  It also provided radio and support communications with the Tribe from the initial call until the conclusion of the emergency. (Doc. 93, Ex. 1 at 2344-45).  During this timeframe, Moody County, the City of Flandreau, and the Tribe all utilized the same radio channel.  (Doc. 91, Ex. 1, Wellman Dep. 63:18-23).  In addition, other nearby agencies or jurisdictions also had access to this radio channel like Lake County and certain South Dakota Highway Patrol officers who worked in that geographical area. (*Id.*).

### C.  Events prior to pursuit of vehicle driven by Tahlen Bourassa on June 17, 2017

During the section 638 contract period, in January 2016, Neuenfeldt was hired as a police officer.  (Doc. 91, Ex. 2, Neuenfeldt Dep. 14:12-19).  Neuenfeldt had been certified as a law enforcement officer by the State of South Dakota after attending the State Academy in 2013.  (Doc. 91, Ex. 2, Neuenfeldt Dep. 8:5-8).  Neuenfeldt previously worked as a deputy sheriff for Moody County from 2013 through late-2015.  (Doc. 91, Ex. 2, Neuenfeldt Dep. 13:20-14:14).  Neuenfeldt eventually became Acting Chief of Police for the Tribe and occupied that role on June 17, 2017.  (Doc. 91, Ex. 2, Neuenfeldt Dep. 60:2-8).

On the evening of June 17, 2017, Moody County Sheriff's Deputies Carl Brakke and Logan Baldini were on duty together in Brakke's police cruiser.  (Doc. 91, Ex. 3, Brakke Dep. at 21:5-20).  They were doing a drive-by security check of a residence located in rural Moody County at 24364 484th Avenue, Dell Rapids, South Dakota.  (*Id.*; Doc. 91, Ex. 4 at 1; Doc. 109 (citing Doc. 85-9, Brakke Dep. 21:5-21:8).  The owners of this unoccupied property had requested extra drive-bys from the Moody County Sheriff's Office to help the owners with security because there had been a party there the prior evening.  (Doc. 91, Ex. 3, Brakke Dep. 29:15-30:5); Doc 109 at 2594 (citing Doc. 85-9, Brakke Dep. 29:8-30:5)).  The owners had ongoing concerns with trespassing.  (Doc. 91, Ex. 3, Brakke Dep. 29:15-30:5).

At 11:50 p.m. on June 17, 2017, Deputy Brakke radioed to Moody County dispatch that he could see six to eight vehicles at the location and "looks like another house party going on."  (Doc. 91, Ex. 3, Brakke Dep. 32:7-15; Ex. 4 at 4; Doc. 109 at 2594 (citing Doc. 85-9, Brakke Dep. 32:7-34:1).  Deputy Brakke then relayed to dispatch that as they pulled up to the residence, 15 individuals ran from the house toward the trees.  (Doc. 91, Ex. 3, Brakke Dep. 32:12-15).  Deputy Brakke said he believed there were more people in the house, and there were a number of people who did not run, but instead stayed in the driveway near Deputy Brakke's cruiser.  (Doc. 91, Ex. 3, Brakke Dep. 33:1-5).  Deputy Brakke estimated there were 25 people in the house having a party.  (Doc. 91, Ex. 3, Brakke Dep. 33:17-20).

Deputy Brakke testified that he was involved with radio traffic from at least two different dispatchers and two different radio channels that night.  (Doc. 91, Ex. 3, Brakke Dep. 47:22-48:5).  He testified that after he contacted Moody County's dispatch, he went to the "Brookings inter-agency" channel, which is a channel that Troopers from the South Dakota Highway Patrol monitor

3

and where deputies go to ask for their help, and asked for assistance at a house party and "gave the address the same type of way" that he gave it to his own dispatcher. (Doc. 91, Ex. 3, Brakke Dep. 57:4-25). Deputy Brakke testified that on his inter-agency request for assistance, he asked for "any available units" or "can you start all unites to my location" and "went on to explain about the kids running and the number of vehicles." (Doc. 91, Ex. 3, Brakke Dep. 47:5-15; 57:15-25). The parties have been unable to locate recordings from the Brookings inter-agency channel. (Docs. 89-1 at 1974, n.4; 109 at 2596 n.1). Todd Dravland, system engineer for the Brookings Inter-Agency Channel, reported to Plaintiffs that on June 18, 2017, there was "mechanical Hard Disk Drive" failure that "wiped" the alleged recordings. (Doc. 110, Ex. 2). Deputy Baldini also testified that Deputy Brakke made a call for "a generally assist' on the radio. (Doc. 91, Ex. 5, Baldini Dep. at 18:3-4).

At 11:52 p.m., Deputy Brakke contacted Flandreau City Police Officer Brent Goehring via radio and told him about the party at the residence. (Doc. 91, Ex. 3, Brakke Dep. 53:3-10; Doc. 109 at 2594 (citing Doc. 85-9, Brakke Dep. 52:14-53:24). Officer Goehring responded, "10-4. We can start heading that way." (Docs. 91, Ex. 3, Brakke Dep. 53:20-24; 109 at 2594 (citing Doc. 85-9, Brakke Dep. 52:14-53:24)).

At about 12:02 a.m. on June 18, 2017, one of the partygoers standing in the driveway with Deputies Brakke and Baldini started to have a seizure. (Doc. 91, Ex. 4 at 2093, Ex. 3, Brakke Dep. 38:14-24). Deputy Brakke requested a non-tribal ambulance to assist with the seizure. (Doc. 91, Ex. 3, Brakke Dep. 39:14-19). At about 12:05 a.m., South Dakota Highway Patrol Trooper Isaac Kurtz was working in the area and asked Moody County dispatch if Deputy Brakke needed assistance with the house party. (Doc. 91, Ex. 13). Dispatch responded and said, "Yes, please." (*Id.*; Doc. 91, Ex. 6 at 2145).

Deputy Brakke did not directly call Neuenfeldt to ask him to assist. (Doc. 91, Ex. 3, Brakke Dep. 71:15-17). Sheriff Troy Wellman of Moody County, Neuenfeldt's former supervisor, confirmed that as a tribal police officer, Neuenfeldt had a habit of jumping calls or arriving on the scene when his assistance was not requested. (Doc. 109 at 2600 (citing Doc. 85-17, Wellman Dep. 25:4-25:15)). He testified that "If we were on a traffic stop outside of town, we would not request any help. The deputies that I have and had at the time are capable of doing their job. That's why I hired them. If we need help, we'll ask for it, but there were times that Rob [Neuenfeldt] would

show up on a call or on a traffic stop that he was not requested for backup or any kind of mutual aid at that point." (Doc. 109 at 2600 (citing Doc. 85-17, Wellman Dep. 25:4-25:15). Sheriff Wellman specifically instructed Moody County dispatchers to document instances of Mr. Neuenfeldt jumping calls. (Doc. 109 at 2599-60 (citing Doc. 85-17, Wellman Dep. 24:12-23, 26:3-9)). Sheriff Wellman also advised his deputies that if Neuenfeldt did jump calls, they were to tell Neuenfeldt to leave. (Doc. 109 (citing Doc. 85-17, Wellman Dep. 26:3-9)).

On the evening of June 17, 2017, Sheriff Wellman testified that his Moody County employees at the rural property "obviously were outnumbered and tried to call in other resources to try to contain the situation." (Doc. 91, Ex. 1, Wellman Dep. 33:18-24). Sheriff Wellman testified that under the Assist Agreement, his deputies could call the tribal police officers and ask for help. (Doc. 91, Ex. 1, Wellman Dep. 63:8-12). Sheriff Wellman concluded that Deputy Brakke made "a request for additional resource[s]," but it was not to Neuenfeldt specifically. (Doc. 91, Ex. 1, Wellman Dep. 39:8-40:17). However, Sheriff Wellman also said that there was, a radio "call for backup to all available units," and "the tribe falls into that." (Doc. 91, Ex. 1, Wellman Dep. 41:14-17).

Neuenfeldt was also on duty on June 17, 2021, and testified that he responded to the house party scene because he heard Deputy Brakke call out over the radio and request assistance "when one of the people he was with started having a seizure." (Doc. 91, Ex. 2, Neuenfeldt Dep. 132:14-133:8; 261-62). Neuenfeldt arrived before the ambulance. (Doc. 91, Ex. 4 at 2094). By the time the ambulance arrived, the seizure had passed, and the individual did not need to be transported to the hospital for medical care. (Doc. 91, Ex. 2, Neuenfeldt Dep. at 133:9-13).

### D. The pursuit of Bourassa'a vehicle

After the party had been broken up around 1:20 a.m., Deputy Brakke was in or near his police cruiser in the driveway to the residence giving tickets or processing some of the partygoers who had not fled. (Doc. 91, Ex. 3, Brakke Dep. 38:18-20, 73:15-18). Neuenfeldt, Deputy Baldini, and Trooper Kurtz had helped search the area for the partygoers who had fled and cleared other structures on the rural property and were having a discussion at the end of the driveway. (Doc. 91, Ex. 5, Baldini Dep. 53:14-18). At that time, Deputy Brakke had already seen at least three cars drive north past the driveway to the residence that would stop about a half of a mile past the driveway and then speed off, as though they were picking up those partygoers who had fled. (Doc.

91, Ex. 14 at 2).  Deputy Brakke relayed via radio to the other police units that these cars may be picking up people that ran from the house.  (*Id.*).  While talking with Deputy Baldini and Chief Neuenfeldt, Trooper Kurtz noticed a vehicle traveling eastbound on 244th Street that appeared to be traveling slow and stopped to the west of 484th Avenue.  (Doc. 91, Ex. 5, Baldini Dep. 54:4-11).  Trooper Kurtz was in his cruiser and drove south toward the vehicle that he saw.  (Doc. 91, Ex. 5, Baldini Dep. 58:6-18; Ex. 7, Kurtz Dep. at 118:22-25).  Based on the vehicle's actions, Trooper Kurtz believed he had reasonable suspicion that the person driving the vehicle was involved at the house party.  (Doc. 91, Ex. 7, Kurtz Dep. at 111:22-23).

