UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MICAH ROEMEN, and TOM TEN EYCK, Guardian of Morgan Ten Eyck; and MICHELLE TEN EYCK, Guardian of Morgan Ten Eyck, <br><br>Plaintiffs, <br>vs. <br><br>UNITED STATES OF AMERICA, ROBERT NEUENFELDT, individually and UNKNOWN SUPERVISORY PERSONNEL OF THE UNITED STATES, individually, <br><br>Defendants. | 4:19-CV-4006-LLP <br><br>**MEMORANDUM OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is a Motion for Summary Judgment filed by Defendant United States of America. (Doc. 98). For the following reasons, the Government's Motion for Summary Judgment is denied.

## BACKGROUND

### A. Flandreau Santee Sioux Tribe's 638 Contract for Law Enforcement Services

The Flandreau Santee Sioux Tribe ("the Tribe") and the United States, acting through the Bureau of Indian Affairs, Office of Justice Services ("BIA") entered into a contract wherein the Flandreau Santee Sioux Tribal Police Department was operated by the Tribe pursuant to an Indian Self-Determination and Education Assistance Act ("ISDEAA") Contract ("638 contract"). (Docs. 101, ¶ 1; 112, ¶ 1). In this section 638 contract, the provision of law enforcement services for the Flandreau Santee Sioux Indian Reservation was transferred from the BIA to the Tribe from October 1, 2015, through September 30, 2018. (Docs. 101, ¶ 2; 112, ¶ 2).

### B. Mutual Aid Agreement and Dispatch Agreement

During this same time, the Moody County Sheriff's Office ("Moody County") and the Tribe entered into a Law Enforcement Assist Agreement in September of 2015. (Docs. 101, ¶ 5; 112, ¶ 5). Pursuant to the Mutual Aid Agreement, Moody County, or the Tribe could request assistance from the other entity "[i]n the event of or the threat of an emergency, disaster, or

1

widespread conflagration which cannot be met with the facilities of one of the parties to this agreement, the other party agrees, upon proper request, to furnish law enforcement assistance to the party requesting the assistance upon either an actual or standby basis." (Docs. 101, ¶ 5; 112, ¶ 5). A "proper request" from Moody County to the Tribe "shall only be communicated directly, either formally or informally, by the Sheriff's Office or the Sheriff's designee(s), to the Tribe's Chief of Police or the Chief's designee." (Docs. 101, ¶ 8; 112, ¶ 8). While the furnishing party is rendering aid to the other, the responding officer "shall temporarily have the same powers and authority conferred by law on the members of the law enforcement of the party to which the assistance is rendered." (Docs. 101, ¶ 9; 112, ¶ 9).

As of June 17, 2017, Moody County provided dispatch services to the Tribe and the City of Flandreau. (Docs. 101, ¶ 10; 112, ¶ 10). During this timeframe, Mood County, the City of Flandreau, and the Tribe all utilized the same radio channel. (Docs. 101, ¶ 11; 112, ¶ 11). Other nearby agencies or jurisdictions also had access to this radio channel like Lake County and certain South Dakota Highway Patrol officers who worked in that geographical area. (Docs. 101, ¶ 12; 112, ¶ 12).

### C. Events prior to pursuit of vehicle driven by Tahlen Bourassa on June 17, 2017

During the section 638 contract period, in January 2016, Officer Neuenfeldt was hired as a police officer by the Tribe's then-Police Chief, Nicholas Cottier. (Docs. 101, ¶ 13; 112, ¶ 13). Officer Neuenfeldt eventually became Acting Chief of Police for the Tribe and occupied that role on June 17, 2017. (Docs. 101, ¶ 16; 112, ¶ 16).

On the evening of June 17, 2017, Moody County Sheriff's Deputies Carl Brakke and Logan Baldini were on duty together in Brakke's police cruiser. (Docs. 101, ¶ 17; 112, ¶ 17). They were doing a drive-by security check of a residence located in rural Moody County at 24364 484th Avenue, Dell Rapids, South Dakota. (Docs. 101, ¶ 21; 112, ¶ 21). The owners of this unoccupied property had requested extra drive-bys from the Moody County Sheriff's Office to help the owners with security because there had been a party there the prior evening. (Docs. 101, ¶ 22; 112, ¶ 22). The owners had ongoing concerns with trespassing. (Docs. 101, ¶ 22; 112, ¶ 22).

At 11:50 p.m. on June 17, 2017, Deputy Brakke radioed to Moody County dispatch that he could see six to eight vehicles at the location and "looks like another house party going on." (Docs.

2

101, ¶ 23; 112, ¶ 23). Deputy Brakke then relayed to dispatch that as they pulled up to the residence, 15 individuals ran from the house toward the trees. (Docs. 101, ¶ 24; 112, ¶ 24). Deputy Brakke said he believed there were more people in the house, and there were a number of people who did not run, but instead stayed in the driveway near Deputy Brakke's cruiser. (Docs 101, ¶ 25; 112, ¶ 25).

Deputy Brakke testified that he was involved with radio traffic from at least two different dispatchers and two different radio channels that night. (Docs. 101, ¶ 27; 112, ¶ 27). He testified that after he contacted Moody County's dispatch, he went to the "Brookings inter-agency" channel and asked for assistance at a house party and "gave the address the same type of way" that he gave to his own dispatcher. (Doc. 101, ¶ 28; 112, ¶ 28). Deputy Brakke testified that on his inter-agency request for assistance, he asked for "any available units" or "can you start all units to my location" and "went on to explain about the kids running and the number of vehicles." (Docs. 101, ¶ 29; 112, ¶ 29). Deputy Baldini also testified that Deputy Brakke made a call for "a general assist" on the radio. (Docs. 101, ¶ 31; 112, ¶ 31).