The vehicle that was approaching the residence turned out to be a gray Dodge pickup that was driven by Tahlen Bourassa.  (Doc. 91, Ex. 7, Kurtz Dep. at 74: 18-22).  Micah Roemen and Morgan Ten Eyck were passengers in Bourassa's pickup.  (Doc. 91, Ex. 8, Roemen Dep. 81:16-19).

Bourassa turned north onto 484th Avenue and started heading towards the residence.  (Doc. 91, Ex. 5, Baldini Dep. 58:15-21).  Trooper Kurtz met Bourassa's vehicle, and after Bourassa's vehicle passed Trooper Kurtz, officers heard Bourassa's vehicle accelerate, and Trooper Kurtz testified that he saw the truck fishtail in his rearview mirror.  (Doc. 91, Ex. 7, Kurtz Dep. at 118:22-25; Ex. 5, Baldini Dep. 59:7-60:10; 211-12).  Trooper Kurtz turned around to go north on 484th Avenue and activated his emergency lights to stop Bourassa's truck.  (Doc. 91, Ex. 7 at 123-26).

Bourassa approached the driveway to the residence in his vehicle.  (Doc. 91, Ex. 5, Baldini Dep. 60:4-10).  As he approached, Chief Neuenfeldt stepped from the driveway into the road and began giving Bourassa hand signals and verbal commands to stop.  (Doc. 91, Ex. 5, Baldini Dep. 60:4-10; Ex. 2, Neuenfeldt Dep. at 257:3-9).  Chief Neuenfeldt testified he "was yelling stop because Kurtz was trying to pull [Bourassa] over."  (Doc. 91, Ex. 2, Neuenfeldt Dep. 257:3-6).  As Bourassa's vehicle slowed and approached the driveway to the residence, Chief Neuenfeldt crossed to the driver's side of the truck and Deputy Baldini stayed near the passenger side where Roemen sat.  (Doc. 91, Ex. 8, Roemen Dep. 75:19-25).  Bourassa briefly stopped at the driveway for Sergeant Kurtz's emergency lights.  (Doc. 91, Ex. 5, Baldini Dep. 60:4-13; Ex. 8, Roemen Dep. 68:8-21).

During this stop, Bourassa locked his doors as Chief Neuenfeldt approached his side of the truck.  (Doc. 91, Ex. 8, Roemen Dep. 75:19-25).  Passenger Roemen testified that Chief Neuenfeldt

told Bourassa he would arrest him if Bourassa did not unlock his doors.  (Doc. 91, Ex. 8, Roemen Dep. 80:13-18).  Bourassa ignored the officers' commands to get out or unlock his doors, and Bourassa accelerated his vehicle.  (Doc. 91, Ex. 2, Neuenfeldt Dep. 152:16; Ex. 8, Roemen Dep. 80:13-18).  Chief Neuenfeldt drew his gun as the Bourassa vehicle accelerated toward him.  (Doc. 91, Ex. 2, Neuenfeldt Dep. 152:9-16).  Chief Neuenfeldt testified that he was struck in the left thigh and shoulder by Bourassa's truck and knocked to his knees as it drove by at approximately 20 m.p.h.; that Bourassa "sideswiped [him] when he went past." (Doc. 91, Ex. 2, Neuenfeldt Dep. 254:13-21).

There is no known witness to the strike.  Roemen did not see the strike and admitted she could not see Chief Neuenfeldt's lower body at all through the driver-side window.  (Doc. 91, Ex. 8, Roemen Dep. 128:7-11, 134:7-18, 194:14-195:14).  Deputies Baldini and Brakke did not witness the truck striking Chief Neuenfeldt, but they testified they saw Chief Neuenfeldt getting up from his knees as Bourassa's truck sped away.  (Doc. 91, Ex. 3, Brakke Dep. 80:10-81:3; Ex. 5, Baldini Dep. 104:22-23).  Later that evening after the incident concluded, Chief Neuenfeldt sought medical care at the emergency room, where the provider noted objective findings of "a little bit of bruising" on his left lower thigh that looked like it would turn into a "more significant bruise as time goes." (Doc. 91, Ex. 9 at 2212).  The provider also observed that his left shoulder did not appear bruised, but it was "a little bit red." (Doc. 91, Ex. 9 at 2212,).

Bourassa then fled from the scene.  Trooper Kurtz was behind Bourassa's truck as it sped away, and Trooper Kurtz immediately initiated a high-speed pursuit going north on 484th Avenue at 1:21 a.m. (Doc. 91, Ex. 7, Kurtz Dep. at 91:13-16; Ex. 6 at 2145).  Trooper Kurtz listed the reason for initiating the pursuit as exhibition driving and failure to stop when directed by law enforcement.  (Doc. 91, Ex. 7, Kurtz Dep. 73:25-74:3; Ex. 12 at 1).  He said Bourassa failed to stop for Chief Neuenfeldt and himself because he had activated his emergency lights.  (Doc. 91, Ex. 7, Kurtz Dep. 75:1-9).

After getting up off the ground, Chief Neuenfeldt got in the driver's side of his cruiser.  (Doc. 91, Ex. 5, Baldini Dep. at 99:8-19).  Deputy Baldini also ran to Chief Neuenfeldt's cruiser and got in the passenger's side because he had concerns for Chief Neuenfeldt's safety, and "I saw Rob getting up off the ground, and I didn't know if he was injured in any way." (Doc. 91, Ex. 5, Baldini Dep. 99:8-19).  Chief Neuenfeldt's cruiser was secondary behind Trooper Kurtz in the

7

pursuit. (Doc. 91, Ex. 7, Kurtz Dep. 193:20-22). At approximately 1:22 a.m., Chief Neuenfeldt relayed over the radio: "HP28: He hit me with his truck. That's assault on law enforcement." (Doc. 91, Ex. 13).

From 484th Avenue, Bourassa turned west onto 242nd Street, and Trooper Kurtz followed Bourassa. (Doc. 91, Ex. 6 at 2145; Ex 7, Kurtz Dep. at 91:17-22). At this time, Highway Patrol Trooper Chris Spielmann entered the area after hearing the pursuit on radio traffic. Trooper Spielmann set up across 481st Avenue just north of 241st Street, ahead of Bourassa to prepare spike strips. (Doc. 91, Ex. 10, Spielman Dep. 20:11-21:18). Trooper Kurtz gave Trooper Spielmann permission to deploy spikes. (*Id.*) Bourassa then turned northbound on 481st Avenue and approached the position of Trooper Spielman. (Doc. 91, Ex. 10, Spielman Dep. 22:2-19). Trooper Kurtz also turned east on 241st Street. (Doc. 91, Ex. 10, Spielman Dep. 22:17-19).

After traveling east on 241st Street for approximately 3 miles, Bourassa turned south onto 484th Avenue and then quickly turned east on 242nd Street. (Doc. 91, Ex. 8, Roemen Dep. 98:5-9). Passenger Roemen testified that after turning east on 242nd Street, Bourassa stopped in the middle of the road and turned off his headlights. (Doc. 91, Ex. 8, Roemen Dep. 95:14-98:9, 102:1-3). The Bourassa truck was stopped for about one minute. (Doc. 91, Ex. 8, Roemen Dep. 97:13-98:2). While the Bourassa truck was stopped, neither of the passengers asked to get out of the truck or attempted to get out. (*Id.* at 96:17-97:11).

Meanwhile, Trooper Kurtz shadowed Bourassa by turning southbound on 484th Avenue. (Doc. 91, Ex. 7, Kurtz Dep. 92:7-8). However, because Bourassa abruptly turned onto 242nd Street and turned off his headlights, Trooper Kurtz temporarily lost sight of the Bourassa vehicle near the intersection of 484th Avenue and 242nd Street. (Doc. 91, Ex. 7, Kurtz Dep. 92:7-20). Shortly after he lost sight of the Bourassa vehicle, Trooper Kurtz saw Bourassa's taillights headed eastbound, and he relayed that location to the other pursuing police units. (Doc. 91, Ex. 7, Kurtz Dep. 92:10, 193:1-6; Ex. 6 at 2145).

Roemen testified that while the Bourassa truck was hiding, he watched other cop cars "fly by" continuing south on 484th Avenue, but one police car turned east on 242nd Street and started driving toward Bourassa's truck. (Doc. 91, Ex. 8, Roemen Dep. 102:1-103:1). Chief Neuenfeldt and Deputy Baldini were the closest law enforcement vehicle to Bourassa's last known whereabouts, as they were traveling southbound on 484th Avenue between 241st Street and 242nd

Street when they heard Trooper Kurtz relay that he believed he saw Bourassa's taillights eastbound on 242nd Street, so they turned east on 242nd Street, saw Bourassa's taillights, and Bourassa took off again. (Doc. 91, Ex. 8 at 98:17-103:6; Ex. 5, Baldini Dep. 155:3-19).

Chief Neuenfeldt and Deputy Baldini saw Bourassa's vehicle within minutes after Trooper Kurtz lost sight, and they continued the pursuit as the primary pursuer. (Doc. 91, Ex. 6 at 2145). After Trooper Kurtz lost sight of the Bourassa vehicle around 1:28 a.m., he continued to search for the truck and radioed at 1:30 a.m. that he would try to get ahead of the Bourassa truck so he could find a place to lay spike strips. (Doc. 91, Ex. 7, Kurtz Dep. 193:2-10; Ex. 4 at 2097).

From eastbound on 242nd Street, Bourassa turned north on 485th Avenue, with Chief Neuenfeldt and Deputy Baldini following directly behind. (Doc. 91, Ex. 8, Roemen Dep. 102:8-103:7; Ex. 5, Baldini Dep. 156:11-16). When Chief Neuenfeldt's vehicle became the primary pursuer, he focused on driving and Deputy Baldini covered the radio to relay the turns and route of the pursuit to dispatch and the other responding officers and agencies. (Doc. 91, Ex. 5, Baldini Dep. 222:23-25). Eventually, Bourassa turned west on 237th Street and traveled that road for about a mile before turning north onto 484th Avenue. (*Id.* at 161). Chief Neuenfeldt and Deputy Baldini followed. (*Id.*). Next, after traveling north on 484th Avenue for about a mile, Bourassa turned west onto 236th Street and sped on that road for two miles. (*Id.*). Bourassa then turned north on 482nd Avenue and drove north on that road for approximately 5 miles until 482nd Avenue turned into 231st Street, going west until reaching Highway 13. (*Id.* at 167-68).