At 11:52 p.m., Deputy Brakke contacted Flandreau City Police Officer Brent Goehring via radio and told him about the party at the residence. (Docs. 101, ¶ 32; 112, ¶ 32). Officer Goehring responded, "10-4. We can start heading that way." (Docs. 101, ¶ 32; 112, ¶ 32).

At about 12:02 a.m. on June 18, 2017, one of the partygoers standing in the driveway with Deputies Brakke and Baldini started to have a seizure. (Docs. 101, ¶ 33; 112, ¶ 33). Deputy Brakke requested an ambulance to assist with the seizure. (Docs. 101, ¶ 34; 112, ¶ 34). At about 12:05 a.m., South Dakota Highway Patrol Trooper Isaac Kurtz was working in the area and asked Moody County dispatch if Deputy Brakke needed assistance with the house party. (Docs. 101, ¶ 36; 112, ¶ 36). Dispatch responded and said, "Yes, please." (Docs. 101, ¶ 36; 112, ¶ 36).

Sheriff Troy Wellman of Moody County testified that his Moody County employees at the rural property "obviously were outnumbered and tried to call in other resources to try to contain the situation." (Docs. 101, ¶ 39; 112, ¶ 39). Sheriff Wellman said that Deputy Brakke made "a request for additional resource[s]," but it was not to Officer Neuenfeldt specifically. (Docs. 101, ¶ 41; 112, ¶ 41). However, Sheriff Wellman also said that there was, in general, a radio "call for backup to all available units," and "the tribe falls into that." (Docs. 101, ¶ 42; 112, ¶ 42).

Officer Neuenfeldt was also on duty on June 18, 2021, and testified that he responded to the house party scene because he heard Deputy Brakke call out over the radio and request assistance "when one of the people he was with started having a seizure." (Docs. 101, ¶ 44; 112, ¶ 44). Officer Neuenfeldt arrived on the scene at 12:13 a.m. and testified he believed he arrived before the ambulance. (Docs. 101, ¶¶ 45-46; 112, ¶¶ 45-46). By the time the ambulance arrived, the seizure had passed, and the individual did not need to be transported to the hospital for medical care. (Docs. 101, ¶ 35; 112, ¶ 35). Officer Goehring arrived on the scene at 12:17 a.m. (Docs. 101, 47; 112, 47). Trooper Kurtz arrived on the scene at 12:35 a.m. (Docs. 101, ¶ 48; 112, ¶ 48).

### D. The pursuit of Bourassa'a vehicle

After 1:20 a.m., Deputy Brakke was in or near his police cruiser in the driveway to the residence giving tickets or processing some of the partygoers who had not fled. (Docs. 101, ¶ 49; 112, ¶ 49). Officer Neuenfeldt, Deputy Baldini, and Trooper Kurtz had helped search the area for the partygoers who had fled and cleared other structures on the rural property and were having a discussion at the end of the driveway. (Docs. 101; ¶ 50; 112, ¶ 50). At that time, Deputy Brakke reported that he had already seen at least three cars drive north past the driveway to the residence that would stop about a half of a mile past the driveway and then speed off, as though they were picking up those partygoers who had fled. (Docs. 101; ¶ 51; 112, ¶ 51). Deputy Brakke relayed via radio to the other police units that these cars may be picking up people that ran from the house. (Docs. 101; ¶ 52; 112, ¶ 52). While talking with Deputy Baldini and Officer Neuenfeldt, Trooper Kurtz noticed a vehicle traveling eastbound on 244th Street. (Docs. 101, ¶ 53; 112, ¶ 53). Trooper Kurtz was in his cruiser and drove south toward the vehicle that he saw. (Docs. 101, ¶ 54; 112, ¶ 54).

The vehicle that was approaching the residence turned out to be a gray Dodge pickup that was driven by Tahlen Bourassa. (Docs. 101, ¶ 59; 112, ¶ 59). Micah Roemen and Morgan Ten Eyck were passengers in Bourassa's pickup. (Docs. 101, ¶ 60; 112, ¶ 60).

Bourassa turned north onto 484th Avenue and started heading towards the residence. (Docs. 101, ¶ 61; 112, ¶ 61). After Bourassa's vehicle passed Trooper Kurtz, Trooper Kurtz turned around to go north on 484th Avenue and activated his emergency lights to stop Bourassa's truck. (Docs. 101, ¶¶ 62, 63; 112, ¶¶ 62, 63).

Bourassa approached the driveway to the residence in his vehicle. (Docs. 101, ¶ 64; 112, ¶ 64). Bourassa stopped at the driveway for Sergeant Kurtz's emergency lights. (Doc. 101, ¶ 68, 112, ¶ 68). During this stop, Bourassa locked his doors as Officer Neuenfeldt ran across the front of the truck and to the driver's side. (Doc. 101, ¶ 69; 112, ¶ 69; Doc. 113-1, Roemen Dep. 69-14-22, 70:6-17). Roemen claims that Officer Neuenfeldt commanded Bourassa to exit the vehicle and told Bourassa he would arrest him if Bourassa did not unlock his doors. (Doc. 101, ¶ 70; 112, ¶ 70; Doc. 113-1, Roemen Dep. 77:3-6).