As the pursuit reached just southeast of the town of Flandreau, FSST Tribal Police Officer Brian Arnold was driving toward Bourassa's vehicle. (Doc. 91, Ex. 15 at 2). Right before Bourassa turned north onto Highway 13, Bourassa met Officer Arnold and forced Officer Arnold off the road and into the ditch. (*Id.*)

Bourassa sped north on Highway 13 through the town of Flandreau. (Doc. 91, Ex. 2, Neuenfeldt Dep. 304:9-15). Chief Neuenfeldt and Deputy Baldini continued to pursue. (*Id.*). Once Bourassa crossed the bridge on Highway 13 just north of Flandreau, Bourassa went by a car and then came to a very rapid stop on Highway 13 just north of 229-A. (Doc. 91, Ex. 2, Neuenfeldt Dep. 304:14-16). Chief Neuenfeldt stopped his cruiser in the southbound lane behind Bourassa, and Deputy Baldini got out of the cruiser and told Bourassa to stop or get out of the vehicle. (Doc. 91, Ex. 2, Neuenfeldt Dep. 306:1-11; Ex. 5, Baldini Dep. 218:8-22).

After nearly a 20-minutes pursuit, instead of getting out of his truck, Bourassa ignored Deputy Baldini's commands and suddenly reversed 20-30 yards and then turned east down 229-A. (Doc. 91, Ex. 5, Baldini Dep. 186:22-187:25, 218-19).  Chief Neuenfeldt and Deputy Baldini were some distance behind Bourassa when they finally turned east down 229-A because Chief Neuenfeldt had to wait for Deputy Baldini to get back inside the cruiser. (Doc. 91, Ex. 2, Neuenfeldt Dep. 308:5).  At that point, Bourassa could have continued north or south on Highway 13 or turned east or west down 229-A. (Doc. 91 Ex. 5, Baldini Dep. 182:10-14; Ex. 2, Neuenfeldt Dep. 309:2-9).

As he slowly followed Bourassa east down 229-A, Chief Neuenfeldt was not speeding because the road was dusty and he knew it was a dead-end. (Doc. 91, Ex. 2, Neuenfeldt Dep. 308:13-15).  Chief Neuenfeldt estimated he was a quarter of a mile behind Bourassa on 229-A because he recalls being near a specific grove of trees when Deputy Baldini got on the radio and said he thought Bourassa wrecked. (Doc. 91, Ex. 2, Neuenfeldt Dep. 313:20-22).  Deputy Baldini also estimated their cruiser was at least a quarter of a mile behind the truck on 229-A. (Doc. 91, Ex. 5, Baldini Dep. 190:2-17).  As Chief Neuenfeldt and Deputy Baldini drove toward the end of 229-A, they believed that Bourassa had wrecked up ahead because they could see what appeared to be lights flashing. (Doc. 91, Ex. 15 at 2247).  As they approached the dead-end, they noticed that Bourassa had crashed his truck into a field to the north of the road. (*Id.*).  Neither Chief Neuenfeldt nor Deputy Baldini witnessed the crash because there was a large hill in the middle of 229-A. (*Id.*).  Chief Neuenfeldt's cruiser struggled to stop and Deputy Baldini testified that it was likely because his brakes were hot from the pursuit. (Doc. 91, Ex. 5, Baldini Dep. 224:5-12).  Chief Neuenfeldt's cruiser slid over a fence post at the entrance to the field where Bourassa crashed farther into the field. (Doc. 91, Ex. 5, Baldini Dep. 193:10-194:10).

Roemen testified that once Bourassa turned onto 229-A, he told Bourassa that it was a dead-end road. (Doc. 91, Ex. 8, Roemen Dep. 88:13-15).  Bourassa ignored his passenger's advice, driving fast down 229-A. (Doc. 91, Ex. 8, Roemen Dep. 112:4-13).  All three occupants of the pick-up were ejected in the crash and sustained serious injuries. (Doc. 91, Ex. 15 at 2247; Ex. 6 at 2145).  While Chief Neuenfeldt and Deputy Baldini were the first responders on the accident scene, Highway Patrolman Denver Kvistad, City Officer Brent Goehring, and FSST Officer

Arnold all arrived within one or two minutes of the crash. (Doc. 91, Ex. 6 at 2145-46; Ex. 4 at 2098).

## II.   Procedural History

The United States Attorney issued a certification of scope of employment for Chief Neuenfeldt as to Plaintiffs' negligence claim alleged in Count I of the Complaint and as to Plaintiffs' assault and battery claim alleged in Count III. With leave of the Court, Plaintiffs filed a Second Amended Complaint alleging, in Count V, a claim for negligent training, supervision, and retention.

The United States has moved to dismiss Counts I, II and V under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the basis of sovereign immunity. The motion is fully briefed. On August 9, 2022, the Court heard oral argument on the motion. During oral argument, the Court denied from the bench the Government's Motion to Strike Affidavit of Expert report of John Long and ordered that the Government be given an opportunity to depose Mr. Long. At the conclusion of oral argument, the Court ordered that Plaintiffs file a brief summarizing their argument as to why Count V is not barred by the discretionary function exception to the FTCA and the United States was ordered to file a reply brief. In response to the Court's order, Plaintiffs filed their brief on August 16, 2022, and the Government filed its response on August 23, 2022. The Government's Motion to Dismiss is now ready for disposition.

## STANDARD OF REVIEW

The United States has moved to dismiss the claims against it as alleged in Plaintiffs' Second Amended Complaint on the basis of lack of subject matter jurisdiction. An argument that the Court lacks subject matter jurisdiction to hear a case may be raised at any time. Fed. R. Civ. P. 12(h)(1), (3).

In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the complaint must be successfully challenged on its fact or on the factual truthfulness of its averments. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction. *Id.* In a factual attack on the jurisdictional allegations of the complaint, the

court may receive competent evidence such as affidavits, deposition testimony, and the like in order to determine the factual dispute. *Id.*

The Government makes a factual challenge under Rule 12(b)(1) on the jurisdictional allegations of the Second Amended Complaint. (Doc. 97 at 2462). The Court may therefore consider matters outside the pleadings in resolving this jurisdictional issue without converting the motion to a motion for summary judgment. *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018). When a district court engages in a factual review, it inquires into and resolves factual disputes. *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002), *overruled on other grounds as recognized by Henson v. Union Pacific R.R. Co.*, 3 F.4th 1075, 1082 (8th Cir. 2021). In resolving a factual attack, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed materials facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* The party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence. *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011).

The Rule 12(b)(1) procedure enables the court to resolve a threshold jurisdictional issue without the need for trial, unless the issue is "so bound up with the merits that a full trial on the merits may be necessary to resolve the issue." *Moss*, 895 F.3d at 1097. If the jurisdictional issue is "bound up" with the merits it remains within the district court's discretion to decide whether to evaluate the evidence under the summary judgment standard. *Id.*

## DISCUSSION

The FTCA "was designed primarily to remove sovereign immunity of the United States from suits in tort." *Levin v. United States*, 568 U.S. 504, 506 (2013). The Act gives federal district courts exclusive jurisdiction over claims against the United States for money damages for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Sheridan v. United States*, 487 U.S. 392, 398 (1988) (citing 28 U.S.C. § 1346(b)(1)).

This broad waiver of sovereign immunity is subject to a number of exceptions set forth in 28 U.S.C. § 2680. The United States has moved to dismiss Plaintiffs' claims against it on the basis of sovereign immunity. It argues that Plaintiffs' allegations are barred under the discretionary function and intentional tort exceptions of § 2680(a), (h).

The Eighth Circuit has not directly addressed which party has the burden to prove the applicability, or lack thereof, of the intentional tort or discretionary function exceptions under the FTCA. *See GLJ, Inc. v. United* States, 505 F.Supp.3d 863, 871 (S.D. Iowa Dec. 4, 2020). District courts considering Eighth Circuit precedent, including this Court, have concluded the burden likely rests with Plaintiffs as the party with the burden to prove jurisdiction. *Val-U Const. Co. of S.D. v. United States*, 905 F.Supp. 728, 736 (S.D. 1995) ("The government correctly places the burden of proving the acts complained of fall outside the discretionary function exception on the plaintiff.") (Piersol, J.); *Keller Special Trust v. United States*, Civ. No. 16-5014, 2017 WL 4785450, at *5 (D.S.D. Oct. 20, 2017); *GLJ, Inc.*, 505 F.Supp.3d at 871 (citing *Compart's Boar Store, Inc. v. United States*, 122 F.Supp.3d 818, 828 n.6 (D. Minn. 2015) (citing *Hart v. United States*, 630 F.3d 1085, 1089 n.3 (8th Cir. 2011)). Both the intentional tort exception and the discretionary function exception must be strictly construed in the United States' favor. *See U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (stating that "[w]aiver of immunity must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires.").

## I.    Discretionary Function Exception

The discretionary function exception provides that the FTCA shall not apply to claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

In *Berkovitz v. United States*, 486 U.S. 531 (1988), the Supreme Court enunciated a two-prong analysis for determining when the FTCA's discretionary function exception applies. *Id.* at 536. First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz*, 486 U.S. at 536). The requirement of judgment or choice is not satisfied if a "federal statute,

regulation,[1] or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." *Id.* (quoting *Berkovitz*, 486 U.S. at 536). Second, the conduct must be "based on considerations of public policy." *Id.* at 322-23. The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's act are grounded in policy when exercising that discretion." *Id.* at 324. The plaintiff must rebut this presumption. *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir. 1998). Otherwise, the court will "presume the decision was based on public policy considerations." *See id.*

For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in policy of the regulatory regime. *Gaubert*, 499 U.S. at 324-25. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by the statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis. *Id.* at 325.