Officer Neuenfeldt reached for the door handle and pulled on the handle two or three times to try and open the door. (Doc. 113-1, Roemen Dep. 77:3-80:25). Bourassa did not unlock his doors and did not exit the vehicle. (Doc. 101, ¶ 71, 112, ¶ 71). The last time Officer Neuenfeldt pulled on the door handle, Bourassa accelerated and fled. (Doc. 113-1, Roemen Dep. 80:24-25). Officer Neuenfeldt drew his gun as the Bourassa vehicle accelerated. (Docs. 101, ¶ 72; 112, ¶ 72).

Officer Neuenfeldt testified that he was struck in the left thigh and shoulder by Bourassa's truck and knocked to his knees as it drove by at approximately 20 m.p.h.; that Bourassa "sideswiped [him] when he went past." (Doc. 91-2, Neuenfeldt Dep. 254:13-21). There is no known witness to the strike. (Docs. 101, ¶¶ 74, 75; 112, ¶¶ 74, 75). Roemen did not see the strike, but admitted he could not see Officer Neuenfeldt's lower body at all through the driver-side window. (Docs. 101, ¶ 74; 112, ¶ 74). Deputies Baldini and Brakke did not witness the truck striking Officer Neuenfeldt, but they testified they saw Officer Neuenfeldt getting up from his knees as Bourassa's truck sped away. (Docs. 101, ¶ 75; 112, ¶ 75). Later that evening after the incident concluded, Officer Neuenfeldt sought medical care at the emergency room, where the provider noted objective findings of "a little bit of bruising" on his left lower thigh that looked like it would turn into a "more significant bruise as time goes." (Docs. 101, ¶ 76; 112, ¶ 76). The provider also observed that his left shoulder did not appear bruised, but it was "a little bit red." (Docs. 101, ¶ 77; 112, ¶ 77).

Trooper Kurtz was behind Bourassa's truck as it sped away, and Trooper Kurtz immediately initiated a high-speed pursuit going north on 484th Avenue around 1:21 a.m. (Docs. 101, ¶ 78; 112, ¶ 78). Trooper Kurtz listed the reason for initiating the pursuit as exhibition driving and failure to stop when directed by law enforcement. (Docs. 101, ¶ 79; 112, ¶ 79).

5

Once Trooper Kurtz initiated the pursuit, he asked dispatch to contact a supervisor. (Doc. 101, ¶ 82; 113, ¶ 82). Officer Neuenfeldt got in the driver's side of his cruiser and Deputy Baldini ran to Officer Neuenfeldt's cruiser and got in the passenger's side. (Docs. 101, ¶¶ 83, 84; 112, ¶¶ 83, 84). Officer Neuenfeldt's cruiser was secondary behind Trooper Kurtz in the pursuit. (Docs. 101, ¶ 85; 112, ¶ 85). At approximately 1:22 a.m., Officer Neuenfeldt relayed over the radio: "HP28: He hit me with his truck. That's assault on law enforcement." (Docs. 101, ¶ 87; 112, ¶ 87).

From 484th Avenue, Bourassa turned west onto 242nd Street, and Trooper Kurtz followed Bourassa. (Docs. 101, ¶ 88; 112, ¶ 88). At this time, Highway Patrol Trooper Chris Spielmann entered the area after hearing the pursuit on radio traffic. Trooper Spielmann set up across 481st Avenue just north of 241st Street, ahead of Bourassa to prepare spike strips. (Docs. 101, ¶ 89; 112, ¶ 89). Trooper Kurtz gave Trooper Spielmann permission to deploy spikes. (Docs. 101, ¶ 94; 112, ¶ 94). Bourassa then turned northbound on 481st Avenue and approached the position of Trooper Spielman. (Docs. 101, ¶ 95; 112, ¶ 95). Bourassa then turned east on 241st Street. (Doc. 85-16, Kurtz Dep. 91:23-92:1).

After traveling east on 241st Street for approximately 3 miles, Bourassa turned south onto 484th Avenue and then quickly turned east on 242nd Street. (Docs. 101, ¶ 98; 112, ¶ 98). Roemen testified that after turning east on 242nd Street, Bourassa stopped in the middle of the road and turned off his headlights. (Docs. 101, ¶ 99; 112, ¶ 99). While the Bourassa truck was stopped, neither of the passengers asked to get out of the truck or attempted to get out. (Docs. 101, ¶ 101; 112, ¶ 101).

Meanwhile, Trooper Kurtz shadowed Bourassa by turning southbound on 484th Avenue. (Docs. 101, ¶ 102; 112, ¶ 102). Trooper Kurtz temporarily lost sight of the Bourassa vehicle near the intersection of 484th Avenue and 242nd Street. (Docs. 101, ¶ 103; 112, ¶ 103). Shortly after he lost sight of the Bourassa vehicle, Trooper Kurtz saw Bourassa's taillights headed eastbound, and he relayed that location to the other pursuing police units. (Docs. 101, ¶ 104; 112, ¶ 104).