There are obviously discretionary acts performed by a government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. *Id.* at 325, n.7; *see also In re Estate of Walters v. United States*, Civ. No. 05-3007, 2006 WL 8453000, at *4 (D.S.D. Mar. 29, 2006). For example, where a postal employee negligently causes an accident with a postal vehicle, his actions would not be shielded by the discretionary function exemption because the employee's discretion in how to operate the vehicle is not grounded in regulatory policy. *In re Estate of Walters*, 2006 WL 8453000, at *4 (citing *Gaubert*, 499 U.S. at 325 n.7). By contrast, day-to-day decisions as to road maintenance involve choice or judgment as to which of a range of permissible courses is wisest. *Id.*

---

[1] In *Gaubert v. United States*, the United States Supreme Court acknowledged that the discretionary function exemption also applies to an agency's internal guidelines." *See* 499 U.S. 315, 324 (1991) (stating that an agency may rely on internal guidelines rather than on published regulations).

### A.  Count I - Negligence

In Count I of Plaintiffs' Second Amended Complaint, Plaintiffs allege that the United States is liable under the FTCA for the alleged negligence of Neuenfeldt.  Specifically, Plaintiffs allege that Neuenfeldt breached duty of care to Roemen and Ten Eyck by initiating the pursuit, by his conduct during the pursuit and by refusing to discontinue the pursuit—all allegedly outside Neuenfeldt's jurisdictional authority.  The Government argues that BIA pursuit policies are discretionary and that the United States has not waived its immunity for Neuenfeldt's discretionary acts during the pursuit.

As stated above, the United States makes a factual challenge under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  Both parties have submitted evidence outside of the initial pleadings in support and in opposition to the Government's Motion to Dismiss.  In resolving the Government's factual attack, this court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *See Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 2021).

Two courts in the district of South Dakota have concluded that certain pursuit policies in the BIA Law Enforcement Handbook are discretionary. *See Colombe v. United States*, Civ. No. 5:16-5094, 2019 WL 7629237, at *14 (D.S.D. Jul. 30, 2019), *report and recommendation adopted by* 2019 WL 7628982 (D.S.D. Oct. 21, 2019) (Viken, J.); *see also Uses Many v. United States*, Civ. No. 3:15-3004, 2017 WL 2937596, at *5 (D.S.D. Jul. 7, 2017) (Lange, J.).  In *Colombe,* the Honorable Veronica Duffy found that although some portions of the BIA Handbook's pursuit policy are phrased in mandatory terms, considering the policy as a whole, the ultimate decisions of whether to initiate and whether to continue a pursuit are left to the sound discretion of the officers." *Colombe*, 2019 WL 7629237, at *14; *see also Uses Many*, 2017 WL 2937596, at *5. The court found in *Colombe*, "[t]his intent is particularly manifested in the sections of the policy which directly address authorization for pursuit (2-24-03); factors to consider before engaging in and while continuing a pursuit (2-24-04) and guidelines for pursuits (2-24-06). *Id.*

In the section (2-24-03) which addresses authorization for pursuit, paragraph A instructs that officers should "use the same objective reasonableness standard he/she uses when any force is used in the course of accomplishing their duties."  That language certainly implicates use of discretion by officers.

> In the section (2-24-04) which addresses the factors to consider before engaging in and while continuing a pursuit, the policy lists several factors which should be considered, but stresses the list is not comprehensive (i.e. "[t]hese considerations include, but are not limited to . . ."). In other words, the officers are expected to use their discretion in deciding what to consider when determining the risk/benefit analysis of proceeding with or continuing the pursuit.
>
> And in the section which lists the general guidelines for pursuits (2-24-06), the policy begins in paragraph A by acknowledging that "[n]o set of guidelines can address all possible circumstances. As a result, officers are expected to evaluate their actions based on whether the potential benefits of their actions outweigh the risks that are involved." Again by acknowledging the guidelines are not comprehensive, the policy clearly indicates the officers are expected to use their discretion.

*Id.* These courts further found that pursuit conduct challenged in those cases was the kind that the discretionary function was design to shield. *Colombe*, 2019 WL 7629237, at \*15-16; *Uses Many*, 2017 WL 2937596, at \*5 ("This Court has been presented with no reason to treat Officer Long Mandan's decision to initiate and continue the pursuit any differently than an officer's decision of the manner to effectuate an arrest, both falling with the type of judgments shielded by the discretionary function exception."). In *Colombe*, Judge Duffy stated that decisions "pertaining whether to initiate and/or whether to continue a vehicle pursuit are directly related to policy analysis and considerations of public policy" and that "[s]uch decisions clearly implicate 'competing and legitimate concerns of public safety and require determinations about priorities of serious threats to public health and the allocation of limited law enforcement resources.'" *Id.* at \*17 (quoting *Fitzsimmons v. United States*, 496 F.Supp.2d 1035, 1044 (D.N.D. 2007)).

It does not appear that Plaintiffs contest that under the BIA pursuit policy, the decisions of officers to initiate or continue pursuit are discretionary decisions *if* an officer is acting within his jurisdictional authority. However, it is undisputed that in this case, Officer Neuenfeldt's conduct occurred entirely outside the reservation. Pursuant to the Annual Funding Agreement, which is incorporated by reference into the Tribe's section 638 contract, the Tribe is authorized to provide law enforcement services "to all residents of, and visitors to the Flandreau Santee Sioux Tribal Reservation." (Docs. 85-2 at 1467; 93-1 at 2271). The Annual Funding Agreement acknowledges, however, that "[w]hen operating within the scope of this contract, the [Tribe] may be required to leave or operate outside of Indian country." (Doc. 85-2 at 1467). The Funding Agreement lists instances in which the Tribe may be required under the section 638 contract to operate outside the

boundaries of the reservation, but specifies that the list is not exclusive. (Doc. 85-2 at 1467) ("Such requirements may include, but are not limited to. . ."). In this case, the parties agree that the Tribe is operating under its section 638 contract when providing law enforcement services pursuant to the Assist Agreement with Moody County.

The Assist Agreement provides that "[i]n the event of or the threat of an emergency, disaster, or widespread conflagration which cannot be met with the facilities of one of the parties to this agreement, the other party agrees, upon proper request, to furnish law enforcement assistance to the party requesting the assistance upon either an actual or standby basis." (Doc. 85-8). "A proper request for the County shall only be communicated directly, either formally or informally, by the Sheriff's Office or the Sheriff's designee(s), to the Tribal Chief of Police or the Chief's designee." (Doc. 85-8). Although the Assist Agreement provides that "any law enforcement officer rendering the assistance shall temporarily have the same powers and authority conferred by law on the members of the law enforcement of the party to which the assistance is rendered," that does not mean that the Tribe no longer has to follow mandatory standards set forth in the Law Enforcement Handbook when acting pursuant to the Assist Agreement. (Doc. 85-8). The Annual Funding Agreement is clear that mandatory standards in the Law Enforcement Handbook govern the Tribe's conduct whenever its is operating under its section 638 contract. (Doc. 85-8 at 1467).

This case differs from *Colombe* and *Uses Many* is several respects. In *Colombe* and *Uses Many*, the tribal police officers, instead of state troopers, initiated and continued the pursuit within reservation boundaries. *Colombe*, 2019 WL 7629237 at *2-3; *Uses Many*, 2017 WL 2937596, at *1. Neither *Colombe* nor *Uses Many* examined section 2-24-09, entitled "Pursuits-Beyond Jurisdiction or Initiated by Another Agency." The issue in those cases was whether the tribal officer's conduct in initiating within reservation boundaries and continuing the pursuit within reservation boundaries was discretionary under the Law Enforcement Handbook and tribal pursuit policy. *See Colombe*, 2019 WL 7629237, at *5-6; *Uses Many*, 2017 WL 2937596, at *4. In *Uses Many*, the court found that the pursuing officer followed all of the applicable mandates of the pursuit policy. 2017 WL 2937596, at *5. At issue in this case, however, is whether Officer Neuenfeldt had discretion under the Law Enforcement Handbook to join in and then continue a

pursuit initiated by another jurisdiction and which started and continued entirely outside the boundaries of the Tribe's reservation.

Section 2-24-09 of the Law Enforcement Handbook is entitled "Pursuits-Beyond Jurisdiction or Initiated by Another Agency" and section(B)(3) provides that "officers will discontinue pursuits initiated by another jurisdiction when the pursuit continues outside their jurisdiction, unless officer safety becomes a consideration." (Doc. 91-11). This pursuit was initiated miles from the Flandreau Santee Sioux Indian Reservation. The pursuit was initiated by Trooper Kurtz with the South Dakota Highway Patrol. The Law Enforcement Handbook provides that under these circumstances, officers will discontinue pursuit unless officer safety becomes a consideration. The United States has argued that the fact that the policy requires an officer to evaluate officer safety renders the policy discretionary. This case is unique, however, in that the safety of Trooper Kurtz ceased to be a consideration when he was evaded by Bourassa and when Neuenfeldt only then became the primary pursuer. In fact, because of Neuenfeldt's continued pursuit, Bourassa subsequently ran tribal officer Brian Arnold off the road. The Court therefore finds that under section 2-24-09(B)(3) of the Law Enforcement Handbook, Officer Neuenfeldt did not have discretion to continue the pursuit once Trooper Kurtz lost contact with Bourassa. There were no safety considerations for Trooper Kurtz. The policy provides that absent considerations of officer safety, an officer "will discontinue" a pursuit initiated by another jurisdiction.

Count I is a negligence claim unlike Count III which is an assault and battery claim which is being dismissed against the United States for reasons set out elsewhere in this opinion. Plaintiffs did and are entitled to set out claims in the alternative. Under these facts as found by the Court, the Court does have jurisdiction under the FTCA over Plaintiffs' claim for negligence alleged in Count I of the Second Amended Complaint.