While the Bourassa truck was hiding, Roemen watched other cop cars "fly by" continuing south on 484th Avenue, but one police car turned east on 242nd Street and started driving toward Bourassa's truck. (Docs. 101, ¶ 105; 112, ¶ 105). Chief Neuenfeldt and Deputy Baldini were the closest law enforcement vehicle to Bourassa's last known whereabouts, as they were traveling

6

southbound on 484th Avenue between 241st Street and 242nd Street when they heard Trooper Kurtz relay that he believed he saw Bourassa's taillights eastbound on 242nd Street, so they turned east on 242nd Street, saw Bourassa's taillights, and Bourassa fled again. (Docs. 101, ¶ 106; 112, ¶ 106).

Officer Neuenfeldt and Deputy Baldini saw Bourassa's vehicle within minutes after Trooper Kurtz lost sight, and they continued the pursuit as the primary pursuer. (Docs. 101, ¶ 107; 112, ¶ 107). At around 1:30 a.m. a couple of minutes after Trooper Kurtz lost sight of the Bourassa, he radioed that he would try to get ahead of the Bourassa truck to block him. (Docs. 101, ¶¶ 108, 109; 112, ¶¶ 108, 109).

From eastbound on 242nd Street, Bourassa turned north on 485th Avenue, with Officer Neuenfeldt and Deputy Baldini following directly behind. (Docs. 101, ¶ 112; 112, ¶ 112). Bourassa turned west on 237th Street and traveled that road for about a mile before turning north onto 484th Avenue. (Docs. 101, ¶ 114; 112, ¶ 114). Next, after traveling north on 484th Avenue for about a mile, Bourassa turned west onto 236th Street and drove on that road for two miles. (Docs. 101, ¶ 115; 112, ¶ 115). Bourassa then turned north on 482nd Avenue and drove north on that road for approximately 5 miles until 482nd Avenue turned into 231st Street, going west until reaching Highway 13. (Docs. 101, ¶ 116; 112, ¶ 116).

During about a mile of this portion of the pursuit, 482nd Avenue turned into a minimum maintenance road called a two track, but Officer Neuenfeldt knew this road turned back into gravel after that section, so he continued pursuit. (Doc. 101, ¶ 117; 112, ¶ 117). As the pursuit reached just southeast of the town of Flandreau, FSST Tribal Police Officer Brian Arnold was driving toward Bourassa's vehicle. (Doc. 101, ¶ 118; 112, ¶ 118). Right before Bourassa turned north onto Highway 13, Bourassa met Officer Arnold and forced Officer Arnold off the road and into the ditch. (Doc. 101, ¶ 119; 112, ¶ 119).

Bourassa sped north on Highway 13 through the town of Flandreau. (Docs. 101, ¶ 120; 112, ¶ 120). Once Bourassa crossed the bridge on Highway 13 just north of Flandreau, Bourassa went by a car and then came to a very rapid stop on Highway 13 just north of 229-A. (Docs. 101, ¶ 121; 112, ¶ 121). This was the only time the pursuit crossed paths with a non-law enforcement vehicle. (Doc. 101, ¶ 122; 112, ¶ 122). Officer Neuenfeldt stopped his cruiser in the southbound lane behind Bourassa and Deputy Baldini got out of the cruiser and told Bourassa to stop or get out of the vehicle. (Docs. 101, ¶ 123; 112, ¶ 123).

Bourassa disregarded Deputy Baldini's commands. (Docs. 101, ¶ 124; 112, ¶ 124). Instead of continuing north or south on Highway 13, Bourassa suddenly reversed and turned east down 229-A. (Docs. 101, ¶¶ 124, 126; 112, ¶¶ 124, 126). Once Deputy Baldini got back inside the cruiser, Officer Neuenfeldt and Deputy Baldini pursued Bourassa's vehicle east down 229-A. (Docs. 101, ¶ 125; 112, ¶ 125).

Officer Neuenfeldt testified that he slowly followed Bourassa east down 229-A because the road was dusty and he knew it was a dead-end. (Docs. 101, ¶ 127; 112, ¶ 127). Officer Neuenfeldt and Deputy Baldini estimated their cruiser was approximately a quarter of a mile behind Bourassa's truck on 229-A. (Docs. 101, ¶¶ 128, 129; 112, ¶¶ 128, 129). Officer Neuenfeldt recalls being near a specific grove of trees when Deputy Baldini got on the radio and said he thought Bourassa wrecked. (Docs. 101, ¶ 128; 112, ¶ 128). At 1 hour, 42 minutes and 59 seconds on the call log, Deputy Baldini reported that Bourassa was heading eastbound on 229-A. (Doc. 91-6). Approximately 19 seconds later, at 1 hour, 43 minutes and 18 seconds on the call log, Deputy Baldini reported that Bourassa's vehicle had wrecked. (Doc. 91-6). Approximately 15 seconds later, at 1 hour, 44 minutes and 16 seconds on the call log, Deputy Baldini reported that 3 individuals were on the ground ejected. (Doc. 91-6). Approximately 9 seconds after it was reported that 3 individuals were on the ground ejected, South Dakota Highway Patrolman Denver Kvistad arrived on the scene. (Doc. 91-6). The entire vehicle pursuit lasted nearly 24 minutes. (Doc. 91, Roche Decl. Exs. 4, 6).

In his accident report, Officer Neuenfeldt reported that he "began to drive into the pasture and became hung up on a large fence post the suspect vehicle had apparently knocked over." (Doc. 91-15). Deputy Baldini testified in his deposition that they had trouble stopping on 229-A and the vehicle camp to a stop on the fence in the field. (Doc. 91-5, Baldini Dep., 193:10-194:10; 223:18-224:21). There are photos of Officer's Neuenfeldt's vehicle and the damage to his vehicle, but it does not appear that those photos are part of the record on summary judgment. (Doc. 91-5, Baldini Dep. 191:22-25, 192:7-193:8).