## II.    Count V – Negligent Supervision and Training

The section 638 contract by and between the Tribe and the Federal government provides that "[t]he [Tribe] shall be responsible for managing the day-to day operations conducted under this Contract and for monitoring activities conducted under this Contract to ensure compliance with the Contract and applicable Federal requirements." Among other things, the section 638 contract provides that "[t]he [Tribe] shall ensure that newly employed law enforcement officers successfully complete the approved Basic Police Officer Training Program conducted at the Indian

Police Academy, or equivalent training," and that "the [Tribe] will be responsible to ensure that, in accordance with 25 C.F.R. Subpart D, 12.32, a thorough background investigation is completed on applicants for all law enforcement positions." (Doc. 85-2). The Tribe is required to "administer the program, services, functions and activities . . . of the Contract in conformity with," among other things, 25 C.F.R. Part 12 (April 1, 2009) and the Bureau of Indian Affairs' Law Enforcement Services Handbook ("BIA Law Enforcement Handbook"). Plaintiffs argue that the United States had an obligation to ensure compliance with these mandatory standards governing the Tribe's training and supervision of tribal law enforcement officers operating under the section 638 contract. Plaintiffs argue that under 25 C.F.R. § 12.12, the Government was obligated "to ensure compliance with the federal standards required of law enforcement programs in place for the Flandreau Santee Sioux Reservation." (Doc. 140 at 3321), (Doc. 126 at 3163) ("The Government was aware Officer Neuenfeldt was enforcing law without mandatory proper training and had a duty to fix those deficiencies. The Government chose to write letters without consequence, when it was required to ensure the Tribe and Officer Neuenfeldt were in compliance with the federal directives and statutes."). Specifically, 25 C.F.R. § 12.12 provides that:

> The regulations in this part are not intended to discourage contracting of Indian country law enforcement programs under the Indian Self-Determination and Education Assistance Act (Pub. L. 93-638, as amended, 25 U.S.C. 450). The Deputy Commissioner of Indian Affairs will ensure minimum standards are maintained in high-risk activities where the Federal government retains liability and the responsibility for settling tort claims arising from contracted law enforcement programs. It is not fair to law abiding citizens of Indian country to have anything less than a professional law enforcement program in their community. Indian country law enforcement programs that receive Federal funding and/or commissioning will be subject to a periodic inspection or evaluation to provide technical assistance, to ensure compliance with minimum Federal standards, and to identify necessary changes or improvements to BIA policies.

*What About Self-Determination?*, 25 C.F.R. § 12.12.

Plaintiffs argue that the Government failed to ensure compliance with certain mandatory federal standards governing training and supervision of tribal law enforcement officers operating under a section 638 contract. Plaintiffs argue that "the federal standards the Government agreed to uphold that relate to training, supervision, and retention," include the following:

> Law enforcement personnel of any program funded by the Bureau of Indian Affairs must not perform law enforcement duties until they have successfully completed a

19

basic law enforcement training course prescribed by the Director.  The Director will also prescribe mandatory supplemental and in-service training courses.

*Do Indian Country Law Enforcement Officers Complete Any Special Training*, 25 C.F.R. § 12.35. Plaintiffs state that under the section 638 contract, the Tribe was required to comply with the BIA Law Enforcement Handbook which provides "[a]ll individuals hired for the position of law enforcement officer . . . must successfully complete the approved Basic Law Enforcement Training Program prior to appointment as a law enforcement officer. . . ."  (Doc. 140 at 3322 (citing Doc. 85-3 at 632-35)).  In the event that a tribal law enforcement officer had prior state-level training, Plaintiffs argue that the Government was required to ensure that the officer obtain the necessary waiver under 25 C.F.R. § 12.36 before performing law enforcement functions.  (Doc. 140 at 3322-23).  25 C.F.R. § 12.36 provides that:

> All requests for evaluation of equivalent training must be submitted to the Indian Police Academy for review, with final determination made by the Director. Requests for a waiver of training requirements to use personnel before completing the required courses of instruction must be submitted to the Director and approved or disapproved by the Commissioner of Indian Affairs.  In no case will such a waiver allow personnel to be used in any position for more than one year without achieving training standards.  Failure to complete basic training requirements will result in removal from a law enforcement position.

*Does Other Law Enforcement Training Count*, 25 C.F.R. § 12.36.  Plaintiffs argue that the Government also failed to ensure that Neuenfeldt was undergoing a "minimum of forty hours of in-service training."  (Doc. 140 at 3326 (citing Doc. 85-3 at 1891).  The BIA Law Enforcement Handbook provides that "[a]ll law enforcement personnel will receive a minimum of forty hours of in-service training annually to meeting training needs and to keep abreast of developments in the field of law enforcement."  (Doc. 85-3 at 1894).  Plaintiffs' expert, John Long, opines that the training completed by Neuenfeldt at the South Dakota State Academy "does not constitute sufficient IPA training on criminal jurisdictional in Indian County."  (Doc. 127-1 at 3168). Plaintiffs argue that the areas of training Officer Neuenfeldt would have received addressed the numerous areas in which he was negligent on the night and the morning of June 17-18, 2017. (Doc. 140 at 3319).  Finally, Plaintiffs argue that the United States breached its duty to ensure that a proper background investigation had been conducted for Neuenfeldt as is required under 25 C.F.R. § 12.32 which provides:

Law enforcement authority is only entrusted to personnel possessing adequate education and/or experience, training, aptitude, and high moral character. All Indian country law enforcement programs receiving Federal funding and/or authority must ensure that all law enforcement officers successfully complete a thorough background investigation no less stringent than required of a Federal officer performing the same duties. The background investigations of applicants and employees must be adjudicated by trained and qualified security professionals. All background investigations must be documented and available for inspection by the Bureau of Indian Affairs.

*Do Minimum Employment Standards Include a Background Investigation*, 25 C.F.R. § 12.32.

Plaintiffs argue that the Government failed in its duty to ensure compliance with the mandatory training and background check requirements as they relate to Neuenfeldt. (Doc. 140 at 3328). Plaintiffs state that the letters sent by the BIA to the Tribe threatening consequences for the Tribe's failure to comply with these requirements did not fulfill the Government's duty to ensure compliance with federal regulations governing training and background investigations. Plaintiffs argue that "[i]f the Government would have 'ensured compliance' with the mandates governing the [Tribe's] police program . . . Neuenfeldt, would have, at the very least, been behind a desk on the night of June 17, 2017." (Doc. 140 at 3328). Plaintiff's expert, John Long, opines that the Government should have done more to ensure that Officer Neuenfeldt was operating appropriately as a federal law enforcement officer. (Doc. 140 at 3331-32). Mr. Long has stated in his report that "[i]n order to ensure compliance with the [638 contract], the [BIA] has the ability to reassume a tribal law enforcement program . . . [and] can also withhold future funding as current year funding is awarded on October 1st." (Doc. 127-1 at 3168). Mr. Long stated that "BIA OJS had a duty to conduct onsite inspection of the [Tribe] and if correctable issues were found onsite, the [BIA] team should have worked with tribal or BIA program to correct the deficiencies." (Doc. 127-1 at 3168). Mr. Long opines that "[i]f the BIA OJS had resumed the tribal law enforcement program, which should have occurred, the law enforcement for the [T]ribe would be provided by the BIA . . . [and] [t]he BIA officers would have been properly trained." (Doc. 127-1; 140 (referencing "John Long discussing that the BIA could have reassumed the tribal law enforcement program or withheld federal funding, but did not")).

In order to determine whether the Government's duty to ensure compliance with the training and background investigation requirements was discretionary, and thus falls within the discretionary function exception to the FTCA, the Court must apply the two-prong test enunciated

by the Supreme Court in *Berkovitz v. United States*, 486 U.S. 531 (1988). In analyzing the first prong, an act is not considered discretionary if a federal statute, regulation, policy, or internal agency guideline "specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536; *United States v. Gaubert*, 499 U.S. 315, 324 (1991) (acknowledging that not all agencies issue comprehensive regulations and that an agency may instead rely on internal guidelines for binding directives). In the present case, Plaintiffs have presented no statute, regulation, policy or agency guideline that prescribes a course of action that the United States must follow should, as Plaintiffs argue, the Tribe be out of compliance with training and background investigation requirements for tribal law enforcement officers operating under a section 638 contract. Here, the Annual Funding Agreement provides that the BIA "shall provide technical assistance and guidance, as needed, to the Tribe," and that "the Awarding Official and/or the Awarding Official's Technical Representative will monitor [the Tribe's] performance under th[e] contract," including, but not limited to "periodic on-site technical assistance visits, as needed and/or requested by the Contractor." (Doc. 93-1 at 2287). On December 7-9, 2015, approximately two months into the term of the Tribe's 638 contract, the BIA performed a three-day audit of the Tribe's law enforcement operations. (Doc. 140 at 3328 (citing Doc. 85-6 at 1957)). In a December 30, 2015, letter, the BIA notified the Tribe of several ways in which the Tribe was out of compliance with the section 638 contract and Federal regulations. (Doc. 85-6 at 1957). After Neuenfeldt was hired by the Tribe in January 2016, the BIA sent two follow up letters again notifying the Tribe that a background investigation had not been conducted on its law enforcement officers and offering to continue to provide technical assistance to the Tribe. (Doc. 140 at 3328 (citing Doc. 85-6 at 1959-60). In both letters, the BIA warned the Tribe that if it was unable to comply with the terms of the section 638 contract, it could retrocede the contract or the BIA may be compelled to proceed with reassumption of the contract. (Doc. 85-6 at 1960, 1962). In the April 18, 2017, letter, the BIA offered to assist the Tribe with completion of the background investigation and warned the Tribe that its failure to comply with this requirement could also result in suspension, withholding, or delay in payment of funds under the contract. The section 638 contract provides that the Government may terminate the contract by resuming the contract or operation of the contracted program without the consent of the Tribe. (Doc. 93-1 at 2278, 2292). Although Mr. Long opines that the Government should have reassumed the section 638 contract after noting several

deficiencies, there is no statute, regulation, policy, or agency guideline that obligates the Government to do so nor prescribes a specific course of action the Government must follow in the event the Tribe is noncompliant with its obligations under the contract or under Federal regulations.   For example, there is nothing that provide that after 6 months or a year of noncompliance or after 3 warnings, the Government may withhold funding or reassume the contract.