Roemen testified that once Bourassa turned onto 229-A, he told Bourassa that it was a dead-end road. (Docs. 101, ¶ 134; 112, ¶ 134). Bourassa continued to drive fast down 229-A. (Docs. 101, 135; 112, 135). The vehicle crashed and all three occupants of the pick-up were ejected from the vehicle and sustained serious injuries. (Docs. 101, ¶ 137; 112, ¶ 137). While

8

Officer Neuenfeldt and Deputy Baldini were the first responders on the accident scene, Highway Patrolman Denver Kvistad, City Officer Brent Goehring, and FSST Officer Arnold all arrived within one or two minutes of the crash. (Docs. 101, ¶ 138; 112, ¶ 138).

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273–74 (8th Cir. 1988). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (internal quotation marks omitted).

## DISCUSSION

Pending before the Court is a Motion for Summary Judgment filed by the United States. Therein the Government argues that it is entitled to judgment as a matter of law on Count I of the Second Amended Complaint alleging negligence because Plaintiffs cannot establish that the United States breached a known legal duty established by South Dakota law when they solely

9

allege the United States violated alleged federal mandates. (Doc. 99 at 2494). The Government also argues that Plaintiffs have failed to provide any causation evidence. (Doc. 99 at 2494). The United States agues that the undisputed material facts prove as a matter of law that Bourassa's conduct was the proximate cause of Plaintiffs' injuries and that Plaintiffs were contributorily negligent more than slight or assumed the risk of their injuries when they willingly entered Bourassa's vehicle with knowledge of his prior history of stand-offs with law enforcement, and did not attempt to exit the truck mid-pursuit or ask to get out of the truck even with the ability to do so on multiple occasions. (Doc. 99 at 2494). The Government also argues that South Dakota substantive law provides immunity to the United States under SDCL § 3-21-9 which precludes liability for any injury resulting from a person resisting arrest. (Docs. 119 at 3107; 99 at 2525).

The United States also moved for summary judgment on Plaintiffs' Count V alleging negligent training and supervision. The Court need not address this claim because it was dismissed by the Court in its Memorandum Opinion and Order on September 27, 2022, for lack of jurisdiction.

## I. Private Analog Duty

A statutory limitation on the government's waiver of immunity under the FTCA includes the state-law, private-analogue duty requirement. The state-law private duty requirement precludes the imposition of FTCA liability based solely on the breach of a federally created duty—if a private person acting in similar circumstances would not be liable under state law for the alleged harm. *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019).

In the present case, the Government argues that sovereign immunity shields it from Plaintiffs' negligence claim because Plaintiffs have based their negligence claim on Officer Neuenfeldt's alleged violation of a federal mandate and have failed to establish that a private person acting in similar circumstances would be liable under South Dakota law for the alleged harm. (Doc. 99 at 2494).

In its opinion on the motion to dismiss, this Court held that section 2-24-09(B)(3) of the Law Enforcement Handbook mandates that officers will discontinue pursuits outside the boundaries of the reservation unless officer safety becomes a consideration. "It is true that negligent performance of (or failure to perform) duties embodied in federal statutes and

regulations[1] may give rise to a claim under the FTCA, but *only* if there are analogous duties under local tort law." *Hornbeck Offshore Trans., LLC v. United States*, 563 F.Supp.2d 205, 210 (D.D.C. Jul. 1, 2008). This is because the FTCA, by its terms, does not create new causes of action; rather, it makes the United States liable in accordance with applicable local tort law." *Id.* (quoting *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157-58 (D.C. Cir. 1985)). In determining whether the Government would be liable under the FTCA for Officer Neuenfeldt's conduct, the Court must determine on summary judgment whether this duty set forth in the Law Enforcement Manual is analogous to those imposed under local tort law. *See Hornbeck Offshore Trans.*, 563 F.Supp.2d at 210; *Geo. Byers Sons v. East Europe Import Export*, 463 F.Supp. 135, 137-38 (D. Md. 1979) (observing that the scope of waiver of immunity in FTCA is generally limited to "ordinary common-law torts," not violations of federal statutes and regulations). The existence of a duty is a question of law to be determined by the Court. *Tipton v. Town of Tabor*, 538 N.W.2d 783, 785 (S.D. 1995).

At issue in the present case is Officer Neuenfeldt's high-speed pursuit of Bourassa's vehicle. In determining whether there is a private analog to this conduct under South Dakota law, the Supreme Court has stated that the FTCA requires courts to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA "in the performance of activities private persons do not perform." *United States v. Olson*, 546 U.S. 43, 46 (2005) (citing *Indian Towing v. United States*, 350 U.S. 61, 64 (1955) (rejecting the claim that the scope of FTCA liability for "uniquely governmental" functions depends on whether state law "imposes liability on municipal or other local governments for the negligence of their agents acting in" similar circumstances). While the private analogue need not be exact, there must be some persuasive analogy to show that the government actor sued would be subject to liability under state law if it were a private actor. *PW Arms, Inc. v. United States*, 186 F.Supp.3d 1137, 1143 (W.D. Wash 2016) (citing *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 650 (9th Cir. 1992)). "Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy." *Id.* (quoting *LaBarge v. Mariposa Cty.*, 798 F.2d 364, 367 (9th Cir. 1986)). The Supreme Court has interpreted the FTCA's

---

[1] In *Gaubert v. United States*, the United States Supreme Court acknowledged that the discretionary function exemption also applies to an agency's internal guidelines." *See* 499 U.S. 315, 324 (1991) (stating that an agency may rely on internal guidelines rather than on published regulations).

imposition of Government liability "in the same manner and to the same extent as a private individual under *like* circumstances." 28 U.S.C. § 2674. In doing so, the Court has stated that "the words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield." *See United States v. Olson*, 546 U.S. 43, 46 (2005).