With regard to the second prong of the discretionary function exception test, the Court finds that the Government's discretion to work with the Tribe to ensure compliance with the section 638 contract and Federal regulations is grounded in public policy.  As this Court noted in *Val-U Const. Co. of S.D., Inc. v. United States*, 905 F.Supp. 728, 737 (D.S.D. 1995), the stated purpose of the Indian Self-Determination and Education Assistance Act is to assure "maximum Indian participation in the direction . . . of services to Indian communities, 25 U.S.C. § 450a(a) (1983), through 'effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.'"  When the Government must choose to withhold contract funding or reassume a section 638 contract is the type of conduct that is not subject to judicial second-guessing.

## III.    Count V - Negligent Hiring and Retention

Plaintiffs also argue that the United States is negligent under Count V of the Second Amended Complaint for retaining Officer Neuenfeldt, knowing he lacked the mandatory training and background check. (Doc. 140 at 3320).  Plaintiffs argue that "[t]he Government was mandated to ensure that Neuenfeldt was sitting behind a desk until he had been adequately trained and a background check had been completed" and "was required to ensure that Neuenfeldt either completed his training or was removed as an officer." (Doc. 140 at 3334-35).  In support of their position, Plaintiffs cite 25 C.F.R. § 12.35 and § 12.36.

25 C.F.R. § 12.35 provides as follows:

Law enforcement personnel of any program funded by the Bureau of Indian Affairs must not perform law enforcement duties until they have successfully completed a basic law enforcement training course prescribed by the Director.  The Director will also prescribe mandatory supplemental and in-service training courses.

25 C.F.R § 12.35, *Do Indian Country Law Enforcement Officers Complete Any Special Training*.

25 C.F.R. § 12.36 provides as follows:

> All requests for evaluation of equivalent training must be submitted to the Indian Police Academy for review, with final determination made by the Director. Requests for a waiver of training requirements to use personnel before completing the required courses of instruction must be submitted to the Director and approved or disapproved by the Commissioner of Indian Affairs. In no case will such a waiver allow personnel to be used in any position for more than one year without achieving training standards. Failure to complete basic training requirements will result in removal from a law enforcement position.

25 C.F.R. § 12.36, *Does Other Law Enforcement Training Count*.

"A negligent retention claim alleges that information which the employer came to know or should have become aware of, after hiring the employee made continued employment of the employee negligent." *Kirlin v. Halverson*, 758 N.W.2d 436, 452 (S.D. 2008). Plaintiffs argue that the Government was aware that Neuenfeldt lacked an adequate background check and training because Special Agent in Charge Joel Chino Kaydahzinne sent letters to the Tribe indicating that uniformed officers employed by the Tribe were unable to provide documentation verifying they had completed background checks or that they had completed training or requested a waiver. (*See* Doc. 140 at 3331) (citing Doc. 85-6 at 1957-58, 1961-62).

Plaintiffs also argue as part of their negligent supervision claim that the Government was negligent in ensuring that an adequate background investigation was performed for Neuenfeldt. (Doc. 140 at 3319). Plaintiffs argue that such a background investigation is mandated by 25 C.F.R. § 12.32 which provides as follows:

> Law enforcement authority is only entrusted to personnel possessing adequate education and/or experience, training, aptitude, and high moral character. All Indian country law enforcement programs receiving Federal funding and/or authority must ensure that all law enforcement officers successfully complete a thorough background investigation no less stringent than required of a Federal officer performing the same duties. The background investigations of applicants and employees must be adjudicated by trained and qualified security professionals. All background investigations must be documented and available for inspection by the Bureau of Indian Affairs.

25 C.F.R. § 12.32, *Do Minimum Employment Standards Include a Background Investigation*.

Under South Dakota law, an alleged failure to perform a background check relates to a negligent hiring claim, not a negligent supervision claim. "[A] negligent hiring claim suggests

that at the time an employee was hired it was negligent for an employer to engage the employee's services based on what the employer knew or should have known about the employee." *Kirlin v. Halverson*, 758 N.W.2d 436, 452 (S.D. 2008). The scope of the employer's duty of reasonable care in hiring an employee "focuses on the job duties for which the employee is being hired in relation to persons the employer would reasonably foresee the employee coming into contact with through the employment." *Raleigh v. Performance Plumbing & Heating*, 130 P.3d 1011, 1018-19 (Colo. 2006) (*en banc*); *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907, 911 (Minn. 1983). The South Dakota Supreme Court has held that the duty of reasonable care in hiring may require an employer to conduct a background investigation of an employee who makes frequent contact with the public. *Iverson v. NPC Int'l, Inc.*, 801 N.W.2d 275, 280 (S.D. 2011) (citing *McGuire v. Curry*, 766 N.W.2d 501, 507 (S.D. 2009).

The Government argues that this Court does not have jurisdiction over Plaintiffs' negligent hiring and negligent retention claims because they failed to present them to the appropriate Federal agency. Before the United States can be sued under the FTCA, "the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency. . . ." 28 U.S.C. § 2675(a). The presentment requirement is a "jurisdictional precondition to filing a FTCA suit in federal district court." *Mader v. United States*, 654 F.3d 794, 805 (8th Cir. 2011) (*en banc*).

Although the Eighth Circuit has held it will "liberally construe an administrative charge for exhaustion of remedies purposes," it has also noted the distinction between a claim lacking specificity and a claim which was never made. *Hennager v. United States*, Civ. No. 3:19-259, 2020 WL 7295832, at *5 (D.N.D. Nov. 4, 2020) (citing *Allen v. United States*, 590 F.3d 541, 544 (8th Cir. 2009), *report and recommendation adopted*, Civ. No. 3:19-258, 2020 WL 7024481 (D.N.D. Nov. 30, 2020). A plaintiff may not proceed with a claim in federal district court where crucial facts forming the basis of that claim were omitted from the administrative claim. *Id.*; *see also Edwards v. United States*, 57 F.Supp.3d 938, 949 (D. Minn. 2014) (citing *Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 722 (7th Cir. 2012) ("The administrative claim need not set forth a legal theory, but must allege facts that would clue a legally trained reader to the theory's applicability."); *Parker v. United States*, Civ. No. 8:18-123, 2018 WL 4953013, at *5 (D. Neb. Oct. 11, 2018) (same).

The Court finds that even liberally construing Plaintiffs' administrative complaint, they have failed to allege facts to support a negligent hiring or negligent retention claim. All of the facts presented in Plaintiffs' administrative complaints regard Officer Neuenfeldt's pursuit-related conduct and violations of pursuit policy. (Docs. 66-1; 66-2). There are no facts in Plaintiffs' administrative claims suggesting that at the time that Officer Neuenfeldt was hired, that the Government knew or should have known that he presented a danger to persons which whom the Government would reasonably foresee Neuenfeldt coming into contact with through his employment. In addition, the Court finds that Plaintiffs' administrative complaint is completely devoid of any facts suggesting that after hiring Neuenfeldt, the Government became aware of or should have been aware of information that made Neuenfeldt's continued employment negligent. (*See* Docs. 66-1; 66-2).

Plaintiffs do not argue that they failed to administratively present claims for negligent hiring or retention, but argue instead that the Court should consider these claims because they did not believe they had the factual basis for such claims at the time they filed their claims administratively. (Doc. 109 at 2629, n.12). Plaintiffs have provided no legal authority to support this argument. Because Plaintiffs failed to present their claims for negligent hiring and retention, this Court does not have jurisdiction over these claims.

## IV.   Is the negligence claim in Count I and the assault and battery claim in Count III barred under the intentional tort exception to the FTCA.

The intentional tort exception preserves the Government's immunity from suit for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). Courts refer to section 2680(h) as the "intentional tort exception." *Levin*, 568 U.S. 503, 507 (2013). In 1974, Congress carved out an exception to 2680(h)'s preservation of the United States' sovereign immunity for intentional torts by adding a proviso, also known as "the law enforcement proviso," covering claims that arise out of the wrongful conduct of law enforcement officers. *Milbrook v. United States*, 569 U.S. 50, 52 (2013) (citing Act of Mar. 16, 1974, Pub. L. 93-253, § 2, 88 Stat. 50).

The United States argues that Neuenfeldt was not a federal investigative or law enforcement officer pursuant to the law enforcement proviso and therefore, the United States has

not waived its immunity for Plaintiffs' assault and battery claim alleged in Count III or for any claims that "arise out of" the assault or battery.  The United States argues that Plaintiffs' claim for negligence alleged in Count I and Plaintiffs' claim of negligent training, supervision, and retention alleged in Count V "arise out of" Plaintiffs' assault and battery claim and therefore must also be dismissed under the intentional tort exception to the FTCA.  The Court has already concluded that Plaintiffs' FTCA claim alleging negligent supervision and training in Count V of the Second Amended Complaint is barred by the discretionary function exemption.  The Court will therefore focus its analysis of the intentional tort exception as it relates to Plaintiffs' claim for negligence alleged in Count I and claim for assault and battery alleged in Count III.

### A.    Count III – Assault and Battery Claim

Plaintiffs argue that the United States has waived its immunity as to the Count III assault and battery claim under the law enforcement proviso.  The "law enforcement proviso," extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the "acts or omissions of investigative or law enforcement officers."  28 U.S.C. § 2680(h).  The proviso defines "investigative or law enforcement officer" to mean "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  *Id.*

The Government argues in opposition that Neuenfeldt was not a "federal law enforcement officer" for purposes of the law enforcement proviso of the FTCA because the BIA had not issued him a Special Law Enforcement Commission ("SLEC") and he was not acting pursuant to a cross deputization agreement.  (Doc. 97 at 2467).

In response, Plaintiffs argue that nowhere in the language of the statute does it require a tribal officer to have a SLEC card or be cross deputized and that reading such language in the statute would run afoul of the Supreme Court's broad interpretation of the law enforcement proviso in *Millbrook v. United States*, 569 U.S. 50 (2013).  (Doc. 109 at 2614).  In *Millbrook*, the plaintiff had alleged that he had been sexually assaulted by a BOP correctional officer.  569 U.S. at 51. The Government contended that section 2680(h)'s law enforcement proviso did not save Millbrook's claims because of the Third Circuit's binding precedent in *Pooler v. United States*, 787 F.2d 868 (1986), which interpreted the proviso to apply only to tortious conduct that occurred during the course of "executing a search, seizing evidence, or making an arrest."  *Id.* at 53.  The

district court agreed and granted summary judgment for the United States because the alleged conduct "did not take place during an arrest, search, or seizure of evidence" and the Third Circuit affirmed. *Id.* at 53-54.