As the Government pointed out in its brief, in *Schreiner v. United States*, Civ. No. 03-5069, 2005 WL 1668429 (D.S.D. Jul. 18, 2005), Judge Schreier concluded that in a vehicle pursuit, a police officer has a common law duty to "exercise ordinary care or skill not to injure another." *Id.* at *3 (citing *Lovell v. Oahe Electric Co-op.*, 382 N.W.2d 396, 398 (S.D. 1986)). The duty of ordinary care is that which an "ordinarily prudent or reasonable person exercises under the same or similar circumstances." *Id.* at *4 (citing *Doyen v. Lamb*, 49 N.W.2d 382, 383 (S.D. 1951)). While in the face of violations of the law, an officer must take steps to stop violations and apprehend the violators, these steps must all be within rational limits. *Id.* (citing *State v. Spotted Horse*, 462 N.W.2d 463, 464-65 n.2, 468 (S.D. 1990)); *see also Blacksmith v. United States*, Civ. No. 06-5022, 2008 WL 11506053 (D.S.D. Jan. 16, 2018) (concluding that in a vehicle pursuit, an officer has a duty of care to a fleeing suspect). Plaintiffs in this case, however, were simply passengers in a fleeing vehicle and it is undisputed that Officer Neuenfeldt knew throughout the pursuit that they were present in the vehicle.

The Government argues that considering the facts and circumstances of this case, Officer Neuenfeldt's conduct was reasonable. (Doc. 99 at 2512). Whether or not Officer Neuenfeldt breached a duty of care is a question of fact. *See Nicolay v. Stukel*, 900 N.W.2d 71, 78 (S.D. 2017). While Officer Neuenfeldt observed Bourassa flee law enforcement when asked to pull over, Officer Neuenfeldt knew all the while that Roemen and Ten Eyck were passengers in the vehicle. There is no evidence in the record that establishes that Roemen or Ten Eyck were engaged in any unlawful activity. Once Bourassa evaded Trooper Kurtz, Officer Neuenfeldt continued the pursuit of Bourassa's vehicle on dirt roads and at high speeds, continuing onto what Officer Neuenfeldt knew was a dead-end road. Taking the facts in the light most favorable to Plaintiffs as the Court is bound to do at this stage precludes the Court from granting summary judgment in favor of the United States. The Court concludes that questions of fact exist as to whether by continuing a high-speed pursuit of Bourassa's vehicle containing passengers Roemen and Ten Eyck in the manner

that he did, Officer Neuenfeldt exceeded rational limits and breached his duty to exercise ordinary care and skill not to injure another.

## II.  Causation Evidence

The Government also argues that Plaintiffs have failed to provide any causation evidence. (Doc. 99 at 2494). The United States argues that the undisputed material facts prove as a matter of law that Bourassa's conduct was the proximate cause of Plaintiffs' injuries. It contends that Plaintiffs were contributorily negligent more than slight or assumed the risk of their injuries when they willingly entered Bourassa's vehicle with knowledge of his prior history of stand-offs with law enforcement and did not attempt to exit the truck mid-pursuit or ask to get out of the truck even with the ability to do so on multiple occasions. (Doc. 99 at 2494).

### A.  Proximate Cause

Under South Dakota law, in order to prevail on a suit based on negligence, Plaintiffs must prove that Officer Neuenfeldt owed a legal duty to them, that he breached that duty, that such breach was a proximate cause of the injury, and an actual injury. *See Janis v. Nash Finch Co.*, 780 N.W.2d 497, 500 (S.D. 2010). Proximate cause is defined under South Dakota law as "An immediate cause which, in natural or probable sequence, produces the injury complained of. This excludes the idea of legal liability based on mere speculative possibilities or circumstances and conditions remotely connected to the events leading up to an injury." *Mulder v. Tague*, 186 N.W.2d 884, 887 (S.D. 1971); S.D. Pattern Jury Instructions 20-10-10 (2008 ed., 2022 updates). "Normally, proximate cause is an issue for a [factfinder], but when legal minds cannot differ, summary judgment may be entered on proximate cause." *Walther v. KPKA Meadowlands Ltd. Partnership*, 581 N.W.2d 527, 537 (S.D. 1998).

The Government argues that Bourassa's actions "resulting in him losing control of his vehicle and throwing his passengers from the vehicle, was the sole direct and 'immediate cause which, in natural or probable sequence, produced the injury complained of.'" (Doc. 99 at 2515) (citing *Much v. H-D Co-op, Inc.*, 487 N.W.2d 623 (S.D. 1992)). The Government argues that Officer Neuenfeldt's pursuit conduct was "inconsequential" and that he was solely attempting to keep pace with the vehicle driving in excess of 100 miles per hour. (Doc. 99 at 2515). To bolster its argument that Officer Neuenfeldt's conduct was not the proximate cause of the accident, the

13

Government argues that Officer Neuenfeldt testified that he was slowly pursuing Bourassa, had lost sight of the truck, and was no longer within eyesight of the vehicle when Bourassa lost control of the vehicle.