On appeal, the Supreme Court reversed. *Id.* at 57. The Court stated that "[u]nder the proviso, an intentional tort is not actionable unless it occurs while the law enforcement officer is 'acting within the scope of his office or employment.'" *Id.* at 57 (quoting § 2680(h)). The Court found that "[n]othing in the text further qualifies the category of 'acts or omissions' that may trigger FTCA liability. . .[n]or does the text of the proviso provide any indication that the officer must be engaged in 'investigative law enforcement activity.'" *Id.* at 55, 56. The Court stated that "[h]ad Congress intended to further narrow the scope of the proviso, Congress could have limited it to claims arising from 'acts or omissions of investigative or law enforcement officers acting in a law enforcement or investigative capacity." *Id.* at 57 (citing *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008)). The Court declined to read such an interpretation into unambiguous text. *Id.*

Plaintiffs argue that under the plain text of the law enforcement proviso exception and the *Millbrook* Court's broad interpretation of that exception, Neuenfeldt was a "law enforcement officer" when he engaged in the high speed pursuit of Bourassa because he was "an[] officer of the United States . . . empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." (Doc. 109 at 2608 citing 28 U.S.C. § 2680(h)). Plaintiffs argue that Neuenfeldt was empowered with apparent authority by the federal government to execute searches, seize evidence, or make arrests for violations of federal law and points to the following deposition testimony by Neuenfeldt to support their claim that Neuenfeldt had such apparent authority:

Q.    And during the time that you were the chief and before that when you were a tribal officer before the elevation to chief you made arrests on the reservation?

A.    Yes.

Q.    Okay.  And that included violations of tribal laws?

A.    Yep.

Q.    Included violations of federal laws?

A.    Yep.

Q.      Did you conduct searches, sir?

A.      Yes.

Q.      Okay.  And so when I say that, I'm including not only searches of a person's body, but it may be their vehicle or even where they live at times?

A.      Correct.

Q.      Okay.  And you seized evidence?

A.      Yes.

Q.      Okay.  And can you tell me, what kinds of evidence would you seize?

A.      Oh, we had counterfeit monies, drugs, drug paraphernalia, open containers, alcohol, marijuana.

Q.      Okay.  And you arrest people for violations of federal laws?

A.      We – I did do a federal search warrant.  I guess that would be – would that be federal law?

Q.      Sure.

A.      Or a federal arrest warrant.

Q.      Okay.  And that was on the Flandreau Santee Sioux Tribe Reservation?

A.      Correct.

Q.      And that federal arrest warrant then included taking someone into custody, and even though it was prosecuted perhaps in the federal courts in Sioux Falls, you executed this federal arrest warrant on tribal land or Indian Country?

A.      Correct.

Q.      And before I go onto those other crimes, Rob, that federal arrest warrant was for what, do you remember?

A.      I believe it was for parole – a parole violation.

Q.      Okay.  And did you have the opportunity to arrest people for things like assaults?

A.      Assaults, domestics, yes.

Q.      Okay.  Robbery?

A.      I am not sure I did one of those, but we could have.

(Doc. 109 at 2603-04) (citing Doc. 110, Ex. 4 Roemen Dep. at 8:8-10:6).  Plaintiffs also state Neuenfeldt believed that he and other tribal officers had authority to enforce violations of federal law.  Plaintiffs argue that it was the federal government's negligence in the training, supervision, and retention of Neuenfeldt that vested Neuenfeldt with apparent authority to execute searches,

seize evidence, or make arrests in violation of federal law.  (*See* Doc. 109 at 2619).  Plaintiffs argue that the government never told Neuenfeldt to stop enforcing federal law and that the government knew that Neuenfeldt was not properly trained and never told him that he needed a SLEC to operate as a federal law enforcement officer.  (Doc. 109 at 2606, at 2618.).  Plaintiffs argue that because Neuenfeldt was empowered with apparent authority to execute searches, seize evidence, or make arrests in violation of federal law, he was a "federal law enforcement officer" under the FTCA, and the United States may be liable under the FTCA for Neuenfeldt's intentional torts under the law enforcement proviso.  (Doc. 109 at 2619).

The Court finds that there is nothing in *Millbrook* or in the other federal cases cited by Plaintiffs that provide that the United States has waived is immunity under the law enforcement proviso if an officer of the United States has apparent authority[2] to execute searches, seize evidence, or make arrests in violation of federal law.  In fact, in *Millbrook*, the Court stated the "[t]he plain text [of the law enforcement proviso] confirms that Congress intended immunity determinations to depend on a federal officer's *legal* authority. . . [,]" not the officer's apparent authority.  569 U.S. at 56.  The correctional officer's legal authority in *Millbrook* was not at issue, as the government had conceded that the officer was "empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law."  *Id.* at 55, n.3.  Here, however, the United States strongly contests that Neuenfeldt had legal authority to execute searches, to seize evidence, or to make arrests for violations of federal law because he did not have a SLEC card, nor was he cross-deputized.

In *Iverson v. United States*, which was issued after the *Millbrook* decision and which was cited by Plaintiffs in their brief, the Eighth Circuit Court of Appeals stated that when evaluating if an actor is empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law, a court must "look to whether there is a specific statutory grant of authority to search, seize, or arrest."  973 F.3d 843, 850 (8th Cir. 2020).  The court stated that dictionaries from the time Congress enacted the law enforcement proviso defined "empower" as "to give official authority to" or to "delegate legal power to."  *Id.* at 850-51 (citing *Empower*, Webster's Third New Int'l Dictionary (1971)).  The *Iverson* court stated that under this definition,

---

[2] Under South Dakota law, apparent authority is "such as a principal intentionally, or by want of ordinary care, causes or allows a third person to believe the agent to possess."  *Dahl v. Sittner*, 429 N.W.2d 458, 462 (S.D. 1988) (citing SDCL § 59-3-3).

transportation security officers were empowered under 49 U.S.C. § 44901(a), (g)(4) to carry out screenings of all passengers and property that will be carried aboard a passenger aircraft and that authorized physical searches were one means to complete that duty. *Id.* at 851. The court stated that the screenings by transportation security officers fell within the ordinary meaning of the term "search" and concluded accordingly that TSOs are therefore "empowered by law to execute searches." *Id.* at 851; *accord Pellegrino v. U.S. Transp. Sec. Admin.*, 937 F.3d 164, 172 (3d Cir. 2019).

In *Bunch v. United States*, 880 F.3d 938 (7th Cir. 2018), which was also cited by Plaintiffs in their brief, a fire had consumed the plaintiff's home, claiming the life of her three-year-old son. *Id.* at 940. Ultimately, the plaintiff was convicted for her son's murder. *Id.* at 939. The conviction rested on testimony and evidence apparently fabricated by the federal forensic chemist and the plaintiff served 17 years in state prison. *Id.* at 940. The plaintiff brought an action against the United States under the FTCA alleging malicious prosecution and intentional infliction of emotional distress. *Id.*

In determining whether the chemist was empowered by law to execute searches or seize evidence, the court in *Bunch*, much like the Eighth Circuit in *Iverson*, examined whether the chemist was authorized by statute to execute searches or seize evidence for violations of federal law. *See id.* at 943. Pursuant to the Secretary's statutory authority to promulgate regulations to carry out these powers, the Secretary enacted 27 C.F.R. Part 55 which authorized "[a]ny ATF officer" to "inspect the site of any accident or fire in which there is a reason to believe that explosive materials were involved" or to "enter into or upon any property where explosive materials have been used, are suspected of having been used, or have been found in an otherwise unauthorized location." *Id.* (quoting 27 C.F.R. § 55.31 (1995)." "ATF officer" was defined as "[a]n officer or employee of the Bureau of Alcohol, Tobacco and Firearms (ATF) authorized to perform any function related to the administration or enforcement of this part." *Id.* (citing 27 C.F.R. § 55.11).

On appeal, the Seventh Circuit Court of Appeals in *Bunch* found that the reference in section 55.11 to ATF officers or employees "authorized to perform *any* function related to the administration or enforcement of this part" could support a finding that ATF officers or employees in the forensic chemists' position have the necessary powers to qualify for the investigative or law

enforcement officer. *Id.* at 943. The court concluded that there were questions of material fact as to whether a forensic chemist with the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") was a federal investigative officer who was empowered by statute to execute searches and seize evidence, reversed the district court's grant of summary judgment, and remanded for further proceedings. *See id.* at 943 ("The materials presented to the district court at summary judgment stage do not foreclose the possibility that the law empowered [the chemist] and his fellow chemists) to execute searches or to seize evidence.").