As the South Dakota Supreme Court has recognized, there may be more than one legal cause of an injury. *State v. Two Bulls*, 547 N.W.2d 764, 766 (S.D. 1996) (citing W. Page Keeton et al., *Prosser and Keeton on* Torts 52, at 347-49 (5th Ed. 1984)) ("Tort law has long recognized that the negligence of two or more individuals may combine to cause injuries to another and that each may be legally responsible for the resulting injuries."). Even if Bourassa was negligent and his negligence was a proximate cause of Plaintiffs' injuries, recovery against the Defendant would not be barred under the doctrine of concurrent negligence. *See DeBerg v. Kriens*, 149 N.W.2d 410, 505 (S.D. 1967). When an injury occurs through the concurrent negligence of two persons which would not have happened in the absence of either, the negligence of both parties is considered to be the proximate cause of the accident. *See id.* As provided in South Dakota Pattern Jury Instruction 20-30-40 regarding concurrent negligence,

> There may be more than one legal cause of an injury. If you find that the defendant was negligent and that the defendant's negligence was a legal cause of the plaintiff's injury, it is not a defense that the negligence of some third person, not a party to this action, was also a legal cause of plaintiff's injury.

S.D. Pattern Jury Instructions 20-30-40 (2008 ed., 2022 updates).

However, an intervening or superseding cause may relieve a negligent actor from that actor's antecedent negligence. *Braun v. New Hope Tp.*, 646 N.W.2d 737, 740 (S.D. 2002). The appropriate question in the intervening/superseding cause analysis "is one of negligence and the extent of the obligation: whether the original actor's responsibility extends to such interventions, which are foreign to the risk the original actor has created." *Id.* (citation omitted) (cleaned up). "When the natural and continuous sequence of causal connection between the negligent conduct and the injury is *interrupted by a new and independent cause*, which itself produces the injury, that *intervening* cause operates to relieve the original wrongdoer of liability." *Id.* (citing *Schmeling v. Jorgensen*, 84 N.W.2d 558, 564 (S.D. 1957)). "[T]he intervening cause must be a *superseding* cause. It must so entirely supersede the operation of the defendant's negligence that it alone, without his negligence contributing thereto, produced the injury." *Id.*

Viewing the facts in the light most favorable to Plaintiffs, the non-moving party in this matter, a reasonable factfinder could conclude that Officer Neuenfeldt breached a duty of care to Plaintiffs who he knew to be passengers in the vehicle driven by Bourassa and that his negligence was a proximate cause of Plaintiffs' injuries. There is no dispute that Officer Neuenfeldt continued to pursue Bourassa's vehicle, containing passengers Roemen and Ten Eyck, on dirt roads and at high speeds for a lengthy period of time and eventually down what Officer Neuenfeldt knew to be a dead-end road. The parties have not pointed to any conclusive evidence establishing the distance of the dead-end road, but facts suggest it was no more than a half-mile long. (Doc. 85-15, Baldini Dep. 190:2-4). The call log establishes that Officer Neuenfeldt's police cruiser travelled this distance in a short period of time, and there is evidence that his cruiser had trouble stopping and ran into the field over a fencepost. Officer Neuenfeldt testified that his vehicle was travelling slowly down the dead-end road some distance from Bourassa's vehicle when Bourassa's vehicle went off the road. Deputy Baldini testified that in his opinion, the vehicle had difficulty stopping because the police cruiser's brakes were hot from the pursuit. (Doc. 85-16, Baldini Dep. 224:1-12). A trial will provide the Court with an opportunity to evaluate the officers' seemingly varied accounts in light of all the other evidence received at trial.

The Government has not established that Bourassa, fleeing down a dead-end, dirt road at high speeds was a risk foreign to that which Officer Neuenfeldt's alleged negligence originally created. *See Braun*, 646 N.W.2d at 740-41 ("In order to determine whether an actor's liability is shifted to a third person, one must look to see if the intervening cause was foreseeable."); *see also Howard v. Bennett*, 894 N.W.2d 391, 395 (S.D. 2017) (citing *Braun* case). The Government will not be relieved from liability unless Bourassa's negligence, operating alone, without Officer Neuenfeldt's negligence contributing thereto, was the sole cause of Plaintiffs' injuries. *See Howard*, 894 N.W.2d at 395 ("An intervening cause that cuts of liability is a superseding cause if it so entirely supersedes the operation of the defendant's negligence that it alone . . . produces the injury."). The Government has not sustained its burden on summary judgment and issues relating to causation will be resolved at trial.

    B.    **Contributory negligence and assumption of risk**

The Government argues that Plaintiffs failed to exercise ordinary care to protect themselves from known harms or they assumed the risk of their injuries given their knowledge of Bourassa's prior criminal history and their failure to exit his truck mid-pursuit. (Doc. 99 at 2516).

### 1. Contributory Negligence

Contributory negligence is a "breach of duty which the law imposes upon persons to protect themselves from injury, and which, concurring and cooperating with actionable negligence for which defendant is responsible, contributes to the injury complained of as a proximate cause." *Johnson v. Armfield*, 672 N.W.2d 478, 481 (S.D. 2003) (citing *Boomsma v. Dakota, Minnesota, & E. R.R. Corp.*, 651 N.W.2d 238, 245-46 (S.D. 2002)). Where plaintiff's contributory negligence is more than slight compared to defendant's negligence, plaintiff is barred from recovery provided it is a proximate cause of the injury. *Id.* (citing SDCL § 20-9-2).