Unlike in *Bunch* or *Iverson*, it is undisputed that Neuenfeldt did not have statutory or regulatory authority to enforce federal law at the time of the incidents in question. Federal regulations provide that the "BIA may issue law enforcement commissions to . . . tribal full-time certified law enforcement officers to obtain active assistance in enforcing applicable Federal criminal statues, including Federal hunting and fishing regulations, in Indian country." 25 C.F.R. § 12.21. The BIA will issue commissions to . . . tribal full-time certified law enforcement officers only after the head of the local government of Federal agency completes an agreement with the Commissioner of Indian Affairs asking that BIA issue delegation commissions. 25 C.F.R. § 12.21(a). "The agreement must include language that allows the BIA to evaluate the effectiveness of these special law enforcement commissions and to investigate any allegations of misuse of authority." *Id.* "Tribal law enforcement officers operating under a BIA contract or compact are not automatically commissioned as Federal officers; however, they may be commissioned on a case-by-case basis." 25 C.F.R. § 12.21(b). As part of its evidence that jurisdiction is lacking in this case, the United States presented the Declaration of Joel Chino Kaydahzinne who served during this time as the Assistant Special Agent in Charge for the BIA, Office of Justice Services, located in Aberdeen, South Dakota, for the area including the Flandreau Santee Sioux Indian Reservation. (Doc. 92, ¶ 2). Mr. Kaydahzinne affirmed under penalty of perjury that the BIA did not have a SLEC or deputization agreement with the Tribe, and that absent a SLEC or deputization agreement, the BIA would not have issued a SLEC to Neuenfeldt. (Doc. 92, ¶ 8). Mr. Kaydahzinne further affirmed that Neuenfeldt did not possess a special law enforcement commission ("SLEC") prior to or at the time of the incident and was thus not legally commissioned to enforce federal law. (Doc. 92, ¶ 8). Plaintiffs have failed to produce evidence to controvert this Declaration. Instead, as discussed above, Plaintiffs argue that Neuenfeldt was a federal law enforcement officer because, due to the government's alleged negligence in supervising, training,

and retaining Neuenfeldt, he was empowered with apparent authority by the federal government to execute searches, seize evidence, or make arrests for violations of federal law. As the Court has already determined, under *Iverson*, in order to qualify as a federal law enforcement officer under the law enforcement proviso of the FTCA, Neuenfeldt must have statutory or regulatory authority to execute searches, to execute searches, to seize evidence, or to make arrests for violations of federal law. It is undisputed that Neuenfeldt did not have such authority in this case because there was no cross deputization agreement nor did he have an SLEC. [3] Accordingly, the United States has not waived its immunity under the law enforcement proviso for Count III of Plaintiff's Second Amended Complaint alleging assault or battery.

### B. Count I – Negligence Claim

"Section 2680(h) does not merely bar claims for assault or battery; in sweeping language it excludes any claim arising out of assault or battery . . . to cover claims . . . that sound in negligence but stem from a battery committed by a Government employee." *United States v. Shearer*, 473 U.S. 52, 55 (1985). The United States argues that Plaintiffs' negligence claim alleged in Count I is barred by sovereign immunity because it "arises out of" the assault and battery and thus falls within the intentional tort exception to the FTCA. (Doc. 117 at 3059).

To determine whether the intentional tort exception applies, courts should examine the conduct underlying the claim, not merely how the claim is labeled in the complaint. *Larson v. United States*, 2021 WL 3634149, at *4 (D.S.D. Aug. 17, 2021), *aff'd*, 2022 WL 1494239 (8th Cir. 2022) (citing *United States v. Neustadt*, 366 U.S. 696, 703 (1961) ("We must . . . look beyond the

---

[3]     Other federal courts, including courts within the District of South Dakota have come to a similar conclusion. *See, e.g. Gatling v. United States*, Civ. No. 15-08070, 2016 WL 147920, at *3 (D. Ariz. Jan. 13, 2016) ("[T]he FTCA federal law enforcement officer exception to the intentional tort exception does not apply to tribal officers not in possession of an SLEC."); *United States v. Cleveland*, 356 F.Supp.3d 1215 (D.N.M. 2018) (providing that a tribal officer without a SLEC is not a federal employee for purposes of the FTCA); *Buxton v. United States*, Civ. No. 09-5057, 2011 WL 4528337, at *2 (D.S.D. Apr. 1, 2011*), report and recommendation adopted by*, 2011 WL 4528329 (D.S.D. Sept. 28, 2011) (holding that because none of the tribal officers have held special law enforcement, they are not federal "investigative or law enforcement officers of the United States Government"); *Bob v. United States*, Civ. No. 07-5068, 2008 WL 818499, at *2 (D.S.D. Mar. 26, 2008) (holding that because none of the tribal officers have held special law enforcement commissions nor were cross-deputized with another federal agency, they are not federal "investigative or law enforcement officers"); *Blacksmith v. United States*, Civ. No. 06-5022, 2008 WL 11506053, at *5 (D.S.D. Jan. 16, 2008) (finding that tribal officer was not acting as a federal officer because he has never held a SLEC nor has he been cross-deputized by the BIA, the FBI, or any federal agency).

literal meaning of the language to ascertain the real cause of the complaint")); *Gross v. United States*, 676 F.2d 295, 305 (8th Cir. 1982) (Gibson, J., dissenting) ("Unless a court looks at the acts giving rise to a complaint, the applicability of the FTCA will depend on the ingenuity of counsel in drafting the complaint."). Plaintiffs cannot circumvent section 2680(h) through "artful pleading of the claim." *Moeller v. United States*, Civ. No. 3:21-3012, 2021 WL 5771185, at *4 (D.S.D. Dec. 6, 2021) (quoting *Buxton v. United States*, Civ. No. 09-5057, 2011 WL 4528337, at *11 (D.S.D. Apr. 1, 2011)); *Shearer*, 473 U.S. at 55 (explaining that the plaintiff could not avoid the reach of § 2680(h) by framing her complaint in terms of negligence when the sweeping language of § 2680(h) excludes any claim arising out of assault or battery).

"In contrast, if a plaintiff bases a claim on conduct that does not constitute a claim 'arising out of' a tort specified in section 2680(h), then the plaintiff's suit is not barred." *Truman v. United States*, 26 F.3d 592, 595 (5th Cir. 1994).

> Even in cases in which the facts alleged in a complaint have two distinct aspects that may give rise to two similar torts, "the partial overlap between . . . two tort actions does not support the conclusion that if one is excepted under the Tort Claims Act, the other must be as well. Neither the language nor history of the Act suggests that when one aspect of the Government's conduct is not actionable [because it constitutes a tort enumerated in section 2680(h)], a claimant is barred from pursuing a distinct claim arising out of other aspects of the Government's conduct.

*Id.* (quoting *Block v. Neal*, 460 U.S. 289, 298 (1983)); *see also Limone v. United States*, 579 F.3d 79, 92 (1st Cir. 2009) ("[I]f there is merely a loose connection, a family resemblance, or even a partial overlap between the conduct on which the asserted claim rests and that comprising an excepted tort, the claim is not barred by section 2680(h).").

When an element of an excepted tort is missing from the factual scenario, the claim does not come within the exception. *Limone*, 579 F.3d at 93; *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 854 (10th Cir. 2005); *Truman*, 36 F.3d at 596 ("In her amended complaint, Truman did not allege that any offensive contact directly or indirectly resulted from Whittaker's actions. It follows that Truman's claim cannot arise out of battery."). Under South Dakota law, in order to state a claim for civil assault or battery, a plaintiff must allege that he was suffered a harmful or offensive contact or the imminent apprehension of such contact. S.D. Pattern Jury Instructions, *Battery* § 20-160-20 ("Battery is the intentional harmful or offensive physical contact upon another person."); S.D. Pattern Jury Instructions, *Assault* § 20-160-10 ("Assault

occurs when a person acts with the intent to cause a harmful or offensive physical contact against another, or the imminent apprehension of such contact, and puts that person in imminent apprehension of the contact, but the harmful or offensive contact does not occur."); Restatement (Third) of Torts: *Intentional Torts to Persons* § 101(b), cmt. b (tentative draft no. 1 Apr. 8, 2015) ("Harmful battery liability provides a remedy, not simply for conduct causing bodily harm, but for conduct causing such harm in a particular way—by intentionally contacting the plaintiff's person."); Restatement (Third) of Torts: *Intentional Torts to Persons* (tentative draft no. 5 Apr. 15, 2020) (noting approval of tentative draft no. 1, § 101(a)-(c) at the 2015 annual meeting).  Here, there is no allegation, nor did Plaintiffs cite to any facts that would justify an inference that Neuenfeldt caused Roemen and Ten Eyck to have an imminent apprehension of a harmful or offensive contact with their person.  Neither are there any allegations or facts suggesting that Neuenfeldt made personal contact with Plaintiffs or even with Bourassa's vehicle[4].  Because Plaintiffs have not alleged that they suffered a harmful or offensive contact that would be actionable under South Dakota battery law, nor that Plaintiffs had an imminent apprehension of such contact, it follows that Plaintiffs negligence claim cannot arise out of an assault or battery. *See Truman*, 36 F.3d at 596 ("In her amended complaint, Truman did not allege that any offensive contact directly or indirectly resulted from Whittaker's actions.  It follows that Truman's claim cannot arise out of battery.").  Plaintiffs' negligence claim is therefore not barred under the intentional tort exception.

Accordingly, it is hereby ORDERED:

1.  Defendant, United States' Motion to Strike the Expert Report of Plaintiffs' proposed expert, John Long, (Doc. 128) is DENIED; the United States will be permitted to depose Mr. Long;

---

[4]    "[T]he contact requirement is satisfied in cases where the actor directly contacts something closely connect to plaintiff's body. . . Thus, a touching is legally sufficient if the actor contacts, not the plaintiff's body, but instead an object that the plaintiff is holding, or the plaintiff's clothing, or the chair upon which plaintiff is sitting." Restatement (Third) of Torts: Intentional Torts to Persons § 101(b), cmt. e.  It is unclear whether the South Dakota Supreme Court would find that contact with a vehicle in which a plaintiff is a passenger or conduct creating an imminent apprehension of such contact with the vehicle would constitutes an assault or battery.  There are no allegations or facts showing that Neuenfeldt contacted Bourassa's vehicle.  Even if the South Dakota Supreme Court were to recognized contact with a vehicle as a battery, thus opening the door to the argument that the deployment of spike strips could create an imminent apprehension of harm, there are no facts in the record that show that Neuenfeldt deployed the spike strips or ordered such deployment.  It is clear that Neuenfeldt was in his vehicle engaging in pursuit at the time the spike strips were deployed before Plaintiffs proceeded down the dead-end road.

2. Defendant, United States' Motion to Dismiss (Doc. 90) Plaintiffs' claims for lack of jurisdiction is GRANTED IN PART AND DENIED IN PART as follows:

    a. GRANTED as to Plaintiffs' claims against the United States for assault and battery as alleged in Count III of the Second Amended Complaint and for negligent supervision, training, hiring, and retention, as alleged in Count V; and

    b. DENIED as to Plaintiffs' claim for negligence alleged in Count I of the Second Amended Complaint.

Dated this 27ᵗʰ day of September, 2022.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

36