"Slight" with regard to negligence has been defined by the South Dakota Supreme Court to be "small in amount or of little importance or insignificant or unsubstantial or inconsiderable, that is to say, it was not slight in comparison with the negligence of the defendant." *Nugent v. Quam*, 152 N.W.2d 371, 380 (S.D. 1967). Whether a plaintiff was contributorily negligent is a question of fact properly submitted to the factfinder. *Theunissen v. Brisky*, 438 N.W.2d 221, 223-24 (S.D. 1989). "It is only when the facts show beyond any dispute that plaintiff has committed negligence more than 'slight,' that it is appropriate for [a court] to hold, as a matter of law, for a negligent defendant." *Westover v. E. River Elec. Power Coop., Inc.*, 488 N.W.2d 892, 896 (S.D. 1992). As an affirmative defense, Defendant United States has the burden of proof in establishing contributory negligence. *Johnson*, 672 N.W.2d at 481 (citing *Bauman v. Auch*, 539 N.W.2d 320, 326 (S.D. 1995)).

The Government argues that Plaintiffs' conduct cannot be considered slight compared to that of Officer Neuenfeldt's. (Doc. 99 at 2517). In support, the Government argues that Plaintiffs got in the truck and rode around after midnight on a Saturday night knowing that Bourassa had a criminal history and was on parole. (Doc. 99 at 2517). Once Bourassa fled in the vehicle, the United States argues that Plaintiffs had three opportunities to get out of Bourassa's vehicle: 1) when Bourassa was stopped by law enforcement officers at the house party; 2) when Bourassa had evaded Trooper Kurtz and was actively hiding from law enforcement for a least a minute; and 3)

when Bourassa was stopped just north of the bridge on Highway 13 before reversing and turning east on 229-A. (Doc. 99 at 2517).

The Court is unwilling to conclude as a matter of law that Plaintiffs are responsible for their injuries because of a decision to keep company with an individual who had a prior criminal history. Even if the Court was to find that Plaintiffs breached a duty to protect themselves from injury by riding around with Bourassa that night—a finding the Court is unwilling to make—the Government does not argue nor could it argue that this decision was the proximate cause of Plaintiffs' injuries. *See Wilson v. Great N. Ry. Co.*, 157 N.W.2d 19, 22 (S.D. 1968) ("Contributory negligence to bar recovery must be the proximate cause of the injury . . . ."). Whether Plaintiffs breached a duty to protect themselves from injury by not exiting the vehicle during the purported vehicle stops and whether any such negligence was more than slight compared to Officer Neuenfeldt's alleged negligence are issues for trial.

2. **Assumption of Risk**

Assumption of the risk requires that the person: "(1) had actual or constructive knowledge of the risk; (2) appreciated its character; and (3) voluntarily accepted the risk with the time, knowledge, and experience to make an intelligent choice." *Jensen v. Menard, Inc.*, 907 N.W.2d 816, 820 (S.D. 2018). These are issues for trial.

In all, the Court does not find that this is "all but the rarest of cases" where questions of contributory negligence and assumption of the risk should be decided by the Court as a matter of law rather than a factfinder. *See Jensen*, 907 N.W.2d at 820 ("Questions of negligence, contributory negligence, and assumption of the risk are for the jury in all but the rarest of cases so long as there is evidence to support the issues.").

III. **Statutory Immunity**

The Government argues that it is entitled to any state law immunity that applies to a private person in South Dakota. (Doc. 99 at 2525) (citing 28 U.S.C. § 1346(b)(1) which provides that the United States may be liable for personal injury caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred*). The Government

argues that South Dakota substantive law provides immunity to the United States under SDCL § 3-21-9 which provides immunity to any "person" "for any injury caused by or resulting from a person resisting arrest." (Docs. 119 at 3107; 99 at 2525). Specifically, SDCL § 3-21-9 provides that:

> No person, political subdivision, or the state is liable for any injury resulting from the parole or release of a prisoner or from the terms and conditions of his parole or release or from the revocation of his parole or release, or for any injury caused by or resulting from:
>
> (1)   An escaping or escaped prisoner;
> (2)   An escaping or escaped person;
> (3)   A person resisting arrest;
> (4)   A prisoner to any other prisoner; or
> (5)   Services or programs administered by or on behalf of the prison, jail, or correctional facility.

Assuming, but not deciding, that SDCL § 3-21-9 is applicable in this case, the Court finds that SDCL § 3-21-9 does not bar Plaintiffs' claim for damages. The United States argues that Plaintiffs' injuries were caused by or resulted from Bourassa while he was resisting arrest and that the United States is therefore entitled to immunity under SDCL § 3-21-9(3). As the Court has already discussed at length, there are questions of fact in this case relating to causation and whether the negligence of Bourassa was a superseding cause of Plaintiffs' injuries. Accordingly, SDCL § 3-21-9 does not operate to bar Plaintiffs' claim for damages as to these plaintiffs.

Accordingly, it is hereby ORDERED that the Government's Motion for Summary Judgment (Doc. 98) is DENIED.

Dated this 22nd day of March, 2023.

BY THE COURT:

*Lawrence L. Piersol*
Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

*Matthew Thelen*