UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MICAH ROEMEN, and TOM TEN EYCK, Guardian of Morgan Ten Eyck; and MICHELLE TEN EYCK, Guardian of Morgan Ten Eyck, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, ROBERT NEUENFELDT, individually and UNKNOWN SUPERVISORY PERSONNEL OF THE UNITED STATES, individually, <br><br> Defendants. | **4:19-CV-4006-LLP** <br><br><br> **MEMORANDUM OPINION AND ORDER** |

Plaintiffs, Micah Roemen, and Tom Ten and Michelle Ten Eyck, Guardians of Morgan Ten Eyck, brought this action under the Federal Tort Claims Act, alleging that Micah and Morgan, passengers in a fleeing vehicle, were injured as a result of the negligent and reckless high-speed pursuit by tribal police officer, Chief Robert Neuenfeldt. Defendant argues that the United States is immune from this claim under the discretionary function exception to the Federal Tort Claims Act and because Plaintiffs have failed to prove that Neuenfeldt was acting within the scope of his employment during the events at issue in this case. Defendant contests liability and the extent of Micah and Morgan's damages. A trial to the Court was held on November 14-17 and November 20-22, 2023. The following are the Court's findings of fact and conclusions of law.

## LIABILITY

### I.   FACTS

#### A. Flandreau Santee Sioux Tribe's 638 Contract for Law Enforcement Services

1. The Flandreau Santee Sioux Tribe ("FSST" or "the Tribe") and the United States, acting through the Bureau of Indian Affairs, Office of Justice Services ("BIA") entered into a contract wherein the Flandreau Santee Sioux Tribal Police Department was operated by the Tribe pursuant to an Indian Self-Determination and Education Assistance Act

1

("ISDEAA") Contract ("638 contract"). (Plfs' Ex. 67). In this section 638 contract, the provision of law enforcement services for the Flandreau Santee Sioux Indian Reservation was transferred from the BIA to the Tribe from October 1, 2015, through September 30, 2018. (Plfs' Ex. 67).

2. The Annual Funding Agreement between the Tribe and the BIA, incorporated by reference in the Tribe's section 638 contract, provides that the Tribe is authorized to provide law enforcement police services to "all residents of, and visitors to, the Flandreau Santee Sioux Tribal Reservation.[1]" (Plfs' Exs. 60, 67). The Annual Funding Agreement states further that "[w]hen operating within the scope of this contract, the [Tribe] may be required to leave or operate outside of Indian country." (Plfs' Ex. 60).

3. During the section 638 contract period, Robert Neuenfeldt was Acting Chief of Police for the Tribe ("Chief Neuenfeldt") and occupied that role on June 17 and 18, 2017. (Doc. 257-2, Trial Tr. 417:20-24).

## B. Mutual Aid Agreement and Dispatch Agreement

4. In September of 2015, the Moody County Sheriff's Office ("Moody County") and the Tribe entered into a Law Enforcement Assist Agreement. (Plfs' Ex. 6). The Mutual Aid Agreement provided that "[i]n the event of or the threat of an emergency, disaster, or widespread conflagration which cannot be met with the facilities of one of the parties to this agreement, the other party agrees, upon proper request, to furnish law enforcement assistance to the party requesting the assistance upon either an actual or standby basis." (Plfs' Ex. 6). A "proper request" from Moody County to the Tribe "shall only be communicated directly, either formally or informally, by the Sheriff's Office or the Sheriff's designee(s), to the Tribe's Chief of Police or the Chief's designee." (Plfs' Ex. 6). While the furnishing party is rendering aid to the other, the responding officer "shall temporarily have the same powers and authority conferred by

---

[1] The Annual Funding Agreement defines the boundaries of the Flandreau Santee Sioux Tribal Reservation as:

All lands within the territorial boundaries of the reservation, including all territory now held in trust by the United States or owned in fee by the Tribe.

(Plfs' Ex. 60).

law on the members of the law enforcement of the party to which the assistance is rendered." (Plfs' Ex. 6).

5. As of June 17, 2017, Moody County provided dispatch services to the Tribe and the City of Flandreau. (Plfs' Ex. 7). Moody County's dispatch received and accepted "all calls for service within, or near, the jurisdiction of the Tribe, including emergency calls for fire, medical, and emergency situations." (Plfs' Ex. 7). It also provided radio and support communications to the Tribe from the initial call until the conclusion of the emergency. (Plfs' Ex. 7). During this timeframe, Moody County, the City of Flandreau, and the Tribe all utilized the same radio channel. (Doc. 257, Trial Tr. 151:8-20).

## C. Events leading up to the police pursuit on June 17, 2017

6. On the evening of June 17, 2017, Moody County Sheriffs Deputies Carl Brakke and Logan Baldini were doing a drive-by security check of a farm property located in rural Moody County at 24364 484th Avenue, Dell Rapids, South Dakota. (Docs. 257, Trial Tr. 156:8-12, 158:17-159:2; 257-1, Trial Tr. 346:8-20; Plfs' Ex. 20).    The owners of this property had requested extra drive-bys from the Moody County Sheriff's Office to help with security because there had been people breaking into the abandoned house. (Docs. 257, Trial Tr. 158:20-159:8; 257-1, Trial Tr. 184:4-7). The owners had ongoing concerns with trespassing. (Doc. 257-1, Trial Tr. 184:4-7, 346:11-20).

7. At 11:50 p.m. on June 17, 2017, Deputy Brakke radioed to Moody County dispatch that he could see six vehicles at the location and "looks like another house party going on." (Def. Ex. 216.1).   There were approximately 30-40 kids inside the farmhouse having a party and engaging in underage drinking with cars parked outside the farmhouse. (Doc. 257-1, Trial Tr. 184:17-184:19, 347:6-17, 348:16-20; Plfs' Ex. 18). Deputy Brakke relayed to dispatch that as they pulled up to the house, twelve to fifteen individuals ran from the house toward a grove of trees and that there were eight vehicles parked in the driveway. (Docs. 257-1, Trial Tr. 185:22-24, 347:19-20; Def. Ex. 216.2).

8. Deputy Brakke with the Moody County Sherriff's Department put out a general call for assistance on the interagency radio for all available units in the area to come to the scene to assist. (Docs. 257, Trial Tr. 149:13-152:10; 160:1-3, 163:13-20; 257-1, Trial

3

Tr. 347:22-25). Chief Neuenfeldt with the Flandreau Santee Sioux Tribe shared this interagency radio channel with Moody County and the City of Flandreau. (Doc. 257, Trial Tr. 151:8-17).

9. Deputy Brakke contacted Flandreau City Police Officer Brent Goehring via radio asking for assistance at the farm location and Officer Goehring responded that he could assist. (Plfs' Ex. 20).

10. Deputy Brakke began questioning about five party-goers and ticketing them for minor consumption. (Doc. 257-1, Trial Tr. 186:15-20). Deputy Brakke detained these individuals in his patrol car parked at the end of the driveway. (Doc. 257-1, Trial Tr. 187:21-188:9).

11. At about 12:01 a.m. on June 18, 2017, one of the partygoers standing in the driveway with Deputies Brakke and Baldini started to have a seizure. (Doc. 257-1, Trial Tr. 313:18-22; Def. Ex. 216.6). Deputy Brakke requested an ambulance to assist with the seizure. (Doc. 257-1, Trial Tr. 313:18-24; Def. Ex. 216.6). By the time the ambulance arrived, the seizure had passed, and the individual did not need to be transported to the hospital for medical care. (Doc. 257-1, Trial Tr. 313:25-314:2).

12. Around 12:13 a.m., Deputy Brakke radioed that vehicles were arriving to pick up individuals who had fled the house party into the tree grove. (Doc. 257, Trial Tr. 163:13-23; Def. Ex. 216.18).

13. Officer Goehring arrived at the site around 12:17 a.m. (Plfs' Ex. 20).

14. Chief Neuenfeldt was also on duty that evening and responded to the house party scene pursuant to the Tribe's Law Enforcement Assist Agreement with Moody County because he heard Deputy Brakke's radio request for all available units to assist. (Docs. 257, Trial Tr. 149:13-152:10; 257-1, Trial Tr. 186:2-5; 257-2, Trial Tr. 512:23-513:5).

15. Sergeant Kurtz with the South Dakota Highway Patrol also arrived at the farm location to assist the officers. (Plfs' Ex. 25).

16. Chief Neuenfeldt, Deputy Baldini, and Sergeant Kurtz searched the woods and the property for any other partygoers who had fled. (Docs. 257-2, Trial Tr. 513:11-15, 514:13-16; 257-1, Trial Tr. 348:4-23).

17. Deputy Brakke observed at least three cars drive north past the driveway to the abandoned house, stop about a half of a mile past the driveway, and then speed off as though they were picking up partygoers who had fled. (Doc. 257-2, Trial Tr. 513:21-25; Plfs' Ex. 21). Deputy Brakke relayed via radio to the other police units that these cars may be picking up people that ran from the house. (Plfs' Ex. 21).

18. The evening of June 17, 2017, Tahlen Bourassa, an acquaintance of Micah Roemen's from high school, and Morgan Ten Eyck went over to Micah's home. (Doc. 257-2, Trial Tr. 573:8-18). Bourassa helped Micah work on the rear drum brakes of an old Ford pickup and the three of them then went for a drive in Bourassa's 2007 Dodge Ram 2500 pickup. (Docs. 257-2, Trial Tr. 573:19-575:3, 590:10-12; 257-3, Trial Tr. 713:24-25). None of them had been drinking alcohol that night or were otherwise under the influence of any illegal substances. (Docs. 257, Trial Tr. 181:1-7; 257-2, Trial Tr. 574:8-11; Plfs' Exs. 32, 251).

19. Micah Roemen was 20 years old, Morgan was 19 years old and Bourassa was approximately 23 years old. (Doc. 257-2, Trial Tr. 578:1-2, 565:11-24, 565:23-566:2; Plfs' Ex. 32). Bourassa was on probation at the time and was wearing an ankle bracelet that monitored his location. (Plfs' Ex. 28).

20. Around 1:20 a.m., after the party had been broken up, Deputy Brakke was in or near his police cruiser in the driveway giving tickets for underage drinking and processing some of the partygoers. (Doc. 257-1, Trial Tr. 186:15-20; Plfs' Exs. 15, 19, 21). Chief Neuenfeldt, Deputy Baldini, and Sergeant Kurtz had finished their search of the property and joined Deputy Brakke at the end of the driveway. (Plfs' Exs. 15, 19, 25). Sergeant Kurtz was in his vehicle at the end of the driveway. (Plfs' Exs. 15, 19, 25).

21. The officers noticed a vehicle traveling slowly eastbound on 244th Street. The vehicle turned north on 484th Avenue towards the farm property. (Docs. 257-1, Trial Tr. 349:12-16; 257-2, Trial Tr. 515:1-7). The vehicle that was approaching the farm

property was the gray Dodge Ram pickup being driven by Tahlen Bourassa. Bourassa was driving, Morgan was sitting in the middle, and Micah was sitting in the far passenger's seat. (Doc. 257-2, Trial Tr. 574:12-14).

22. Sergeant Kurtz drove south toward the vehicle. (Docs. 257-2, Trial Tr. 515:6-21, 575:25-576:6). After Sergeant Kurtz passed the vehicle, he turned around and activated his emergency lights in order to stop the vehicle and investigate whether any of the occupants had been at the party. (Docs. 257, Trial Tr. 30:1-19; 257-2, Trial Tr. 515:6-21, 575:25-576:6, 588:17-22).

23. Deputy Brakke activated his emergency lights on his vehicle parked in the driveway as Bourassa's vehicle approached. (Docs. 257-1, Trial Tr. 189:11-19; 257-2, Trial Tr. 516:3-8).

24. Chief Neuenfeldt crossed the road to the driver's side of the truck, holding a flashlight in his left hand and shining it at the vehicle to signal it to stop. (Docs. 257-1, Trial Tr. 351:6-9; 257-2, Trial Tr. 516:10-24, 563:13-18). Deputy Baldini stayed near the passenger side where Micah sat. (Docs. 257-1, Trial Tr. 351:6-12).

25. Bourassa briefly brought the vehicle to a stop near the driveway. (Docs. 257, Trial Tr. 44:2-4; 257-1, Trial Tr. 319:4-8; 257-2, Trial Tr. 517:6-7, 576:21-25). As Chief Neuenfeldt approached his side of the truck, Bourassa appeared to Micah to be very scared and locked his doors. (Doc. 257-2, Trial Tr. 577:13-16). Chief Neuenfeldt began to yell commands to the occupants of the truck and commanded Bourassa to get out of the vehicle and threatened to arrest him. (Docs. 257-1, Trial Tr. 319:9-13; 257-2, Trial Tr. 577:13-20).

26. Chief Neuenfeldt heard the engine noise of Bourassa's truck increase. (Plfs' Ex. 15). The truck began to accelerate and Chief Neuenfeldt drew his pistol with his right hand. (Docs. 257-1, Trial Tr. 324:10-12; 257-2, Trial Tr. 504:7-23, 563:1-18, 577:19-22; Plfs' Ex. 15). The pistol had a shell in the chamber and Chief Neuenfeldt pointed it at the vehicle. (Doc. 257-2, Trial Tr. 563:25-564:1; Plfs' Ex. 15). Chief Neuenfeldt reported that he "was unable to get a clear line of sight without risk of hitting a passenger." (Plfs'

Ex. 15). Bourassa fled in his truck with Morgan and Micah in the passenger seats. (Doc. 257-2, Trial Tr. 577:21-22).

27. Chief Neuenfeldt reported and testified after the incident that as Bourassa fled, he was struck by the truck in the left leg and shoulder area, knocking him to his knees. (Doc. 257-2, Trial Tr. 518:19-25, 520:14-19; Plfs' Ex. 15). Chief Neuenfeldt testified that he dropped his flashlight when he was impacted by the truck. (Doc. 257-2, Trial Tr. 520:20-23).

28. The Court does not find that Chief Neuenfeldt was knocked to his knees by Bourassa's truck striking him. The video of the pursuit clearly shows Chief Neuenfeldt in a standing position before bending from his knees to pick up his dropped flashlight and then running to his Dodge Charger V-8 police cruiser. (Plfs' Ex. 101; Def's Exs. 214, 222).

29. Less clear is whether Chief Neuenfeldt was side-impacted by Bourassa's truck in any way. The Court does not find Chief Neuenfeldt's testimony to be credible for several reasons. First, Chief Neuenfeldt's report that the impact of Bourassa's truck knocked him to his knees is inconsistent with this Court's view of the evidence. Additionally, Chief Neuenfeldt's deposition testimony, read at trial, stating that he had been struck by the front bumper of Bourassa's vehicle is not supported by the evidence or even by defense expert, Dr. Peles. (Docs. 257-2, Trial Tr. 473:5-475:13; 257-7, Trial Tr. 1536:21-22; Def. Ex. 222). Finally, Sheriff Wellman testified that over the course of Neuenfeldt's two years of employment as a deputy sheriff with Moody County, he did not find Neuenfeldt to be truthful to him and others and testified that this was one of the reasons Sheriff Wellman eventually fired Neuenfeldt. (Doc. 257 at 132:16-134:8). Deputy Baldini testified that he witnessed Chief Neuenfeldt getting up from the ground, but was on the other side of the pickup before Bourassa fled and acknowledged that the video played for him in Court showed Chief Neuenfeldt bending down to pick up his flashlight. (Doc. 257-1, Trial Tr. 198:14-21).

30. The pursuit vehicle video does not show any impact and there was no witness to the impact. Defense expert, Dr. Joseph Peles, testified that a "probable interaction occurred" between Bourassa's side mirror and Chief Neuenfeldt's left shoulder because

the video shows the "flashlight beam going onto the ground between the left front and left rear tires and illuminating the ground in between." (Doc. 257-6, Trial Tr. 146:9-14). The Court is unable to determine from the videos and photographs in the parties' expert reports that Chief Neuenfeldt dropped his flashlight because of a side impact with the mirror of Bourassa's truck. If anything, page 29 of Dr. Peles's report shows some distance between the truck and the flashlight before Chief Neuenfeldt dropped his flashlight approximately two-hundredths of a second later. (Def. Ex. 222). The Court finds from the pursuit video that Chief Neuenfeldt was by the door of the pickup when he demanded that the doors be opened. (Def. Ex. 214). This places Chief Neuenfeldt behind the mirror on the pickup. Accordingly, the Court finds that it was unlikely that the side mirror struck him as the pickup subsequently moved forward.

31. Additionally, Chief Neuenfeldt testified that he had pointed his pistol at the vehicle as it began accelerating and reported that he "was unable to get a clear line of sight without risk of hitting a passenger." (Plfs' Ex. 15). Chief Neuenfeldt reported to tribal police officer Nicolas Cottier later that evening that if he had been cross-deputized, Chief Neuenfeldt would have shot Bourassa. (Doc. 257-1, Trial Tr. 291:17-21). Whether he pointed his pistol at the truck using just his right hand or whether he dropped the flashlight in his left hand in order to take a steadier aim is not in the record. The Court concludes that it is more likely than not that Chief Neuenfeldt dropped the flashlight when pulling his pistol. Finally, the Court is unable to determine whether Chief Neuenfeldt was impacted by the truck from the video showing the tire tracks in relation to the position of Chief Neuenfeldt's flashlight on the road.

32. On the whole, the evidence does not show that more likely than not, Chief Neuenfeldt was impacted by Bourassa's vehicle.

33. After Bourassa's vehicle fled, Deputy Baldini ran across the street and got into the passenger's seat of Chief Neuenfeldt's police cruiser with Neuenfeldt in the driver's seat. (Docs. 257-1, Trial Tr. 325:1-4; 257-2, Trial Tr. 446:18-21).

**D.    Police Pursuit**

8

34. Sergeant Kurtz was behind Bourassa's truck as it sped away, and immediately initiated a high-speed pursuit going north on 484th Avenue around 1:21 a.m. (Plfs' Exs. 1, 2). Sergeant Kurtz listed the reason for initiating the pursuit as exhibition driving and failure to stop when directed by law enforcement. (Doc. 257, Trial Tr. 89:15-19; Plfs' Ex. 30).

35. Sergeant Kurtz radioed a supervisor, stating that he was in pursuit northbound on 484th Avenue and that he was going to back off because Bourassa was speeding at about 95 to 100 miles per hour on gravel. (Doc. 257, Trial Tr. 41:15-42:9; Plfs' Ex. 35).

36. Chief Neuenfeldt and Deputy Baldini initiated secondary pursuit in Chief Neuenfeldt's Dodge V-8 Charger police cruiser behind Sergeant Kurtz. (Doc. 257-2, Trial Tr. 461:18-21, 525:16-20). Chief Neuenfeldt's police cruiser was a new issue and was not equipped with a camera. (Docs. 257-2, Trial Tr. 429:17-19). Chief Neuenfeldt had a body camera, but it was never activated. (Docs. 257-2, Trial Tr. 429:20-23).

37. Chief Neuenfeldt radioed "HP28: He hit me with his truck. That's assault on law enforcement." (Doc. 257-2, Trial Tr. 521:22-523:7; Plfs' Ex. 35). Sergeant Kurtz radioed "10-4" in response. (Doc. 257-2, Trial Tr. 523:8-9).

38. From 484th Avenue, Bourassa turned west onto 242nd Street, and Sergeant Kurtz followed Bourassa. (Doc. 257-2, Trial Tr. 581:16-17; Plfs' Exs. 1, 2, 35). Sergeant Kurtz radioed that they had just crossed over 483rd Avenue and that he was speeding at about 90 miles per hour on the gravel road. (Plfs' Ex. 35).

39. Highway Patrol Trooper Chris Spielmann entered the area after hearing the pursuit on radio traffic. (Plfs' Ex. 35). Sergeant Kurtz gave Trooper Spielmann permission to deploy spikes. (Plfs' Ex. 35). Trooper Spielmann deployed spike strips ahead of Bourassa across 481st Avenue just north of 241st Street. (Plfs' Ex. 1).

40. After Chief Neuenfeldt radioed that he had been hit by the pickup, Deputy Brakke radioed that the minors he was ticketing in his vehicle identified the driver as possibly Tahlen "Brassna" out of Dell Rapids who was involved in a standoff a year ago. (Docs. 257, Trial Tr. 49:21-50:1, 92:12-93:8; 257-1, Trial Tr. 180:17-181:8; 257-2, Trial Tr. 523:13-524:6, 559:24-560:4; Plfs' Ex. 101). Sergeant Kurtz reported that he had

9

identified the first two digits of the Minnehaha County, South Dakota license plate on Bourassa' pickup as being "1K." (Doc. 257, Trial Tr. 50:8-20, 121:15) (Minnehaha County is the first county south of Moody County). Officers were unable to positively confirm the identity of the driver or passengers. (Docs. 257, Trial Tr. 94:13-18; 257-2, 524:7-14).

41. Bourassa turned northbound on 481st Avenue, and then turned east at 241st Street to avoid the spike strips. (Docs. 257, Trial Tr. 53:8-22; 257-2, Trial Tr. 581:21-582:2; Plfs' Exs. 1, 2, 35). Sergeant Kurtz pursued Bourassa east on 241st Street. (Plfs' Ex. 35). Kurtz radioed that Bourassa was pulling ahead of him on 241st Street travelling at approximately 100 miles per hour while he was pursuing at about 90 miles per hour on the gravel road. (Plfs' Ex. 35).

42. After traveling east on 241st Street for approximately 3 miles, Bourassa turned south onto 484th Avenue and then quickly turned east on 242nd Street. (Doc. 257-2, Trial Tr. 582:3-9; Plfs' Exs. 1, 2, 35).

43. Sergeant Kurtz continued to head south on 484th Avenue. (Doc. 257-2, Trial Tr. 582:8-11). Sergeant Kurtz radioed "I'm no longer pursuing I lost sight of him I believe I saw taillights east bound on 242 from 484 but I'm no longer in pursuit." (Def. Ex. 216.49).

44. Bourassa continued east down 242nd Street with his headlights off. (Doc. 257-2, Trial Tr. 582:12-14; 257-6, Trial Tr. 1437:14-16). At that time, a friend of Bourassa's, Kasen Sakry, called Bourassa on his cell phone. (Doc. 257-6, Trial Tr. 1436:22-24). Morgan answered the phone and said that Bourassa was running from the cops and that they were going down a gravel road with their lights off. (Doc. 257-6, Trial Tr. 1437:13-16). Sakry told Morgan to tell Tahlen to stop where he is at because he had an ankle monitor on at the time and that ultimately he would be located by the police. (Doc. 257-6, Trial Tr. 1437:18-21).

45. At some point, Bourassa's vehicle came to a stop on 242nd Street. (Doc. 257-2, Trial Tr. 582:12-14). While Bourassa's truck was stopped, Micah did not get out of the vehicle because he was very scared and did not know when Bourassa was going to take off again. (Doc. 257-2, Trial Tr. 582:20-24).

46. Chief Neuenfeldt and Deputy Baldini turned east on 242nd Street and saw Bourassa's taillights. (Docs. 257-2, Trial Tr. 527:4-9, 582:17-19; 257-6, Trial Tr. 1437:23-1438:3). Deputy Baldini radioed that he had a "vehicle northbound on 485 and 242 right now." (Doc. 257-2, Trial Tr. 582:25-583:3; Plfs' Ex. 35; Def. Ex. 216.49).

47. Chief Neuenfeldt initiated primary pursuit of Bourassa's pickup after Sergeant Kurtz stated he was no longer in pursuit. (Doc. 257-2, Trial Tr. 463:8-9, 583:6-13; Plfs' Ex. 2). Morgan relayed to Sakry over the phone that a cop had just turned down the gravel road and Bourassa took off again and the phone call ended. (Docs. 257-2, Trial Tr. 582:17-19, 527:4-9; 257-6, Trial Tr. 1437:23-1438:6).

48. Sergeant Kurtz radioed that he would try and get back in front of the vehicle to lay spikes. (Doc. 257, Trial Tr. 97:3-98:22; 257-2, Trial Tr. 527:10-11; Def. Ex. 216.49).

49. Chief Neuenfeldt and Deputy Baldini pursued Bourassa's pickup down 485th Avenue, a gravel road, for approximately five miles. (Doc. 257-2, Trial Tr. 463:8-9, 583:6-13; Plfs' Exs. 1, 2). Micah testified that Bourassa was driving the pickup as fast as it would go. (Doc. 257-2, Trial Tr. 598:1-4). There were times when Bourassa's vehicle and Chief Neuenfeldt's patrol car were driving in excess of a hundred miles per hour even on the gravel roads. (Docs. 257-1, Trial Tr. 328:8-15; 257-2, Trial Tr. 460:16-461:1). As they were traveling down 485th Avenue at high speeds at night, Micah was very scared and told Bourassa, mistakenly, that he believed 485th Avenue to be a dead-end road. (Doc. 257-2, Trial Tr. 594:16-595:17).

50. Bourassa turned west on 237th Street, also a gravel road, with Chief Neuenfeldt and Deputy Baldini in pursuit and traveled that road for about a mile before turning north onto 484th Avenue. (Doc. 257-2, Trial Tr. 463:25-464:3, 583:16-19; Plfs' Exs. 1, 2). After traveling north on 484th Avenue for about a mile, Bourassa turned west onto 236th Street and travelled along it for approximately two miles. (Plfs' Exs. 1, 2). Bourassa then turned north on 482nd Avenue. (Doc. 257-2, Trial Tr. 584:9-11). North of Highway 34, for a period of time, the pursuit continued onto a dirt, single-track between two corn fields before heading back onto maintained road. (Docs. 257, Trial Tr. 106:20-108:4; 257-2, Trial Tr. 528:13-529:16, 530:6-8, 583:23-25).

51. The pursuit continued west onto 231st Street before turning north on Highway 13 towards the town of Flandreau. (Doc. 257-2, Trial Tr. 584:9-11; Plfs' Exs. 1, 2). As Bourassa approached Highway 13, Bourassa's truck approached a civilian vehicle going northbound, and passed it in a no-passing zone right before the bridge. (Doc. 257-2, Trial Tr. 531:7-18).

52. FSST Tribal Police Officer Brian Arnold was driving toward Bourassa's vehicle on 231st Street. (Doc. 257-1, Trial Tr. 378:22-380:5, 385:8-19). Bourassa met Officer Arnold at the crest of a hill on 231st Street and forced Officer Arnold into the ditch. (Doc. 257-1, Trial Tr. 385:8-19).

53. Once Bourassa crossed the bridge on Highway 13 just north of Flandreau, he came to a brief stop at the intersection of Highway 13 and 229A. (Doc. 257-2, Trial Tr. 531:19-532:21, 584:14-17). Micah did not get out of the vehicle because he was scared and did not know when Tahlen was going to take off again. (Doc. 257-2, Trial Tr. 598:14-23). Around 1:42 a.m., Deputy Baldini radioed that they "might be coming to a stop here." (Def. Ex. 216.60). Chief Neuenfeldt stopped his cruiser in the southbound lane behind Bourassa and Deputy Baldini got out of the cruiser and started to yell commands. (Docs. 257-1, Trial Tr. 337:4-22; 257-2, Trial Tr. 532:6-25).

54. Bourassa suddenly reversed to turn east down 229A. (Doc. 257-2, Trial Tr. 532:25-533:6, 584:25-585:2). As Bourassa was driving down 229A, Roemen warned Bourassa that it was a dead-end road, but he continued down 229A at a high rate of speed. (Doc. 257-2, Trial Tr. 585:3-12, 597:5-9).

55. Sometime after Deputy Baldini got back in the cruiser, and approximately 14 seconds after they radioed they might be coming to a stop, Deputy Baldini radioed "229A and South Dakota Highway 13 eastbound." (Doc. 257-1, Trial Tr. 338:8-19; Def. Ex. 216.60). Chief Neuenfeldt turned onto 229A and pursued the vehicle at speeds well in excess of the 55 mile per hour speed limit down what he and Deputy Baldini knew to be a one-track dead-end, gravel road. (Docs. 257-1, Trial Tr. 339:23-24, 342:20-24, 344:4-6, 397:12-14; 257-2, Trial Tr. 488:19-20).

56. Chief Neuenfeldt lost sight of the vehicle and its taillights from the dust. (Docs. 257-2, Trial Tr. 534:22-524; 257-7, Trial Tr. 1685:1-5). Given the dust, it is unlikely that the taillights of Bourassa's truck would have been visible to Chief Neuenfeldt going down 229A. (Doc. 257-3, Trial Tr. 790:8-13). The headlights and emergency lights were illuminated on Chief Neuenfeldt's cruiser. (Doc. 257-2, Trial Tr. 555:7, 558:2-4). In the truck's side mirror, Micah observed Chief Neuenfeldt's police cruiser pursuing them fast down 229A. (Docs. 257-2, Trial Tr. 585:6-18, 599:19-600:11; 257-3, Trial Tr. 790:4-791:7).

57. Chief Neuenfeldt knew that there were no officers on 229A ahead of Bourassa, that back-up units were approaching, and that no other roads intersected 229A. (Docs. 257-1, Trial Tr. 335:17-19; 257-2, Trial Tr. 493:15-25; Plfs' Ex. 35). There were crops in the pasture beyond the road and the Big Sioux River also lay beyond. (Docs. 257, Trial Tr. 79:13-81:14; 257-2, Trial Tr. 493:5-25).

58. To avoid a large tree at the end of 229A, Bourassa pulled the truck off to the left, which sent the truck sliding and rolling into the pasture. (Doc. 257-2, Trial Tr. 600:20-601:14).

59. Chief Neuenfeldt reported that he "lost site of the vehicle for a brief moment due to a hill near a grove of trees and the dust from the suspect vehicle" and testified that it was "after the hill, when we seen the lights," from Bourassa's vehicle illuminating the sky when Deputy Baldini radioed that he believed the Bourassa vehicle had wrecked. (Doc. 257-2, Trial Tr. 495:6-12, 537:14-15; Plfs' Ex. 15). The grove of trees began approximately 1,830 feet[2] from Highway 13 and spanned for some undetermined distance. (Def. Ex. 222; Doc. 257-7, Trial Tr. 1515:6-7). It is unclear from the record exactly where the hill was located within the span of the tree grove.[3]

---

[2]      The tree grove is no longer there and was removed before the Court travelled the route of the pursuit on the first day of trial. Dr. Joseph Peles used Google Earth to estimate that the tree grove was around 1,830 feet from Highway 13. (Doc. 257-7, Trial Tr. 1515:4-7).

[3]      Dr. Peles testified that based on his in-person visit the day before trial he'd "say the crest of the hill is at about 2,000 feet." (Doc. 257-7, Trial Tr. 1515:8-10). The Court does not put much weight in Dr. Peles's estimation. He did not testify as to how he arrived at that estimate.

60. Approximately 32 seconds after Deputy Baldini radioed that Bourassa was on "229A and South Dakota Highway 13 eastbound," Deputy Baldini radioed that he believed they had wrecked. (Def. Exs. 216.60, 222). It is unclear exactly where Chief Neuenfeldt and Deputy Baldini were located when this radio transmission was made.

61. Despite knowing that it was a dead-end road, Chief Neuenfeldt struggled to stop his police cruiser and ran into a downed fence attached to a railroad tie and wooden post. (Docs. 257-1, Trial Tr. 343:4-8, 343:19-344:15; 257-2, Trial Tr. 470:11-18, 471:15-22; Def. Ex. 213). The fence wrapped around the top of the police cruiser's hood. (Doc. 257-3, Trial Tr. 695:2-23; Def. Ex. 213). Photographs of Chief Neuenfeldt's cruiser after the incident show that the push bumper bolted to the frame of his police cruiser was bent. (Doc. 257-3, Trial Tr. 695:2-23; Def. Ex. 213).

62. Chief Neuenfeldt's patrol vehicle came to a stop some distance from Bourassa's truck. (Plfs' Exs. 46, 48; Def. Ex. 213; Doc. 257-2, Trial Tr. 538:20-22). Chief Neuenfeldt and Deputy Baldini exited the vehicle, approached Bourassa's vehicle, and found that the occupants were not inside. (Doc. 257-2, Trial Tr. 538:12-22). They went around the backside of the vehicle, searched the area with their flashlights, and observed and then radioed that the three occupants had been ejected. (Doc. 257-2, Trial Tr. 538:12-22; Plfs' Ex. 15; Def. Ex. 216.62).

63. Plaintiffs' expert, Brad Booth, estimated that based on the radio dispatch logs,[4] 19 seconds elapsed between when Deputy Baldini radioed that Bourassa was travelling eastbound on 229A and when he radioed that he believed Bourassa had wrecked. (Plfs' Ex. 51). Mr. Booth estimates that based on the time these calls were made and the 2,914.614-foot distance that Chief Neuenfeldt had to travel to reach the end of 229A,

---

[4]    The Court finds that the time stamps on the audio files from Moody County Dispatch and on Sergeant Kurtz's dashcam video are more reliable than time stamps on the radio dispatch log. Radio dispatch logs are created when a dispatcher types in a radio communication received. (Docs. 257, Trial Tr. 58:20-59:32; 257-2, Trial Tr. 609:20-610:5; 257-7, Trial Tr. 1511:7-1512:3). Radio communications were paraphrased by the dispatcher in this case, and the delay between the radio communication and the creation of the dispatch log results in a disparity between the time stamp associated with the dispatch log and radio communication recorded in the audio files. (Docs. 257-7, Trial Tr. 1511:7-1512:3; 257-2, Trial Tr. 609:20-610:5). The audio files from Moody County Dispatch and on Sergeant Kurtz's dashcam video both indicate that 32 seconds passed between Baldini's "eastbound on 229A" call and "I believe they wrecked" call.

his police cruiser was travelling at an average speed of more than 104 miles per hour. [5] (Plfs' Ex. 51).

64. Defense expert, Joseph D. Peles, estimated that based on the audio files, approximately 32 seconds elapsed between when Deputy Baldini radioed that Bourassa was travelling eastbound on 229A and when he radioed that he believed Bourassa had wrecked. (Def. Ex. 222). Presuming the eastbound on 229A call by Deputy Baldini occurred exactly when Chief Neuenfeldt turned on 229A and the "believed they wrecked" call occurred at the beginning of the tree grove which Dr. Peles estimates to begin turning 1,830 feet from Highway 13, Dr. Peles estimates that the police cruiser was pursuing Bourassa down 229A at an average speed of 39 miles per hour. (Def. Ex. 222).

65. The Court finds that there are too many unknown variables to render the average speed calculations by Mr. Booth and Dr. Peles reliable. The accuracy of the average speed calculations by Mr. Booth and Dr. Peles are dependent on the exact location of Chief Neuenfeldt's cruiser at the time of the "eastbound on 229A" and "believed they wrecked" radio transmissions. Both experts concede, and the Court agrees, that it is impossible to reliably determine the exact location of Chief Neuenfeldt's cruiser at the time these radio transmissions were made. (Docs. 257-3, Trial Tr. 734:12-735:5, 799:16-800:3; 257-7, Trial Tr. 1525:17-19). First, it is disputed how long it took Chief Neuenfeldt's vehicle to begin turning onto 229A. Deputy Baldini testified that they were stopped 20-30 yards north of 229A and had to reverse that distance before navigating the turn onto 229A. (Doc. 257-1, Trial Tr. 338:1-3; Plfs' Ex. 47). Contrary to Deputy Baldini, Chief Neuenfeldt testified that they were stopped at the intersection of 229A and Highway 30 and did not have to reverse before pursuing Bourassa down 229A. (Doc. 257-2, Trial Tr. 532:12-18, 534:8-13). Second, it is unclear from the record exactly when Baldini radioed "eastbound on 229A" after he got back in the vehicle. (Doc. 257-1, Trial Tr. 338:8-338:19). Third, it is unclear from the record exactly where Chief Neuenfeldt's vehicle was located when the "I believe he wrecked" call was made. (Docs. 257-1, Trial Tr. 338:1-22; 257-7, Trial Tr. 1524:18-25). Dr.

---

[5]    The average speed calculation does not account for acceleration and deceleration and is thus not the highest speed Bourassa's vehicle was travelling. (Doc. 257-3, Trial Tr. 689:24-25, 727:17-23).

Peles acknowledges that the timing and location of Chief Neuenfeldt's cruiser when Deputy Baldini made the "I believe he wrecked" call is unknown and Deputy Baldini did not detail in his report or testimony exactly when he made that call. (Def. Ex. 222; Plfs' Ex. 19). All that the Court is able to determine is that Deputy Baldini made the "I believe he wrecked" call sometime before the end of 229A. (Def. Ex. 222). Given these unknowns, the Court finds that the average speed estimations of Plaintiffs' and Defense experts to be unreliable.

66. The Court finds that based on the record as a whole, Chief Neuenfeldt pursued Plaintiffs well in excess of the speed limit down 229A. Deputy Baldini testified that "obviously we were travelling in excess of the speed limit" of 55 miles per hour during the pursuit down 229A. (Doc. 257-1, Trial Tr. 332:22-333:6, 344:3-6, 397:4-14). Micah also testified that he observed Chief Neuenfeldt continuing to pursue them at high speeds down 229A. Additionally, the fact that Chief Neuenfeldt was unable to see Bourassa's truck during the pursuit down 229A because of dust and the fact that Chief Neuenfeldt was unable to stop his vehicle at the end of 229A before hitting the fence, despite knowing it was a dead end, is further evidence that Chief Neuenfeldt was pursuing Plaintiffs at a high rate of speed down 229A.

67. While Chief Neuenfeldt and Deputy Baldini were the first responders on the accident scene, South Dakota Highway Patrolman, Denver Kvistad; Flandreau Police Department Officer, Brent Goehring; Flandreau Santee Sioux Tribe, Officer Arnold; Moody County Sheriff, Carl Brakke; South Dakota Highway Patrolman, Sergeant Kurtz; and South Dakota Highway Patrolman Chris Spielman, all arrived within one or two minutes of the crash. (Plfs' Exs. 25, 39).

68. The entirety of the approximately 21-minute pursuit occurred in Moody County outside the Flandreau Santee Sioux Tribe reservation. (Docs. 257-2, Trial Tr. 414:9-12; 257, Trial Tr. 142:22-143:1; Plfs' Ex. 2). The Court travelled the entirety of the pursuit route on the first day of trial.

69. Neither Bourassa nor Morgan, given their injuries, have recollection of the events at issue in this case.

### E. Law Enforcement Handbook

70. At the time of this incident, FSST police officers were required to comply with all mandatory standards in the Bureau of Indian Affairs Law Enforcement Handbook, Third Edition ("Law Enforcement Handbook"). (Doc. 257-1, Trial Tr. 273:1-274:12; Plfs' Ex. 67 at 39, 83).

71. The Law Enforcement Handbook provided in relevant part:

> 2-24-09    PURSUITS-BEYOND  JURISDICTION  OR  INITIATED  BY ANOTHER AGENCY
>
> . . .
>
> B. The following guidelines governing joining a pursuit initiated by another jurisdiction:
>
> 1.    Officers must follow LE Handbook Section 2-24-02, Authorization for Pursuit.
>
> 2.    An officer may participate in a pursuit initiated by another jurisdiction to assist with officer safety concerns but should request that the pursuit be terminated if conditions pose a safety hazard.
>
> 3.    OJS officers will discontinue pursuits initiated by another jurisdiction when the pursuit continues outside their jurisdiction, unless officer safety becomes a consideration.
>
> (Plfs' Ex. 8).

### F. United States Scope of Employment Certification

72. The United States Attorney issued a certification of scope of employment for Chief Neuenfeldt as to Plaintiffs' negligence claim alleged in Count I of the Complaint stating that at all times, Chief Neuenfeldt was acting within his scope of employment in carrying out the Tribe's section 638 contract. (Doc. 12).

### JURISDICTION AND LIABILITY

73. The Federal Tort Claims Act ("FTCA") "was designed primarily to remove sovereign immunity of the United States from suits in tort." *Levin v. United States*, 568 U.S. 504, 506 (2013) (citation omitted).  The Act gives federal district courts exclusive jurisdiction over claims against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or

17

omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Sheridan v. United States*, 487 U.S. 392, 398 (1988) (citing 28 U.S.C. § 1346(b)(1)).

I.    **Jurisdictional Issues**

74. The Government argues that this Court lacks jurisdiction over Plaintiffs' claims because: (1) Officer Neuenfeldt was not acting within the scope of his employment at the time of the pursuit; and (2) the discretionary function exception to the FTCA applies to bar Plaintiffs' claims because at all relevant times, Chief Neuenfeldt had discretion to continue the pursuit. (Doc. 275 at 23892-23901). The Court will address each argument in turn.

A.    **Acting within scope of employment**

75. The FTCA "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007) (citing 28 U.S.C. § 2679(b)(1)). Under the FTCA, "an action against the United States is the only remedy for injuries caused by federal employees acting within the scope of their employment." *Anthony v. Runyon*, 76 F.3d 210, 212-13 (8th Cir. 1996) (citing 28 U.S.C. § 2679(d)(1)). The purpose of the FTCA is "to shield covered employees . . . from liability from suit" and to place the "cost and effort of defending the lawsuit . . . on the Government's shoulders." *Osborn*, 549 U.S. at 248, 252.

76. Tribal employees are covered employees for purposes of the FTCA under certain circumstances. *See FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995). Under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), tribes may enter into 638 contracts with the United States to "assume the administration of programs formerly administered by the federal government on behalf of the tribe." *Hinsley v. Standing Rock Child Protective Servs.*, 516 F.3d 668, 670 (8th Cir. 2008) (citing 25 U.S.C. § 450f(a)). Tribal officers are considered covered

employees for purposes of the FTCA if they are " 'acting within the scope of their employment in carrying out' " such a contract. *FGS Constructors, Inc.*, 64 F.3d at 1234-35 (quoting Pub.L. No. 101-512, Title III, § 314, 104 Stat.1959 (codified at 25 U.S.C. § 450f notes)); *Hinsley*, 516 F.3d at 672 ("Tort claims against tribes, tribal organizations, or their employees, that arise out of the tribe or tribal organization carrying out a self-determination contract, are considered claims against the United States and are covered to the full extent of the FTCA.").

77. The United States argues that the question of whether an employee was acting within the scope of employment is a jurisdictional issue upon which Plaintiffs bear the burden of proof. (Doc. 275 at 23892). The United States contends that Plaintiffs failed to meet this burden because, it argues, the facts presented at trial show that Chief Neuenfeldt was not acting pursuant to the Tribe's 638 contract at the time of the events in question. (Doc. 275 at 23893).

78. When a federal employee is sued, the Attorney General has the authority to certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). Under the FTCA's implementing regulations, the United States Attorney for the district court in which the civil action at issue is brought "is authorized to make the statutory certification that the Federal employee was acting within the scope of his office or employment with the Federal Government at the time of the incident out of which the suit arose." 28 C.F.R. § 15.4(a). The certification, "although subject to judicial review, is prima facie evidence that the employee's challenged conduct was within the scope of employ." *Brown v. Armstrong*, 949 F.2d 1007, 1012 (8th Cir. 1991). A plaintiff opposing the certification bears the burden of "com[ing] forward with specific facts rebutting the government's scope-of-employment certification." *Id.*

79. Upon certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee. *Osborn*, 549 U.S. at 230, 241; 28 U.S.C. § 2679(d)(1). The litigation is thereafter governed by the Federal Tort Claims Act ("FTCA"), 60 Stat. 842. *Id.*

19

80. The Annual Funding Agreement between the Tribe and the BIA, incorporated by reference in the Tribe's section 638 contract, states that "[w]hen operating within the scope of this contract, the [Tribe] may be required to leave or operate outside of Indian country." (Plfs' Ex. 60). Here, Chief Neuenfeldt arrived on the scene pursuant to the Tribe's Mutual Assist Agreement with Moody County after Deputy Brakke with the Moody County Sherriff's Department put out a general call for assistance on the interagency radio for all available units in the area to come to the scene to assist. (Docs. 257, Trial Tr. 149:13-152:10, 160:1-3, 162:15-16; 257-1, Trial Tr. 186:2-14). Sheriff Wellman testified that the way Deputy Brakke's call went out, it was appropriate for Chief Neuenfeldt to respond to the scene under the Tribe's Mutual Assist Agreement with Moody County and the Court finds this to be the case. (Doc. 257, Trial Tr. 149:13-152:10).

81. As the Court noted in its opinion granting in part and denying in part Chief Neuenfeldt's motion to dismiss, the United States Attorney filed a Certification of Scope of Employment pursuant to 28 C.F.R. § 15.4 on March 18, 2019, certifying that Chief Neuenfeldt was an employee of the federal government and was acting within the scope of his office or employment at the time of the alleged conduct. (Doc. 12). The United States' certification of employment was never challenged by Plaintiffs, nor withdrawn, and the United States defended against Plaintiffs' claims at trial. Accordingly, the Court finds that Chief Neuenfeldt was acting within the scope of his employment. *See, e.g.*, *Doe v. Meron*, 929 F.3d 153, 160-61 (4th Cir. 2019) ("[I]f a plaintiff does not challenge the Attorney General's certification, the certification is conclusive."); *Saleh v. Bush*, 848 F.3d 880, 889 (9th Cir. 2017) ("The Attorney General's decision regarding scope of employment certification. . . is conclusive unless challenged."); *Hockenberry v. United States*, 42 F.4th 1164, 1170 (10th Cir. 2022) (stating that the scope of employment certification "is prima facie evidence that an employee's challenged conduct was within the scope of his employment. The plaintiff then bears the burden of rebutting the scope-of-employment certification with specific facts."); *Piekarski v. United States*, Civ. No. 16-cv-1752, 2017 WL 6883879, at *3, n.2 (D. Minn. Dec. 19, 2017) (stating that certification "is prima facie evidence that that employee's challenged conduct was within the scope of employ[ment]. Therefore, 'the burden of

altering that status quo' is on the plaintiff, who must come forward with specific facts rebutting the government's scope-of-employment certification.") (citation omitted); *cf. Osborn v. Haley*, 549 U.S. 225, 242 (2007) ("Section 2679(d)(2) does not preclude a district court from resubstituting the federal official as defendant *for purposes of trial* if the court determines . . . that the Attorney General's scope-of-employment certification was incorrect.") (emphasis added). For these reasons, the Court declines the Government's request to dismiss Plaintiffs' claims on the basis that Chief Neuenfeldt was not acting within the scope of his office or employment.

**B.    Discretionary function exception**

82. The broad waiver of the Government's sovereign immunity provided by the FTCA is subject to a number of exceptions set forth in 28 U.S.C. § 2680. In their brief, the United States renews[6] its objection to the Court's jurisdiction over Plaintiffs' claims, arguing that they are barred by the discretionary function exception to the FTCA. (Doc. 275 at 23896). The discretionary function exception provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

83. Courts use a two-step test to determine whether the discretionary function exception applies. *Hilger v. United* States, 87 F.4th 897, 899 (8th Cir. 2023) (citation omitted). "The first inquiry is whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice. . . ." *Id.* (citation omitted); *see also United States v. Gaubert*, 499 U.S. 315, 322 (1991). "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation,[7] or policy specifically prescribes a course of action for an employee to follow,' because 'the

---

[6]    The United States argued in its Motion to Dismiss (Doc. 90), its Motion for Summary Judgment (Doc. 98), and Motion for Reconsideration (Doc. 144) that the discretionary function exception barred Plaintiffs' claims.

[7]    In *Gaubert v. United States*, the United States Supreme Court acknowledged that the discretionary function exemption also applies to an agency's internal guidelines." *See* 499 U.S. 315, 324 (1991) (stating that an agency may rely on internal guidelines rather than on published regulations).

employee has no rightful option but to adhere to the directive.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). If the challenged conduct is discretionary, the next inquiry is determining "whether that judgment is the kind that the discretionary function exception was designed to shield." *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984). "Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Gaubert*, 499 U.S. at 323.

84. "The contours of the discretionary function cannot be defined with precision." *Aslakson v. United States*, 790 F.2d 688, 691 (8th Cir. 1986). "[E]ach case must be analyzed individually based upon relevant criteria in determining whether the acts of government employees are protected from liability under section 2680(a)." *Id.*

85. As the Court stated in its opinion granting in part and denying in part the Government's Motion to Dismiss, "at issue in this case . . . is whether Neuenfeldt had discretion under the BIA Law Enforcement Handbook to join in and then continue a pursuit initiated by another jurisdiction in this case, Moody County which started and continued entirely outside the boundaries of the Tribe's reservation." (Doc. 142 at 3377-78). Section 2-24-09 of the Law Enforcement Handbook is entitled "Pursuits-Beyond Jurisdiction or Initiated by Another Agency," and subsection (B)(3) provides that "officers will discontinue pursuits initiated by another jurisdiction when the pursuit continues outside their jurisdiction, unless officer safety becomes a consideration." (Plfs' Ex. 8). The Government argues that determining officer safety concerns is a discretionary decision and argues as well that based on the evidence submitted at trial, Plaintiffs have failed to show by a preponderance of evidence that officer safety was not a concern throughout the entirety of the pursuit. (Doc. 275 at 23900-01).

86. The Court finds the cases cited by the Government[8] in support of its argument that Chief Neuenfeldt had discretion to continue the pursuit are distinguishable from the

---

[8]    *Hillger v. United States*, 87 F.4th 897 (8th Cir. 2023); *Alberty v. United States*, 54 F.4th 571 (8th Cir. 2022); *Mound v. United States*, Civ. No. 22-1721, 2023 WL 3911505, at *1-2 (8th Cir. 2023). (Doc. 275 at 23900, n.7).

case at bar. In *Alberty v. United States*, a pedestrian sued the United States under the FTCA for injuries sustained from a fall on federal property. 54 F.4th 571 (8th Cir. 2022). The plaintiff argued, in part, that under 40 U.S.C. § 3312, the Government had a mandatory duty and failed to comply with recognized building codes which required stairsteps to be a certain height. *Id.* at 576. Specifically, section 3312 required that:

> [e]ach building constructed or altered by the [GSA] . . . shall be constructed or altered, to the maximum extent feasible as determined by the Administrator . . ., in compliance with one of the nationally recognized model building codes . . . as the Administrator decides is appropriate.

*Id.* On appeal, the Eighth Circuit held that the "as determined by" language in section 3312(b), "exudes deference" to the GSA. *Id.* at 576. The court noted as well that section 3312(b) does not specify a particular building code and that the Administrator "presumably retains discretion not only over how to comply but over which code to comply with when codes conflict or deviate from one another." *Id.* The court held that because the plaintiff had not pointed to "any statutes or mandatory regulations that sufficiently constrain the GSA's discretion over the building's design, he [ ] failed the first step in overcoming the discretionary-function exception." *Id.*

87. In *Mound v. United States*, Civ. No. 22-1721, 2023 WL 3911505, at *1-2 (8th Cir. 2023) and *Hilger v. United States*, 87 F.4th 897 (8th Cir. 2023), the Eighth Circuit Court of Appeals did not examine whether the conduct was discretionary in nature because the appellants had conceded that there were no mandatory statutes or regulations that constrained the Government's discretion in those cases. *Hilger*, 87 F.4th at 899; *Mound*, 2023 WL 3911505, at *1-2. Instead, the appellants in these cases argued that the discretionary function exception applied because the Government's discretionary conduct was not grounded in policy considerations. *Id.*

88. In contrast to the *Alberty*, *Mound*, and *Hilger* cases, as this Court discussed at length in its Memorandum Opinion and Orders ruling on the Government's Motion to Dismiss and Motion for Summary Judgment (Docs. 66, 142), subsection (B)(3) of Section 2-24-09 of the Law Enforcement Handbook removes discretion from government employees because it specifically mandates that "officers will discontinue pursuits initiated by another jurisdiction when the pursuit continues outside their jurisdiction,

unless officer safety becomes a consideration."[9]  As the Court discussed in previous opinions, Section 2-24-09(B)(3) governed Chief Neuenfeldt's conduct in this case because the pursuit was initiated and continued entirely "outside [Officer's Neuenfeldt's] jurisdiction" which the Court interpreted under the Law Enforcement Handbook as being the Flandreau Santee Sioux Indian Reservation. (Docs. 66 at 1071; 142 at 3378).

89. There is no evidence to support that officer safety was a consideration when Chief Neuenfeldt pursued Plaintiffs down 229A.  Chief Neuenfeldt knew that 229A was a dead-end road, that there were no other officers on 229A ahead of Bourassa, that back-up units were approaching, and that no other roads intersected 229A. (Doc. 257-1, Trial Tr. 335:17-19, 344:23-345:1; 257-2, Trial Tr. 493:15-494:8).  Three other officers on the scene, including Chief Neuenfeldt, as well as Plaintiffs' expert, Brad Booth, testified that officer safety was not a consideration when Bourassa fled down 229A. (Doc. 257, Trial Tr. 79:25-80:3, 81:2-12; 257-1, Trial Tr. 292:5-9; 257-2, Trial Tr. 494:4-8; 257-3, Trial Tr. 692:11-13).  Defense expert, Dr. Peles, did not testify to the contrary.  (Doc. 257-7, Trial Tr. 1624:13-1627:2, 1690:8-13).  Accordingly, Chief Neuenfeldt did not have discretion to engage in a high-speed pursuit of Plaintiffs down that road.

90. The Court also rejects the Government's argument that considerations of officer safety render Chief Neuenfeldt's conduct "susceptible to policy analysis" under the second prong of the discretionary function analysis. (*See* Doc. 275 at 23900, n.7).  In deciding whether Chief Neuenfeldt's decision to pursue Plaintiffs outside the boundaries of the reservation is "susceptible to policy analysis," this Court must look to whether his decision was "grounded in social, economic, or political policy." *Metter v. United States*, 785 F.3d 1227, 1231-32 (8th Cir. 2015) (quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991)).  The fact that the policy required an officer to determine whether officer safety was a consideration does not render Chief Neuenfeldt's pursuit decision in this case susceptible to policy analysis.  "For the government to show merely that

---

[9] *See Marshall v. Anaconda Co.*, 596 F.2d 370, 375 (9th Cir. 1979) (stating that "the intent to make mandatory is unmistakable when 'shall . . . unless' language is used.").

some choice was involved in the decision-making process is insufficient to activate the discretionary function exception. The balancing of policy considerations is a necessary prerequisite." *Aslakson v. United States*, 790 F.2d 688, 693 (8th Cir. 1986); *see also Hilger*, 87 F.4th at 900 (8th Cir. 2023) (citing with approval *Chantal v. United States*, 104 F.3d 207, 212 (8th Cir. 1997) ("It is well established that a decision which requires the weighing of competing interests is 'susceptible to policy analysis' and typifies the kind of governmental decisions which Congress intended to shield from judicial second-guessing.")).

91. In *Aslakson v. United States*, a father brought a FTCA claim after his son was killed when the mast of his sailboard struck electrical power lines elevated over the surface of the water that were owned and operated by Western Area Power Administration ("WAPA"), an agency of the United States government. 790 F.2d 699 (8th Cir. 1986). The plaintiff alleged that the United States was negligent by failing to provide adequate vertical clearance between the power lines and surface water. *Id.* at 689.

92. The Western Area Power Administration ("WAPA") was charged with constructing and maintaining electrical power lines in accordance with the National Electric Safety Code. *Id.* at 690. Rule 013B of the NESC stated that "Existing installations, including maintenance replacements, which comply with prior editions of the Code, need not be modified to comply with these rules, except as may be required for safety reasons by the administrative authority." *Id.* The United States argued that any decision by WAPA officials regarding the safety of its power lines was within the scope of the discretionary function exception. *Id.* at 689.

93. On appeal, the Eighth Circuit Court of Appeals in *Aslakson* rejected the Government's argument, stating:

> Where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the [discretionary function] exception falls away and the United States will be held responsible for the negligence of its employees.

*Id.* at 693. The court stated that "For the government to show merely that some choice was involved in the decision-making process is insufficient to activate the discretionary function exception. The balancing of policy considerations is a necessary prerequisite." *Id.* The court reasoned that "WAPA's determination that the power lines over. . .[the water] were not a safety hazard did not involve an evaluation of the relevant policy factors; rather it was a decision made by WAPA officials charged with the responsibility of implementing an already established policy." *Id.* at 693. Furthermore, the court reasoned that "WAPA's policy does not allow its officials to choose a course of action they deem desirable if their power lines are dangerously low. The policy's mandate is clear; WAPA must raise its power lines if they constitute a safety hazard." *Id.* The court stated that:

> Although such a policy necessarily involves some degree of judgment on the part of government officials, it is not the kind of judgment that involves the weighing of public policy considerations. On the contrary, it is the kind of judgment that requires the knowledge and professional expertise of governmental employees who implement government policies.
>
> Aslakson's challenge to the governmental activity involved here goes not to the policy itself or to the manner in which WAPA chose to implement that policy. Furthermore, the challenged conduct is neither regulatory in nature nor administrative decision-making grounded in social, economic, or political policy. Rather, Aslakson claims WAPA officials were guilty of failing to comply with their own safety policy in the maintenance of their electrical transmissions lines.

*Id.* The court ultimately concluded that holding WAPA responsible for compliance with its own safety policy regarding its electrical transmission lines would not undermine its governmental function. *Id.*

94. By contrast, the Eighth Circuit Court of Appeals held in *Hilger v. United States*, 87 F.4th 897 (8th Cir. 2023) and *Metter v. United States*, 785 F.3d 1227 (8th Cir. 2015) that the discretionary decisions by government employees in those cases involved a balancing of policy considerations and were thus protected by the discretionary function exemption. In *Hilger*, a plaintiff who was injured while visiting Mount Rushmore National Memorial brought a FTCA claim alleging that the National Park Service negligently installed and maintained a temporary access mat over a dirt path

adjacent to the entrance and walkway while it was under renovation and failed to warn of its danger. 87 F.4th at 898. The Eighth Circuit held that the discretionary installation, maintenance and failure to warn decisions by the Park Service were "susceptible to policy analysis" because those decisions involved balancing safety concerns against those involving access. *Id.* at 899-900. In *Metter*, plaintiffs brought a FTCA claim for injuries and a death that resulted when a parked pickup truck came out of gear and rolled down an unprotected riverbank. 785 F.3d at 1229-30. Plaintiffs alleged that government employees were negligent in failing to timely replace guardrail posts along the area and to warn of hazardous conditions. *Id.* at 1230. The Eighth Circuit held that the decision to remove and replace the guardrails was susceptible to a "balancing of public policy objectives" involving considerations of the recreational uses of the area, the allocation of funds, the timing of the repairs and the safety of all users of the park and thus fell within the discretionary function exception. *Id.* at 1233.

95. In *Metter*, the Court distinguished its decision in *Aslakson*, stating that "[u]nlike the government agency in *Aslakson*, whose 'policy clearly required it to elevate its power lines if safety considerations compelled such action,' there was no clear policy that bound the Corps to prioritize safety considerations or maintain guardrails." *Id.* at 1232. The *Metter* court stated that:

> We recognize a distinction between the Corps (1) exercising discretion and deciding to replace the guardrails, and (2) deciding to issue a regulation or forming a policy requiring the installation or maintenance of guardrails. Because the Corps had the discretion to decide if, how, and when to replace the guardrails, it had the discretion to alter its initial decisions to replace the guardrails by September 30 when the first contractor failed to perform.

*Id.* at 1233.

96. The Court finds that, like the policy in *Aslakson*, subsection (B)(3) of Section 2-24-09 of the Law Enforcement Handbook does not allow Chief Neuenfeldt discretion to determine his course of action if he decides, based on his knowledge and professional expertise, that officer safety is not a consideration. Instead, the policy's mandate is clear; Chief Neuenfeldt must discontinue the pursuit initiated by Moody County if officer safety is not a consideration. As stated above, Chief Neuenfeldt, along with

other officers on the scene, testified that officer safety was not a consideration when he pursued Plaintiffs at high speeds down 229A, a dead-end, gravel road. The Government's claim that any decision by Chief Neuenfeldt regarding officer safety is within the scope of the discretionary function exception would, as the court articulated in *Aslakan*, "result in the exception swallowing the rule." *Id.*

97. In sum, the Court concludes that Section 2–24–09, subsection (B)(3) of the Law Enforcement Handbook mandated that Chief Neuenfeldt discontinue pursuit of Plaintiffs when Bourassa fled down 229A because officer safety was not a consideration. The Court also concludes that Chief Neuenfeldt's conduct is not susceptible to policy analysis because it did not involve a balancing of public policy considerations. Instead, Chief Neuenfeldt's conduct involved safety considerations under an established policy. Because no step of the discretionary function exception test has been satisfied, the Court declines to dismiss Plaintiffs' claims under the discretionary function exception.

## II. Liability

98. The purpose of the Federal Tort Claims Act is to make the tort liability of the United States the same as that of a private person under like circumstances, in accordance with the local law. *See* 28 U.S.C. § 1346(b). In determining liability under the FTCA, the Court must apply the "law of the state in which the acts complained of occurred," which in this case, is the law of South Dakota. *See Goodman v. United States*, 2 F.3d 291, 292 (8th Cir. 1993) (citing 28 U.S.C. § 1346(b)). Plaintiffs allege that Chief Neuenfeldt is liable for personal injuries caused by Neuenfeldt's negligence in engaging in a high-speed pursuit of Plaintiffs, who were passengers in Bourassa's vehicle, outside the boundaries of the reservation, at night and down what Chief Neuenfeldt knew to be a dead-end, gravel road.

99. In order to prevail in a suit based on negligence under South Dakota law, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury. *Hanson v. Big Stone Therapies, Inc.*, 916 N.W.2d 151, 158 (S.D. 2018) (citation

omitted). Plaintiffs must prove these elements by a preponderance of the evidence. *See Malloy v. Commonwealth Highland Theatres, Inc.*, 375 N.W.2d 631, 634 (S.D. 1985).

## A. Duty

100.    A duty can arise from the common law as a duty to exercise ordinary care and skill, or it can arise from a statute "designed for the benefit of a class of persons which includes the one claiming to have been injured as a result of the nonperformance of the statutory duty." *See Albers v. Ottenbacher*, 116 N.W.2d 529, 531 (S.D. 1962); *First Am. Bank & Trust, N.A. v. Farmers State Bank of Canton*, 756 N.W.2d 19, 26 (S.D. 2008) (stating that "a duty can be created by common-law or statute."). The existence of a duty is a question of law to be determined by the Court. *Tipton v. Town of Tabor*, 538 N.W.2d 783, 785 (S.D. 1995).

101.    Although the South Dakota Supreme Court has not specifically addressed whether a police officer owes a duty of care to passengers in a fleeing vehicle during a police pursuit, this Court found the reasoning by Judge Bogue in his Memorandum Opinion and Order in *Blacksmith v. United States*, Civ. No. 06-5022-AWB, 2008 WL 11506053 (D.S.D. Jan. 16, 2008) persuasive and held in its Memorandum Opinion and Order Denying the Government's Motion for Summary Judgment, *Roemen v. United States*, 4:19-4006-LLP, 2023 WL 2599015, at *8  (D.S.D. March 22, 2023) that under South Dakota law, a police officer has a common law duty of ordinary care to a passenger in a fleeing vehicle. *See also Holthusen v. United States*, 498 F.Supp.2d 1236, 1243-44 (D. Minn. 2007) (applying an analysis similar to that of Judge Bogue in *Blacksmith* in holding that "if confronted with the question, the Minnesota Supreme Court would find the officers' duty of care extends to a passenger in a vehicle being pursued.").

## B. Breach

102.    Negligence is the failure to exercise ordinary care under the circumstances. *Lovell v. Oahe Elec. Co-Op*, 382 N.W.2d 396, 398 (S.D. 1986). "Ordinary care is that which an ordinarily prudent or reasonable person would exercise under the same or similar circumstances." *Id.*    What constitutes reasonable care varies depending on the circumstances and is commensurate with existing and surrounding hazards. *See Lovell*, 382 N.W.2d at 398; *see also Schreinder v. United States*, Civ. No. 03-5069-KES, 2005

WL 1668429, at *4 (D.S.D. Jul. 18, 2005). "The greater the danger, the greater the care required, so that a very high degree of danger calls for a very high degree of care, which, however, amounts to ordinary care in the view of the situation and circumstances." *Lovell*, 382 N.W.2d at 398. Under the circumstances of the present case, the degree of danger was very high and called for a very high degree of care.

103.    "Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done." Restatement (Second) of Torts § 291 (1965); *see also Ulrikson v. Chicago, M. St. P. & P. Ry. Co.*, 268 N.W. 369, 375-76 (S.D. 1936) (stating that deciding what a reasonable man would have done under like circumstances involves "the sound judgment, the sense of proportion between the utility of the act and the injury threatened, the valuation of the respective interests concerned. . . ."); *see also Blacksmith v. United States*, Civ. No. 06-5022-AWB, 2008 WL 2001975, at *4 (D.S.D. May 6, 2008) (finding under South Dakota law that the "officers' conduct during the police pursuit was entirely reasonable and appropriate in light of the serious situation.").

104.    Whether or not Chief Neuenfeldt breached a duty of care is a question of fact. *See Nicolay v. Stukel*, 900 N.W.2d 71, 78 (S.D. 2017).

105.    In determining whether a reasonable man would recognize that his act is one involving a risk of harm to another, a court must not only take into consideration "such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence, and judgment as a reasonable man would have," but also "such superior attention, perception, memory, knowledge, intelligence, and judgment as the actor himself has." Restatement (Second) of Torts § 289 (1965); *see also Rikansrud v. City of Chicago*, 116 N.W.2d 234, 240 (S.D. 1962) (stating that the court must determine as a matter of law "that the circumstances did not require a reasonable person, possessing whatever superior perception the City had acquired through its experience in constructing and operating water and sewer utilities, to recognize that an unreasonable risk of harm to another would be created if it failed to sufficiently

compact or repair its sewer trenches."); *Goodlow v. United States*, Civ. No. 3:01-3028-AWB, Docket 40 at ¶ 8 (D.S.D. Nov. 12, 2004) ("A reasonable police officer exercising ordinary care under the same or similar circumstances, would drive at a slower speed to guard against causing injury to individuals suffering from injuries or attempting to avoid apprehension.").

106.    The Court finds that a reasonable police officer would not engage in a high-speed pursuit of Plaintiffs down 229A as Chief Neuenfeldt did that evening.    Sergeant Kurtz acknowledged that there was potential for disaster in pursuing someone fast down a dead-end gravel road at night.    (Doc. 257, Trial Tr. 74:2-75:18).    Sergeant Kurtz testified that although he would continue down 229A, he would not push.    (Doc. 257, Trial Tr. 78:21-22).    Sheriff Wellman testified that "if I had a pursuit that I knew was going down a dead-end road, I would probably not have them pursue it. I would have them wait at the end." (Doc. 257, Trial Tr. 147:6-17).    Deputy Baldini acknowledged at trial that the most reasonable thing for an officer to do under those circumstances was to wait at the beginning of 229A "for the cavalry to come." (Doc. 257-1, Trial Tr. 345:25-346:3). Tribal law enforcement officer, Nicholas Cottier, testified that he would never have pursued Plaintiffs down 229A.    (Doc. 257, Trial Tr. 292:5-14).    Plaintiffs' expert, Brad Booth, also testified that under the circumstances it was unreasonable for Chief Neuenfeldt to engage in a high-speed pursuit of Plaintiffs down 229A, stating:

> When you look at the totality of the circumstances, this started at an underaged party. This whole thing became very out of hand very quickly. [Pursing Plaintiffs down 229A] was not necessary. And it had horrible results.

(Doc. 257-3, Trial Tr. 692:2-693:16). Mr. Booth testified that given that 229A was a dead-end gravel road, and it was nighttime, it was unreasonable to pursue Plaintiffs down this road at high speeds because "the whole thing has been dangerous and it's just getting worse." (Doc. 257-3, Trial Tr. 692:19-693:16). Chief Neuenfeldt did not know if Plaintiffs or Bourassa, like he, knew it was a dead-end road. The danger to Plaintiffs by engaging in a high-speed pursuit down that road was ever greater given that it was a gravel road and nighttime and dust limited visibility. The ability to off-road was limited because crops and the Big Sioux River lay in the field beyond and

back-up from other police units was one to two minutes away. The Court finds that the benefit of apprehending minors who were possibly involved with the house party at the abandoned farm was greatly outweighed by the risk to their safety by continuing to pursue them at high speeds down 229A that evening. The Court finds that Chief Neuenfeldt breached a duty of care to Plaintiffs by pursing them at high speeds, ultimately down 229A under these circumstances.

## C. Causation and Injury

107.    Having concluded that Chief Neuenfeldt breached a duty of care to Plaintiffs by pursuing them at excessive speeds, at night, ultimately down what Neuenfeldt knew to be a dead-end gravel road, the Court must now determine whether such breach was a proximate cause of the injuries suffered by Plaintiffs. Proximate cause is defined under South Dakota law as "[a]n immediate cause which, in natural and probable sequence, produces the injury complained of." *Mulder v. Tague*, 186 N.W.2d 884, 887 (S.D. 1971); *see also* S.D. Pattern Jury Instructions 20-10-10. The harm suffered must be a "foreseeable consequence of the act complained of." *Weiss v. Van Norman*, 562 N.W.2d 113, 116-17 (S.D. 1997).

108.    Defendant argues that the crash of Bourassa's truck was not a foreseeable consequence of engaging in a high-speed pursuit of Plaintiffs. (Doc. 275 at 23901-23907). Specifically, Defendant argues that:

> Nobody expected [that when Bourassa stopped at the intersection 229A and Highway 13], he would choose to take off again, much less that he would reverse his vehicle towards the parked officers, one being outside of the vehicle shouting commands, and speed off down 229A, ignore the warnings of his passenger, not slow, and jerk the wheel in a direction that caused the roll over. Bourassa had spent the previous twenty minutes out maneuvering numerous law enforcement officers, handling the road conditions well, even to the extent of negotiating his way around spike strips placed in his path.

(Doc. 275 at 23905).

109.    There may be more than one legal cause of an injury. *State v. Two Bulls*, 547 N.W.2d 764, 766 (S.D. 1996) (citing W. Page Keeton et al., *Prosser and Keeton on Torts* § 52, at 347-49 (5th ed. 1984)). "When an injury occurs through the concurrent

32

negligence of two persons which would not have happened in the absence of either, the negligence of both parties is considered to be the proximate cause of the accident." *DeBerg v. Kriens*, 149 N.W.2d 410, 505 (S.D. 1969); *see also* S.D. Pattern Jury Instructions 20-30-40.

110.    An intervening or superseding cause may relieve a negligent actor from that actor's antecedent negligence. *Braun v. New Hope Tp.*, 646 N.W.2d 737, 740 (S.D. 2002). To do so, the subsequent intervention must be "foreign to the risk the original actor has created." *See id.* Thus, "[i]n order to determine whether an actor's liability is shifted to a third person, one must look to see if the intervening cause was foreseeable." *Id.* at 741. "When the natural and continuous sequence of causal connection between the negligent conduct and the injury is *interrupted by a new and independent cause,* which itself produces the injury, that *intervening* cause operates to relieve the original wrongdoer of liability." *Id.* at 740. "[T]he intervening cause must be a *superseding* cause. It must so entirely supersede the operation of the defendant's negligence that it alone, without his negligence contributing thereto, produced the injury." *Id.*

111.    The Court finds that the crash of Bourassa's truck and Plaintiffs' resulting injuries are a foreseeable consequence of Chief Neuenfeldt's high-speed pursuit of Plaintiffs down 229A under the circumstances described. Accordingly, the Court finds that Chief Neuenfeldt's negligence was a proximate cause of Plaintiffs' injuries.

## D. Assumption of Risk and Contributory Negligence

112.    The United States asserts that Plaintiffs are precluded from recovery because they assumed the risk of their injuries by their silence and inaction throughout the 20-minute pursuit and because they were contributorily negligent more than slight in comparison to Chief Neuenfeldt. (Doc. 275 at 23919). Both assumption of risk and contributory negligence are affirmative defenses upon which a defendant bears the burden of proof. *See Burhenn v. Dennis Supply Co.*, 685 N.W.2d 778, 786 (S.D. 2004).

### 1. Assumption of Risk

113.    "A person assumes the risk of injury when the person: '(1) has actual or constructive knowledge of the risk; (2) appreciates it character; and (3) voluntarily accepts the risk, with the time, knowledge, and experience to make an intelligent choice.' " *Schott v.*

*S.D. Wheat Growers Assoc.*, 906 N.W.2d 359, 362 (S.D. 2017) (citation omitted). "Acceptance is not voluntary if another's tortious conduct leaves no reasonable alternative to avert harm." *Goeperk v. Filler*, 563 N.W.2d 140, 144 (S.D. 1997). Assumption of risk is generally a question of fact properly submitted to the factfinder. *Pettry v. Rapid Area Sch. Dist.*, 630 N.W.2d 705, 708 (S.D. 2001).

114. Morgan and Micah, ages nineteen (19) and twenty (20) at the time of the incident did not know they were going to be passengers in a high-speed police chase that evening. The Court finds that the United States has failed to prove by a preponderance of the evidence that Plaintiffs had reasonable alternatives to avert the harm that resulted from the pursuit. Accordingly, the Court concludes that Plaintiffs did not voluntarily accept the risk of their injuries that evening. Defendant argues that Plaintiffs should have exited the vehicle when Bourassa was stopped on 485th Avenue after Bourassa eluded Sergeant Kurtz and when Bourassa stopped at the intersection of Highway 13 and 229A. The Court finds that these were not reasonable alternatives under the circumstances. It is unclear exactly how long the vehicle was stopped on 485th Avenue after Bourassa eluded Sergeant Kurtz. Approximately twelve (12) seconds passed between Sergeant Kurtz's radio communication stating that he lost sight of Plaintiffs and was no longer in pursuit and Deputy Baldini's radio communication that he had a vehicle northbound on 485 and 242. (Defs' Ex. 216.49). There is also testimony that Bourassa was driving slowly on 485th Avenue for some period of time with his lights off. (Doc. 275-6, Trial Tr. 1437:14-15). The South Dakota Supreme Court has specifically held that it is negligent for a passenger to jump out of a moving vehicle. *Goepfert*, 564 N.W.2d at 142. Micah also testified that he was scared and in shock throughout the pursuit and did not know when Bourassa would take off again. Only approximately 32 seconds passed between Deputy Baldini's radio communications that they may be coming to a stop and that they were heading down 229A. Bourassa had unexpectedly fled twice, first at the farm property and again when Chief Neuenfeldt became primary pursuer. The Court finds that it was not reasonable under these circumstances for Micah and Morgan to exit the vehicle when stopped at the intersection of 229A and Highway 13. Additionally, the United States has not shown that Bourassa would have heeded any demands by Plaintiffs to stop or get out. In fact,

about the only time Micah did speak up during the pursuit was to tell Bourassa that 229A was a dead-end road and Bourassa ignored Micah's warning and proceeded down the road at excessive speed.

## 2. Contributory Negligence

115.    Contributory negligence is a "breach of duty which the law imposes upon persons to protect themselves from injury, and which, concurring and cooperating with actionable negligence for which defendant is responsible, contributes to the injury complained of as a proximate cause." *Johnson v. Armfield*, 672 N.W.2d 478, 481 (S.D. 2003) (citation omitted).

116.    Where plaintiff's contributory negligence is more than slight compared to defendant's negligence, plaintiff is barred from recovery provided it is a proximate cause of the injury. *Id.* (citing SDCL § 20-9-2). A plaintiff's contributory negligence is "more than slight" if it is "not small in amount or of little importance or insignificant or unsubstantial or inconsiderable, that is to say, it was not slight in comparison with the negligence of the defendant." *Nugent v. Quam*, 152 N.W.2d 371, 380 (S.D. 1967). Whether a plaintiff was contributorily negligent is a question of fact properly submitted to the factfinder. *Theunissen v. Brisky*, 438 N.W.2d 221, 224 (S.D. 1989).

117.    "Although the character of the plaintiff's contributory negligence . . . is not to be determined by comparison to the care exercised by a reasonable man as an absolute standard but must be compared to the negligence of the defendant, the norm of conduct of the ordinarily reasonable and prudent man must be considered in determining the extent to which each party fell below the standard and thus was guilty of negligence or contributory negligence." *Nugent*, 152 N.W.2d at 594-95.

118.    "The care required of a passenger in an automobile driven by another is that required of an ordinarily prudent or reasonable person under like circumstances." *Hanisch v. Body*, 90 N.W.2d 924, 927 (S.D. 1958). The South Dakota Supreme Court has not had occasion to examine the duty of care owed by an ordinary and prudent passenger in fleeing vehicle.

35

119.    Here, Plaintiffs were injured when Bourassa fled from Chief Neuenfeldt and lost control of his vehicle after proceeding at high speed down 229A, a dead-end gravel road, at night. It is undisputed that Micah warned Bourassa that the road was a dead-end and that Bourassa ignored Micah's warning and continued to flee from officers at high speeds and lost control of his vehicle at the dead-end when trying of avoid a tree. Micah and Morgan were not guilty of any negligence.

**E. SDCL § 3-21-9 Immunity**

120.    The United States argues that under the FTCA, it is entitled to assert protections from any state law immunity that applies to a private person in South Dakota, specifically state law immunity provided for in SDCL § 3-21-9. (Doc. 275 at 23923). SDCL § 3-21-9 provides that:

> No person, political subdivision, or the state is liable for any injury resulting from the parole or release of a prisoner or from the terms and conditions of his parole or release or from the revocation of his parole or release, or for any injury caused by or resulting from:
>
> (1)    An escaping or escaped prisoner;
> (2)    An escaping or escaped person;
> (3)    A person resisting arrest;
> (4)    A prisoner to any other prisoner; or
> (5)    Services or programs administered by or on behalf of the prison, jail, or correctional facility.

The United States argues that it is immune from liability under SDCL § 3-21-9 because Micah and Morgan's injuries resulted from Bourassa, a person resisting arrest. (Doc. 275 at 23923-23924).

121.    Whether sovereign immunity applies is a question of law. *Bickner v. Raymond Tp.*, 747 N.W.2d 668, 671 (S.D. 2008). As the party raising this affirmative defense of immunity, Defendant has the burden of establishing it is entitled to that protection. *Masad v. Weber*, 772 N.W.2d 144, 152-53 (S.D. 2009).

122.    In *Hall v. City of Watertown ex rel. City of Watertown Police Dep't*, 636 N.W.2d 686 (S.D. 2001), a police officer with the City of Watertown spotted someone driving erratically on a highway, and when he turned on his emergency lights to pull the driver over, the driver fled. *Id.* at 687. At some point, the driver drove over a concrete flower

pillar onto a grassy area and hit a tree. *Id.* The officer pulled up beside the vehicle and when he got out of his patrol car, the driver restarted the engine, spun around, and hit the back of the police vehicle. *Id.* He turned, drove directly at the officer, and struck the left front door of the patrol car. *Id.* After this, the driver headed back onto Highway 20. *Id.* The officer followed with lights flashing and siren sounding. *Id.* As the pursuit continued, the vehicle reached speeds of 60 miles per hour. *Id.* The driver turned at high speed at an intersection, lost control, went over a curb and crashed into a residence, injuring its residents. *Id.*

123.  In *Hall*, the occupants of the residence sued the City, its police department, and the officers, alleging in part that the officer was negligent and reckless in pursuing the driver. *Id.* at 687-88. Defendants moved for summary judgment, arguing that SDCL § 3-21-9 granted them immunity and constituted a complete defense as a matter of law. *Id.* at 688. The circuit court upheld immunity under SDCL § 3-21-9, but ruled that it was waived under SDCL § 21-32A-1. *Id.*

124.  On appeal, the South Dakota Supreme Court in *Hall* held that the defendants were not immune under SDCL §.3-21-9 because the driver was neither an escaping or escaped prisoner, nor was he a person resisting arrest. *Id.* Citing to the South Dakota Pattern Jury Instructions (Criminal) 3-9-10 and SDCL § 22-11-4,[10] the court in *Hall* stated that a person resisting arrest must have the intent to resist arrest. *Id.* at 688, n.2. The court concluded that the driver was not a person resisting arrest, because he was not "informed that the police intend to arrest" him, "for without that knowledge a person cannot, in turn, intentionally resist arrest." *Id.* at 688-89, & n.2.

---

[10] SDCL § 22-11-4, defines "resisting arrest" as:

Any person who intentionally prevents or attempts to prevent a law enforcement officer, acting under color of authority, from effecting an arrest of the actor or another, by:

(1)  Using or threatening to use physical force or violence against the law enforcement officer or any other person; or
(2)  Using another means which creates a substantial risk of causing physical injury to the law enforcement officer or any other person;

is guilty of resisting arrest. Resisting arrest is a Class 1 misdemeanor.

SDCL § 22-11-4.

125.    The South Dakota Supreme Court in *Hall* cited with approval the Arizona Appellate Court's decision in *State v. Womack*, 847 P.2d 609 (Ariz. Ct. App. Sept. 29, 1992). There, the defendant fled at high speeds from police officers who attempted to stop the motorcycle for a missing taillight. *Id.* at 110.  The officer activated his emergency lights and engaged in a high-speed pursuit of the driver who was eventually apprehended. *Id.* The driver appealed his conviction under Arizona's resisting arrest statute, Ariz.Rev.Stat.Ann. § 13-2508(A)(2),[11] which is substantially similar to South Dakota's resisting arrest statute.

126.    The court in *Womack* reversed the defendant's conviction for resisting arrest.  First, the court stated that "[a]s we read the statute, it prohibits assaultive behavior directed toward an arresting officer, not an arrestee's efforts to put as much distance as possible between himself and the officer." *Id.* at 111.  The court found that "the defendant's flight was conduct which prevented, without the use of resistance, the effectuation of his arrest. In other words such conduct constituted avoiding arrest, not resisting arrest." *Id.* at 112.

127.    The court in *Womack* also found that the defendant had not resisted arrest because the defendant was never made aware that he was under arrest.  *Id.* at 114.  The court noted that at the time the officer first signaled defendant to pull over, the officer intended only to issue a traffic citation, not to arrest the defendant. *Id.* The court noted that even if the officer's intent changed from the issuance of a citation to that of arresting the defendant, there was no evidence that the officer had communicated this intent to the defendant such that he could be convicted of resisting arrest. *See id.*

128.    Like the defendants in *Hall* and *Womack*, Bourassa was never informed that he was under arrest before he fled and thus cannot be found to have intentionally resisted arrest.

---

[11] A.R.S. § 13-2508 states in pertinent part:

A. A person commits resisting arrest by intentionally preventing or attempting to prevent a person reasonably known to him to be a peace officer, acting under color of such peace officer's official authority, from effecting an arrest by:

1. Using or threatening to use physical force against the peace officer or another; or

2. Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

The fact that Micah testified that he recalled Chief Neuenfeldt yelling that he "would arrest" Bourassa did not mean that he was under arrest. The record is clear Chief Neuenfeldt did not intend to effect an arrest when he was stopping Bourassa at the end of the driveway, nor did he have the authority to do so as a tribal officer. Sergeant Kurtz also had no intention of arresting Bourassa when he activated his emergency lights, but rather intended to conduct an investigatory stop in order to see if Bourassa had picked up any minors who had fled the house party.

129.    Additionally, like the defendant in *Womack*, the Court finds that Bourassa's conduct was that of fleeing or avoiding arrest, not resisting arrest.

130.    For these reasons, the Court concludes that the United States is not entitled to immunity under SDCL § 3-21-9.

**DAMAGES**

**I.    Morgan Ten Eyck Damages**

**A. Life Expectancy of Morgan Ten Eyck**

131.    All three of the life expectancy experts agreed that Morgan's life expectancy would be diminished by her injuries. The experts differed on how much her life expectancy would be diminished.

132.    Dr. Shavelle, a statistician and the defense witness, opined that based upon Morgan's age, sex, motor function and feeding ability, and the severity of disabilities resulting from her injury, the arithmetic mean life expectancy for Morgan was 24 additional years. (Doc. 257-3, 815:10-20, 818:16-24, 829:6-8). A problem with his opinion is that he could not extrapolate from his data the effect of the fact that Morgan was over six (6) years beyond her injury in good health except for her permanent injuries. (Docs. 257-3, Trial Tr. 840:12-842:14; 257-4, Trial Tr. 996:1-25). It was agreed by the experts that in the first several years after serious brain injury, there are more deaths. (Docs 257-3, Trial Tr. 842:4-7; 257-4, Trial Tr. 987:2-13; 996:19-21, 998:17-25). As a result, if an injured person lives beyond those first severe years, their prospects for a longer life expectancy improve. (Doc. 257-4, Trial Tr. 998:17-999:3). Dr. Shavelle claims to have taken that fact into account, but how he did so was not

apparent from his report or his testimony. (Doc. 257-3, Trial Tr. 840:12-842:14, 861:22-862:3, 872:6-873:6).

133.    Dr. Freeman is attacked by the defense because his opinion was excluded in the *Finkelstein v. Prudential Fin. Inc.*, Civ. No. 21-00657-PHX-MTL, 2023 WL 6970280 (D. Ariz. Oct. 23, 2023) decision. (Doc. 275 at 23946, n.39). The reason for the exclusion was that Dr. Freeman did not provide detail about his methodologies in his report. Later on, Dr. Freeman explained his methodology in his deposition, but the trial court ruled he could not supplement his report with methodology detail in his deposition. Dr. Freeman's opinion is that Morgan has a 47.1-year life expectancy. (Plfs' Ex. 93).

134.    Dr. Alan Weintraub also testified as to life expectancy. He is the only one of the three experts that actually visited Morgan in her home environment and examined her. (Docs. 257-4, Trial Tr. 976:25-977:12; 257-3, Trial Tr. 814:14-16). Dr. Weintraub examined Morgan, but not as a treating physician. (Doc. 257-4, Trial Tr. 979:14-25). Dr. Weintraub's background could best be described as a more clinical or hands-on approach than that of Dr. Shavelle and Dr. Freeman, both of whom are relying upon statistical studies to form their respective opinions. (Doc. 257-3, Trial Tr. 848:14-16).

135.    The Court is reminded that the practice of medicine is an art as well as a science. It is difficult to weigh all human factors with statistical data. That is true even for the life expectancy of an individual in normal health, let alone someone permanently limited as Morgan Ten Eyck is. The Court finds that Dr. Shavelle's statistical data is not as persuasive as applied to Morgan Ten Eyck due to the inability to adjust for the fact that Morgan has both lived six (6) years since the incident, and has done so in the best health possible given her injuries and permanent disabilities.

136.    It is not a matter of excluding the opinions of any one of these three experts, all of whom are qualified to give an opinion on Morgan's life expectancy. Instead, it is a matter of finding which of these three opinions is the more persuasive in ascertaining Morgan's probable life expectancy. Dr. Weintraub's opinion of forty (40) years is bracketed by the statistically driven opinions of 24 and 47.1 years of expectancy. (Doc. 257-4, Trial Tr. 1000:4-1001:3). The Court notes that Dr. Weintraub's opinion is a

combination of clinical experience coupled with a knowledge of the literature and statistical data as compared to the statistically-driven opinion of the two other experts. (*See* Doc. 257-4, Trial Tr. 977:3-979:25, 983:9-998:19).   Dr. Weintraub has the experience of actually treating and following many patients with brain injury. (Doc. 257-4, Trial Tr. 971:9-976:21, 998:17-19).   The Court finds that experience to be meaningful, coupled with the literature and the individual condition of Morgan Ten Eyck. After all,

> *Daubert's* gatekeeping requirement . . . ensures the reliability and relevancy of expert testimony . . . [by] mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 152 (1999).

137.    In his opinion, Dr. Weintraub stated that the clinical practice for realistic lifecare planning must include a disabled person's living/care environment, provider health care services/treatments, demographic and psychosocial risk factors, and medical comorbidities even more than the disability itself which, contrary to the analysis done by Dr. Shavelle,[12] Dr. Weintraub's analysis accounts for. (Plfs' Ex. 95 at 6110; Doc. 257-4, Trial Tr. 993:12-994:16).   In the six-years post-injury, Morgan has not had any respiratory, cardiopulmonary, gastrointestinal, or infectious disease-related, bowel, bladder or skin complications since she has returned home to be cared for by her family. (Plfs' Ex. 95 at 6105, 6111; Doc. 257-4, Trial Tr. 985:1-987:13).   Morgan does not have any neurological risk factors and she has not had any complications of post-traumatic seizures. (Plfs' Ex. 95 at 6110). In his report, Dr. Weintraub indicated that:

> Morgan is awake, purposeful, and seems aware of her surroundings. She responded to her mother's questions, laughing at her and

---

[12]    Dr. Shavelle testified that the severity of Morgan's disabilities, specifically her inability to walk or stand unassisted, are important factors in his 24-year life expectancy estimate for Morgan because such persons are more likely to have cardiac, respiratory, genitourinary complications or deep vein thrombosis. (Doc. 257-3, Trial Tr. 817:1-8). While Dr. Shavelle acknowledged that Morgan had not suffered any of these medical comorbidities since she returned home after the incident to be cared for by her family, he testified that this fact and the excellent care she receives from her family does not influence how he calculates life expectancy. (Doc. 257-3, Trial Tr. 826:19-827:25, 861:5-21, 869:5-870:3). The Court believes these factors cannot be overlooked.

> looking at her with appropriate gesturing. She attempts to pull and
> hug her mother upon request. She had great difficulty following
> verbal commands and appears apraxic. She does not have functional
> verbalization but does utter sounds. She responds to yes/no
> questions accurately, moving her head and eyes to the left for 'yes'
> and frowning and moving her head downward for 'no.'"

(Plfs' Ex. 95). Mr. Ten Eyck testified that Morgan is now able to sit up unassisted for several hours at a time and has done so on a plane and in the back of a vehicle when travelling. (Doc. 257-5, Trial Tr. 1176:13-1177:5).

138.    Dr. Weintraub's professional studies, including the literature and statistics, as well as his personal experience as a clinician providing comprehensive care to over 10,000 brain-injured patients and his in-person examination of Morgan in her surroundings with her caregivers make his opinion of forty (40) years the more convincing opinion to this Court. (Doc. 257-4, Trial Tr. 971:1-976:21).

## B. Morgan Ten Eyck - Future Life Care Including Medical Costs

139.    The Ten Eycks are people of modest means and any significant funds to cover Morgan's future life care will have to come from this litigation. Morgan's care is now being primarily provided by her mother, Michelle, with help from Morgan's father, Tom, but Tom must also work outside the house to support the family. (Doc. 257-5, Trial Tr. 1140:7-8, 1143:20-24). Tom Ten Eyck is a teacher. (Doc. 257-5, Trial Tr. 1140:7-8). Michelle has necessarily forgone any outside employment in order to care for Morgan. (Doc. 257-6, Trial Tr. 1272:16-18).

140.    Michelle is 53 years old and Tom is 54 years old. (Doc. 257-5, Trial Tr. 1165:2-3, 1178:23-25, 1222:6-7). Tom Ten Eyck testified that he is a ninety (90) percent disabled veteran, that he has PTSD, two bad ankles, a bad knee and a bad back that he has had decompression surgery on. (Doc. 275-5, Trial Tr. 1213:17-24). Michelle's health and medical conditions are not in the record. The effort, skill and love that Michelle has put into the care of Morgan is both commendable and heartbreaking. The level of care being provided by Michelle is not sustainable by one highly dedicated person with

some limited assistance. In addition to that consideration, Michelle will age out of being able to do what she is now providing, which includes some heavy physical work.

141.  The evidence clearly shows that Morgan will need 24-hour care throughout the remainder of her life. The Defendants did not offer a life care plan. Instead, they had a witness, Kent Jayne, criticize the Ten Eyck plan by John Dahlberg.

142.  The parties differ greatly on the cost of such care. The defense urges $16.00 per hour for the care attendants. That would be someone with no care training nor care skills. That figure does not include workers' compensation insurance and other employee-related expenses. (Doc. 257-4, Trial Tr. 963:13-18).

143.  The Court cannot be blind to the fact that street signs show work at fast food drive-ins now pays more than $16.00 in this trade area. The Ten Eycks ask for qualified care givers and that request is warranted. Dr. Weintraub testified that nursing care was needed, but not skilled nursing care, so no registered nurse is needed. (Doc. 257-4, Trial Tr. 1003:11-1004:14; Plfs' Ex. 95 at 6109). However, given the needs that are demonstrated in the video of daily actions caring for Morgan, the Court finds that a caregiver should be a certified nursing assistant (CNA), not someone off the street with no training or skill. Plaintiffs cite agency care at $31.57 per hour, but at the same time want to be able to pick who personally provides the care while having agency involvement. (Docs. 257-4, Trial Tr. 954:2-5, 1004:12-25; 257-6, Trial Tr. 1298:6-15). With the agency rate and involvement, the Ten Eycks would surely be able to find qualified caregivers and if they cannot, they can then rely on agency caregivers at $31.57 per hour.

144.  The Court will not award separate damages of $9,528,587.89 for three full-time attendant caregivers as proposed by Plaintiffs, which was in addition to the 24-hour care provided for in the life care plan. Such an award is not supported by the evidence. Mr. Dahlberg did not testify that Morgan would need three or more caregivers working full-time, 24-hours a day, but rather that she would need two to three caregivers working shifts and providing each other vacation and sick coverage. (Doc. 257-4, Trial Tr. 967:18-968:2).

145.    In 2022, the Ten Eycks were paid $46,479.03 by the State of South Dakota by Homecare Services of South Dakota, Inc., to care for Morgan. (Doc. 257-5, Trial Tr. 1204:5-23; Def. Ex. 232). Defendant argues that this amount should offset future annual attendant care costs. (Doc. 275 at 23957). There has been no showing by Defendant that this is anything other than a collateral benefit. Additionally, there has been no showing that the Ten Eycks will continue to receive this payment in the future. Accordingly, the Court declines to deduct this amount from future annual attendant care costs.

146.    Defendant objects to the inclusion of G-tube supplies and nutrition over the course of Morgan's lifetime because Morgan takes only liquids from a G-tube, but not any food. (Docs. 275 at 23952; 257-3, Trial Tr. 887:2-9, 908:5-9). On cross-examination, Mr. Dahlberg testified that given this fact, the future value projections for Morgan's G-tube needs should be greatly reduced. (Doc. 257-4, Trial Tr. 941:15-22; 257-6, Trial Tr. 1383:12-1384:10). Mr. Dahlberg did not provide the Court with a more accurate estimate at trial and the Court will not award $5,471.35 in annual damages for gastronomy tube feeding, nor $2,751.19 per year for the dietary supplement as Morgan is now not taking food with a G-tube although there is some G-tube use for liquids.

147.    Defendant objects to the inclusion in Dahlberg's report of a $9,428.80 annual line item for a handicap-accessible van. (Doc. 275 at 23953). Dahlberg's calculations include the cost of the van itself, deducting the cost of a standard automobile ($37,851) which the Ten Eycks need for transportation regardless of Morgan's disability. (Doc. 257-4, Trial Tr. 943:15- 944:10). Defendant's expert, Kent Jayne, testified that instead, the Ten Eycks need only a van conversion (approximately $28,000) amortized over 7 years which yields an annual cost of $4,000. (Doc. 275 at 23953-54; Trial Tr. 257-6 1384:20-1385:6). Defendant argues that awarding the Ten Eycks the cost of the van itself rather than just the van conversion would be providing the Ten Eycks the cost of a free van which they would otherwise need to purchase considering the number of individuals in their family. (Doc. 275 at 23954). While the Ten Tycks have six (6) children, Tom Ten Eyck testified that all of the children have graduated high school and only two children are still living at home, but working or attending college. (Doc. 257-

5, Trial Tr. 1143:25-1144:4, 1146:1-12; Plfs' Ex. 95 at 6106). Accordingly, absent Morgan's disability, a van is no longer a necessary expenditure for the Ten Eycks. Thus, the Court will award Plaintiffs $9,428.80 annually for a handicap-accessible van.

148.    Over Morgan's 40-year life expectancy, Dahlberg's proposed life care plan, including medical expenses, but excluding the feeding tube and nutrition supplement, reduced to present value using a four (4) percent discount rate equals a damages award of $15,699,317.28 for future life care.

## C. Morgan's Future Medical Expenses

149.    In Mr. Dahlberg's report he budgets $19,900.48 for a future surgical correction of Morgan's multiple contractures at the Mayo Clinic along with $110 in travel expenses. (Plfs' Ex. 106). Due to Morgan's right foot and ankle tightness and contracture, she underwent multiple hyperselective neurectomies of the right lower extremity to improve range of motion and positioning of the right foot and ankle on November 7, 2019, followed by a posteromedial release, claw toe corrections to improve ankle, foot and toe range of motion and positioning on December 20, 2019, with Dr. Ryssman at Mayo Clinic in Rochester, Minnesota. (Plfs' Ex. 89). Dr. Nicholas Fleming indicated in his report that there has been discussion with Dr. Ree about proceeding with a right upper extremity surgery similar to her left upper extremity surgery for persistent tightness and contracture on that side. (Plfs' Ex. 89). Mr. Dahlberg budgets a one-time cost $19,900.48 for a future surgical correction of her multiple contractures at the Mayo Clinic along with $110 in travel expenses and this cost is built into Morgan's life care plan. (Plfs' Exs. 106, 122).

Mr. Dahlberg stated:

> As previously discussed, Morgan has been traveling regularly to Mayo Clinic in Rochester, Minnesota for surgical correction of her multiple contractures. I have been attempting to contact Morgan's surgeons to determine the number of surgeries she will have in the future. At this preliminary stage I have used the surgical cost for one of Morgan's previous surgeries to represent the cost for surgeries going forward. The one-time cost per surgery is estimated at $19,990.48.

(Plfs' Ex. 106). The defense does not object to these future medical expenses.

45

150.    Morgan's life care plan, as amended by this opinion, provides for annual medication of $2,691.85, medical supplies of $13,178.45, durable medical equipment of $32,256.08, and recurring future medical procedures of $53,749.04, increased annually for inflation, as well as a one-time future medical procedure at Mayo Clinic of $19,990.48. (Plfs' Exs. 106, 122).

151.    Because Morgan's future medical expenses are accounted for in her life care plan, the Court will not award any other future medical damages.

152.    The Court will not award an offset of future medical expenses for any potential future payments made by TRICARE. *Overton v. United States*, 619 F.2d 1299 (8th Cir. 1980) did not present the question of offsetting future medical expenses against an award of damages, special or general.

153.    TRICARE is currently available to Morgan Ten Eyck even after Tom Ten Eyck retires from the National Guard and throughout Morgan's life even if Tom predeceases her unless programs are changed or deleted. (Docs. 257-5, Trial Tr. 1215:2-14; 257-7, Trial Tr. 1717:1-10).

154.    The medical costs could be covered by TRICARE, but Plaintiffs are not obligated to continue to use TRICARE. *See Feeley v. United States*, 337 F.2d 924, 935 (2d Cir. 1964).

155.    The Ten Eycks testified to a difficult relationship with TRICARE resulting in five Congressional complaints. (Doc. 257-5, Trial Tr. 1180:17-1181:10, 1225:7-18). The Ten Eycks plan to go off TRICARE if other funds are available. (Doc. 257-5, Trial Tr. 1181:8-10, 1229:16-18).

156.    The speculative nature of the prospective benefit is another basis for not offsetting the future expense award. *Molzof v. United States*, 6 F.3d 461, 468 (7th Cir. 1993).

**D. Morgan Ten Eyck - Loss of Future Earning Capacity**

157.    Morgan Ten Eyck claims loss of income as a registered nurse through Dr. Frankenfeld's presentation. (Doc. 263 at 23754).

46

158.    Morgan was a B student at her local high school. (Doc. 257-5, Trial Tr. 1237:16-19). There was a bullying incident in her sophomore year and as a result, she checked herself into a behavioral health institution. (Doc. 257-5, Trial Tr. 1153:4-13; 1195:1). After that, through her senior year she was on a 504 Individualized Education Plan which allowed her to leave the classroom for stress or anxiety. (Doc. 257-5, Trial Tr. 1195:11-23).

159.    Morgan then went to South Dakota State University, a university thirty miles from her home in Egan, South Dakota. (Doc. 257-4, Trial Tr. 976:25-977:2). Morgan withdrew after her first semester at South Dakota State University. (Doc. 257-5, Trial Tr. 1196:2-20, 1200:12-14). Michelle Ten Eyck testified that Morgan did not like the big classes as SDSU and was struggling to keep up with the fast-paced lectures. (Doc. 257-5, Trial Tr. 1238:3-4, 1240:22-1241:2). There was no showing of grades or any credits earned for these classes.

160.    From January 9, 2017, until May 10, 2017, Morgan was a full-time student at Minnesota West Community & Technical College, which is in Pipestone, Minnesota, eighteen (18) miles from her home in Egan, South Dakota. (Def. Ex. 231; Doc. 257-5, Trial Tr. 1154:10-16). Morgan was taking general education courses, but no nursing classes had been taken. (Doc. 257-5, Trial Tr. 1154:3-9, 1238:4-18, 1240:7-9; Def. Ex. 231). There was no showing as to how many credits, if any, Morgan had earned from these classes.

161.    Morgan had worked as a lifeguard and a home-health care aide. (Plfs' Ex. 95). On March 27, 2017, Morgan was accepted and enrolled into the Practical Nursing Program beginning in Fall 2017. (Def. Ex. 231; Doc. 257-5, Trial Tr. 1153:20-1154:2, 1240:3-6). The program was a two-part program where after completion of the first year, a student receives a Licensed Practical Nurse degree and after completion of the second year, receives a Registered Nurse degree. (Doc. 257-5, Trial Tr. 1238:4-8).

162.    Morgan's parents firmly believe that Morgan would have graduated from the Practical Nursing Program and obtained a registered nursing degree and followed that profession. (Docs. 257-5, Trial Tr. 1155:7-10; 257-6, Trial Tr. 1250:1-6). That belief

is the basis for Morgan's claim of $2,251,792.00 in lost earnings minus the cost of education, reduced to present value over what Dr. Frankenfeld estimates to be Morgan's 57.9-year work-life expectancy (32 additional years). (Plfs' Ex. 122).

163.    The Court finds that Morgan would have been a Licensed Practical Nurse or have pursued some other health-related program given her past interests and experience. On the basis of the record, however, Plaintiffs have not shown that it is reasonably certain that Morgan would have gone on to obtain her registered nursing degree and practiced in that profession for the remainder of her working life. *See Martino v. Park Jefferson Racing Ass'n*, 315 N.W.2d 309, 312 (S.D. 1982); S.D. Pattern Jury Instructions (Civil), 50-10-110. A greater degree of certainty is needed to use that claim as a basis for a lifetime of future economic loss.

164.    The Court awards the only other economic loss projection that was urged by the defense at $36,000.00 per year as a home health aide. The Court adopts the $36,000.00 per year figure as that is the only other figure offered.

165.    In 1986, the South Dakota Legislature set a discount rate of three (3) percent compounded annually for medical malpractice cases. SDCL § 21-3A-9. Plaintiffs' expert, Dr. Frankenfeld, used varying discount rates slightly over four (4) percent. The Court finds that a four (4) percent discount rate compounded annually is the appropriate discount factor to use in this case.

166.    $36,000 per year over the course of the 57.9-year work-life expectancy used by Dr. Frankenfeld, reduced to the present value using an annual discount rate of four (4) percent is $643,447.85 in lost earning capacity.

167.    There is no deduction for consumption, none having been requested, and no consumption figure suggested.

168.    The United States claims a set-off against any lost earnings damages award for the $685.00 in monthly social security disability payments that Morgan receives. (Docs. 275 at 23906, n.56; 257-5, Trial Tr. 1211:3-8).

48

169.    In *Overton v. United States*, 619 F.2d 1299 (8th Cir. 1980), the court stated that "plaintiffs receiving governmental benefits should receive their FTCA awards free of any set-off for those benefits if there is a showing or a *presumption* that they or one on whom they were dependent paid a special levy or fee to make the benefits possible." *Id.* at 1309 (emphasis added). The *Overton* court added that even if there is a showing or presumption that a plaintiff contributed toward the benefits received, the government may still be entitled to a partial set-off to the extent that it proves certain governmental benefits attributable to these special levies or premiums are in fact attributable to general taxation. *Id.* at 1308, 1309, n.16.

170.    In *Manko v. United States*, 830 F.2d 831 (8th Cir. 1987), the district court, citing to *Overton*, held that the Medicare benefits the plaintiff received were collateral sources because the plaintiff had made contributions to the Medicare program. *Id.* at 837. Accordingly, the district court did not credit or partially credit the Medicare payments against the government's damages liability. *Id.* On appeal, the *Manko* court, Richard Arnold writing, factually distinguished itself from *Overton*,

> In *Overton*, the question was whether Medicare payments were from a collateral source, and we held that they were not because the plaintiff had never contributed to the Medicare Program. Here, by contrast, that factual predicate is satisfied; the District Court found that Manko had paid into each of the federal programs from which he received benefits. Thus Manko can be said to have contracted for this recovery, and the Court's ruling was correct.

*Id.*

171.    It appears that there is a rule coming from *Overton* and *Manko* in cases involving federal benefits paid to a FTCA plaintiff. In states such as South Dakota, with a collateral source rule that does not dictate some other result, the rule is that if there is no showing of relative degrees of financial contribution between a plaintiff and the United States to the benefits in question, then there is no set-off if the plaintiff, or one on whom she is dependent, contributed toward the benefit. If, on the other hand, a plaintiff, or one on whom she is dependent, made no contribution toward the benefit,

then there is a full set-off of the benefit payments against the government's damages liability.

172.    Social Security benefits are funded almost entirely from employee and employer contributions. *Smith v. United States*, 587 F.2d 1013, 1016 (3d Cir. 1978); *Rofail v. United States*, Civ. No. 04-2502, 2009 WL 1703236, at *14 (E.D.N.Y. Jun. 18, 2009) (concluding that Social Security disability benefits were a collateral source in a FTCA case and were not deductible from the lost earnings award). Given the past employment history of Morgan as a lifeguard and caregiver, and Mr. Ten Eyck's employment as a member of the military and a teacher, we can presume that Morgan and Mr. Ten Eyck contributed to the social security program from which Morgan received her disability benefits.

173.    Although there is a presumption that Tom and Morgan Ten Eyck contributed to the social security disability program, there has been no showing what portion of the benefits may be attributable to government contributions. As a result, there is no offset of past and future social security disability payments.

### E.  Morgan Ten Eyck - Past Medical Expenses

174.    Tom Ten Eyck is a training participant unit reservist in the National Guard. (Doc. 257-5, Trial Tr. 1140:24-1141:5).

175.    At the time of Morgan's injury, the Ten Eycks were enrolled in the TRICARE Reserve Select Program and continued to be enrolled in that program at the time of trial. (Doc. 257-5, Trial Tr. 1205:2-8). TRICARE is a managed health care program that provides civilian health benefits for miliary personnel and their families. *Austin v. United States*, Civ. No. 16-2756, 2018 WL 6168064, at *5 (D. Colo. Nov. 26, 2018); 32 C.F.R. § 199.17.

176.    From the date of injury, June 18, 2017, to the date of trial, October 31, 2023, TRICARE has paid $638,481.90 in medical expenses for Morgan. (Def. Ex. 225, Doc. 257-7, Trial Tr. 1719:3-7).  The Ten Eycks testified that there were some medical

expenses that they paid for out-of-pocket, and it is unclear why they were not paid for or reimbursed by TRICARE. (Doc. 257-5, Trial Tr. 1150:21-1151:10).

177.    Defendants claim that any judgment in favor of Morgan should be reduced by the $638,481.90 in TRICARE payments for Morgan's medical care.

178.    The Ten Eycks claim that the $638,481.90 in medical expenses paid by TRICARE are a collateral source and should not be deducted or credited to Defendants from any judgment. Plaintiffs claim that TRICARE is an insurance policy of their own as they paid a premium and some co-pay.

179.    To the date of trial, the Ten Eyck's had paid $12,281.82 in premiums and $3,348.47 in cost share. (Def. Exs. 225, 236, 241).

180.    Under South Dakota law, "[t]otal or partial compensation received by an injured party from a collateral source, wholly independent of the wrongdoer, does not operate to reduce damages from the wrongdoer." *Jurgensen v. Smith*, 611 N.W.2d 439, 442 (S.D. 2000). In cases where both the benefit and recovery flow from the same party such as in this FTCA case, the South Dakota Supreme Court has provided little-to-no guidance on the applicability of the collateral source rule. Courts in such situations have looked to federal law as a guide. *See Burke v. United States*, 605 F.Supp. 981, 992 (D. Md. 1985) (relying on federal law when Maryland law does not discuss the applicability of the collateral source rule where both the benefit and recovery flow from the same party); *see also Kornegay v. United States*, 929 F.Supp. 219, 220 n.1 (E.D. Va. 1996) (finding that state law "provide[s] little guidance on collateral source issues in actions involving the federal government"); *Feeley v. United States*, 337 F.2d 924, 932-33 (3d Cir. 1964) (finding state law to be of "little help," and looking to federal decisions to decide whether payment by the United States was a collateral source in a FTCA case).

181.    In *Overton v. United States*, the Eighth Circuit Court of Appeals had an opportunity to examine the applicability of the collateral source rule in a FTCA case like this one where both the benefit and recovery are flowing from the federal government. Therein,

the Court stated that "[a] plaintiff may invoke the collateral source rule [ ] either when the payment in question came from a source wholly independent of the liable party or when the plaintiff, or someone upon whom the plaintiff is dependent, may be said to have contracted for the prospect of a 'double recovery.' " 619 F.2d 1299, 1307-09.[13]

182.    Under *Overton*, "[a]bsent some statute to the contrary, plaintiffs receiving governmental benefits should receive their FTCA awards free of any set-off for those benefits if there is a showing or a presumption that they or one on whom they were dependent paid a special levy or fee to make the benefits possible." *Overton*, 619 F.3d at 1308; *see also Manko v. United States*, 830 F.2d 831, 837 (8th Cir. 1987) (finding that the Medicare benefits received by plaintiff was a collateral source because the plaintiff had paid into that federal program). In such a situation, the government may be entitled to a partial set-off to the extent that it proves certain governmental benefits attributable to these special levies or premiums are in fact attributable to general taxation. *Overton*, 619 F.3d at 1308 & n.16.

183.    Defense witnesses established that TRICARE is funded from the general fund of the treasury, with funds coming from the Department of Defense budget. (Doc. 257-6, Trial Tr. 1360:3-18).

184.    It has also been established that the Ten Eycks were responsible for paying premiums and certain co-pays in order to receive their TRICARE benefits. (Def. Ex. 230). Dr. Ruck testified that in this Selected Reserve TRICARE plan, members such as Tom Ten Eyck are responsible for twenty-eight (28) percent of the premiums, with the Government paying the remaining seventy-two (72) percent of the premium amount. (Doc. 257-7, Trial Tr. 1714:1-7). This does not take into account the cost

---

[13] The Court notes that a draft of the Restatement (Third) of Torts: Remedies § 10 defines a collateral source similarly to the *Overton* court as one:

(i)     Independent of any defendant, or
(ii)    A defendant or affiliated entity acting in a different capacity from the one in which defendant committed the tort and paying from a fund to which plaintiff contributed, or to which another person contributed on plaintiff's behalf.

Restatement (Third) of Torts: Remedies § 10, Tentative Draft No. 2 (April 2023).

share paid by the insured. (Doc. 257-7, Trial Tr. 1714:5-8; Def. Ex. 230). The premium and co-pays vary with different TRICARE plans. (Def. Ex. 230).

185.    The 72 percent set-off by the United States of the $638,481.90 in medical expenses paid for Morgan against special damages is warranted under South Dakota collateral source rule and finds further support under *Overton*. There is no offset against general or non-economic damages. Although recognizing the right of the set-off in a FTCA case, there was no set-off in *Owen v. United States*, 645 F.Supp.2d 806, 829 (D.S.D. 2009), as there were only general or non-economic damages awarded. *See also Anderson v. United States*, 731 F.Supp. 391, 402 (D.N.D. 1990) (allowing the United States in a FTCA case to show its percentage of contribution as an offset to damages). Accordingly, Morgan will be awarded $178,774.93 in past medical expenses and $459,707.97 will be set off against Defendant's liability.

## F. Morgan Ten Eyck - Non-Economic Damages

186.    Morgan Ten Eyck is a 26-year-old female who was involved in a high speed, rollover motor vehicle crash on June 18, 2017, where she suffered a closed traumatic brain injury, multiple fractures and internal injuries. According to details received from paramedic staff and law enforcement, there was a high-speed chase at speeds greater than 90 miles per hour and the vehicle crashed, totaling the vehicle. She was ejected from the window of the vehicle and came to rest 30-35 feet from the vehicle. She was found unresponsive by paramedics and never gained consciousness during transport to Avera Flandreau Hospital where she then underwent rapid sequence intubation given her respiratory and neurologic status. She was identified to have severe neurological, musculoskeletal, and internal organ injuries and she was transferred by medical air transport to Avera McKennan Hospital and University Health Center in Sioux Falls where she could receive the necessary neurological and intensive care needed for her condition. (Plfs' Ex. 89).

187.    Morgan was found to have severe traumatic brain injury with imaging showing a subdural hematoma, subarachnoid hemorrhage, diffuse exonal injury, and global cerebral edema. She underwent placement of a right frontal intracranial probe to

monitor edema, swelling, and intracranial pressures upon her arrival on June 18, 2017, per neurosurgeon, Michael R. Puumala M.D. She was also found with a grade IV liver laceration, left-sided pulmonary contusion and pneumothorax, left-sided complex mid-shaft femur fracture, and multiple rib fractures. (Plfs' Ex. 89).

188.    Morgan underwent orthopedic surgeries including a left distal femoral traction pin placement on June 22, 2017, and then an intramedullary nail fixation of the left femur on June 23, both per orthopedic surgeon, Aaron J. Pemberton M.D. Due to her poor neurological status and inability to wean off ventilator support, she underwent a tracheostomy tube and percutaneous endoscopic tube procedure on June 28. Her hospital course at Avera was further complicated by intermittent fevers, autonomic dysfunctions, pneumonia, and Clostridium difficile colitis. (Plfs' Ex. 89).

189.    Morgan had a prolonged stay and rehabilitation course at Madonna Rehabilitation Hospital where she had ongoing medical oversight for her multiple medical problems and where the focus was placed on rehabilitation including therapies and interventions to help with swallowing, communicating, volitional movement, and mobility. She had frequent occupational, physical, and speech therapies. She was able to be decannulated on September 25, 2017. She improved with her swallowing and was becoming less dependent on tube feedings. She had equipment evaluations including an evaluation for a tilt-in-space manual wheelchair for her mobility. (Plfs' Ex. 89).

190.    Morgan was discharged from Madonna Rehabilitation Hospital on February 2, 2018. Morgan's mother Michelle informed medical staff that she would be taking her daughter away prior to the completion of discharge orders and arrangements. When they could not be found, they were considered as leaving the facility against medical advice and prior to completion of discharge planning. At the time of her discharge, and nearly 8 months from the time of her injury, Morgan was dependent for all of her activities of daily living (ADLs) and mobility needs, she was still requiring tube feedings and water flushes through her gastrostomy tube for nutrition and was continued on over 10 medications for her ongoing neurologic and gastrointestinal issues. She was requiring daily stretching, splints, and braces to treat her multiple

contractures. She required turning in bed and repositioning in her wheelchair by a caregiver to prevent skin breakdown. At the time, significant functional progress was noted including her ability to eat foods and drink thin water when presented to her by a caregiver and provided with extra time for safe chewing and swallowing. She gained consistent communication with head gestures and occasionally had bouts of aphonic laughter. She was unable to stand or take steps and was unable to use her upper extremities for any ADLs such as brushing her teeth or feeding herself. (Plfs' Ex. 89).

191.    Morgan was considered to have global weakness and spasticity with multiple joint contractures. She was considered non-verbal, dependent on caregivers for all of her basic self-care needs including eating, toileting, bathing, grooming, and dressing. She was pushed in a wheelchair for mobility and required caregivers for total assist transfers (example: from her bed to her wheelchair). She began outpatient occupational, physical, and speech therapies through LifeScape Rehabilitation Center in Sioux Falls, South Dakota, on February 26, 2018. She underwent further equipment evaluations including a specialized toileting system and bathing chair for trunk and head support with toileting and showering, modular stander for a standing program, Hi/Lo Mat Table for alternative positioning and pressure relief during the daytime, NuStep recumbent stationary bike for neurological rehabilitation and motor movement, Tobii Dynavok eye-gaze communication system for her expressive verbal language impairment. (Plfs' Ex. 89).

192.    Due to her severe left upper extremity contractures of the elbow, wrist, and fingers, Morgan underwent corrective surgery including left musculocutaneous neurectomy and multiple tendon lengthenings to improve elbow, wrist, and finger range of motion on February 19, 2019, with orthopedic surgeon, Peter C. Rhee, D.O. at Mayo Clinic in Rochester, Minnesota. Due to her severe left foot and ankle contractures and inability to stand, Morgan underwent corrective surgery including a left Achilles tendon release, posteromedial release, claw toe corrections to improve ankle, foot and toe range of motion and positioning on February 19, 2019, with orthopedic surgeon, Danial B. Ryssman M.D. at Mayo Clinic in Rochester, Minnesota. Due to her right foot and ankle tightness and contracture, she underwent multiple hyperselective neurectomies of the

right lower extremity to improve range of motion and positioning of the right foot and ankle on November 7, 2019, followed by a posteromedial release, claw toe corrections to improve ankle, foot and toe range of motion and positioning on December 20, 2019, with Dr. Ryssman at Mayo Clinic in Rochester, Minnesota. (Plfs' Ex. 89).

193.    Morgan continued to receive botulinum toxin injections to treat spasticity and tightness elsewhere in the body and continued on multiple anti-spasticity medications. Multiple discussions were had with family about placing a Baclofen pump for improved spasticity treatment, but family continued to express concerns about proceeding with such a surgery. There was discussion with Dr. Rhee about proceeding with a right upper extremity surgery similar to her left upper extremity surgery for persistent tightness and contracture at that side. (Plfs' Ex. 89).

194.    Prior to her injury, Morgan had a history of ADHD, depression, and anxiety. She had graduated high school in Flandreau, South Dakota where she was involved with cheerleading and volleyball. She worked through high school and in the summers as a lifeguard. She also worked at a hamburger place and provided home care for a young woman with disabilities. She had attended Minnesota West College in Pipestone, Minnesota. She had been accepted to nursing school shortly before her accident. Prior to her injury, Morgan was fully independent in basic activities of daily living such as eating, toileting, bathing, grooming, and dressing. She was physically healthy without limitations in mobility. (Plfs' Ex. 89).

195.    Per the most recent records provided, it appears that Morgan continues to require assistance with her basic ADLs and all functional mobility. It is reasonable to conclude that she has ongoing residual diagnostic conditions secondary to her severe traumatic brain injury including quadriplegia, hypertonia, cognitive impairments, expressive communication deficits, dysphagia, or swallowing difficulties and that she will have lifelong dependence for self-care and mobility due to her weakness, hypertonia, and cognitive deficits. Furthermore, it is reasonable to conclude that she will benefit from ongoing, intermittent occupational, physical, and speech therapies as well as bracing and equipment prescriptions throughout her life in order to optimize her physical,

cognitive, social, and emotional functions as well as prevent or mitigate medical complications such as contractures, osteoporosis, and pressure wounds. She is likely to need lifelong medications to control her hypertonia. She is likely to need increased appointments with her primary care physician as well as routine appointments with a local physiatrist for the duration of her life. (Plfs' Ex. 89).

196.    Dr. Weintraub indicated that Morgan is awake, purposeful, and seems aware of her surroundings. She responds to her mother's questions, laughing at her and looking at her with appropriate gesturing. She attempts to pull and hug her mother upon request. She had great difficulty following verbal commands and appears apraxic. She does not have functional verbalization but does utter sounds. She responds to yes/no questions accurately, moving her head and eyes to the left for 'yes' and frowning and moving her head downward for 'no.' Morgan shows withdrawal and grimacing to all types of painful stimuli including attempts at range of motion in her hips and her knees and shoulders. (Plfs' Ex. 95).

197.    Morgan's dad recalled a time when they had gone as a family to the pool. (Doc. 257-5, Trial Tr. 1184:1-1185:5). Morgan had separated herself from the family to encourage a young disabled child to get into the pool and enjoy the water. (Doc. 257-5, Trial Tr. 1184:1-1185:5). Morgan got the child to warm up to her and within ten minutes the young child was in the water, splashing and giggling. (Doc. 257-5, Trial Tr. 1184:1-1185:5).

198.    Regarding the calculation of damages for pain and suffering, the South Dakota Supreme Court has stated:

> Of all the items of compensatory damages which it may become the duty of the court or jury to assess, that which will compensate for human pain and suffering is perhaps the most difficult to determine. Such determination is susceptible of no mathematical or rule of thumb computation, and no substitute for simple human evaluation has been authoritatively suggested.

*Plank v. Heirigs*, 156 N.W.2d 193, 190 (S.D. 1968) (quoting *Flory v. N.Y. Cen. R.R. Co.*, 163 N.E.2d 902 (Ohio 1959)).

57

199.    While Plaintiffs separate pain and suffering from loss of enjoyment of life, the Court will follow the current South Dakota Pattern Jury Instruction (Civil) 50-10-70 and group together damages for loss of capacity of the enjoyment of life along with damages for pain and suffering and disability and disfigurement. *See* S.D. Pattern Jury Instruction (Civil) 50-00-10, 50-10-60, 50-10-70.  Morgan is entitled to recover for pain and suffering, mental anguish, and loss of capacity of enjoyment of life experienced in the past and reasonably certain to be experienced in the future as a result of the injury and is entitled to damages for disability and disfigurement.  S.D. Pattern Jury Instruction (Civil) 50-10-70.

200.    In determining a reasonable amount for past and future physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation and emotional distress, the Court takes into account the above description which are findings of fact of Morgan's injuries as they demonstrate elements of Morgan's non-economic damages.  Morgan knows she has a shorter life expectancy due to her injuries. The Court has, after considering the experts, found a life expectancy of only 40 additional years.  Morgan was a healthy, active young woman and now she knows she will never walk, let alone run or play volleyball as she did.  Morgan knows she has and will suffer humiliation and emotional distress and loss of enjoyment with her paralysis and loss of control of bodily functions. Morgan knows that she will suffer humiliation and loss of enjoyment of life, along with the accompanying mental and emotional distress caused by the permanent and substantial loss of personal privacy.  Morgan knows that due to her injuries, she will not have the social relationship with friends that she would have had but for her injuries. Morgan knows that now she will not have a career with the health care field at whatever level she could have achieved.  Morgan knows that throughout her shortened life she will always be dependent upon others for all her needs.  Morgan knows that she will suffer the loss of not having the opportunity, if she chose, to have a lover or a spouse and Morgan knows that she now will not have the choice of having her own family.

201.    Considering all non-economic damages that Morgan has suffered in the past and is reasonably certain to experience in the future, the Court awards $500,000 per year for

a total of $3,000,000 in past non-economic losses[14] and $20,000,000 in future non-economic losses over the remainder of Morgan's forty (40) year life expectancy.

## G. Reduction of Damages Pursuant to SDCL § 15-8-15.1

202.    The Defendant raised the issue of the limitations of joint tortfeasor liability to no more than twice the percentage of fault allocated to that party pursuant to SDCL § 15-8-15.1. The Court has found that the acts of Chief Neuenfeldt were a proximate cause of Morgan's and Micah's injuries. The Court has also found that Bourassa's turn down 229A was not an intervening cause that superseded Chief Neuenfeldt's negligence. Instead, it was another part of this continuing story of joint and several negligence by Bourassa and Chief Neuenfeldt.

203.    This Court must determine under SDCL § 15-8-15.2 whether the conduct of Bourassa and Chief Neuenfeldt was "so interrelated that it would be inequitable to distinguish between them." *W. Consolidated Co-op. v. Pew*, 795 N.W.2d 390, 399 (S.D. 2011). This Court has considered both the nature of the conduct of Bourassa and Chief Neuenfeldt and the extent of the causal relation between the conduct and damages claimed and finds that their negligent acts were so interrelated that it would be inequitable to distinguish between them. *See* SDCL § 15-8-15.2. Each had their own acts of negligence in this ongoing course of events that lent to the injuries of Morgan and Micah.

204.    As a result, there is no reduction of damages pursuant to SDCL § 15-8-15.1.

205.    If on review, the conduct of Bourassa and Chief Neuenfeldt is not found to be so interrelated, in the alternative, the South Dakota Supreme Court in *Pew* directed:

> If the trier of fact finds that the conduct of LaBolt and Pew are not so interrelated as to be able to distinguish between their respective conduct, then a percentage allocation of fault must be entered for each defendant by the trier of fact. Any defendant who is found by the trier of fact to be responsible for "less than fifty percent of the total fault allocation to all the

---

[14] Six (6) years elapsed from the date of injury until the time of trial. (Plfs' Ex. 95).

parties may not be jointly liable for more than twice the percentage of fault allocated to that party.

*Id.* at 399. After the 8-day trial and the briefing and previous opinions in this case and the *Bourassa* case, Civ. No. 20-4210, the Court is intimately familiar with the facts. The Court finds Chief Neuenfeldt's percentage of fault to be no less than fifty (50) percent of the total fault allocated to all the parties. There is no percentage of fault allocated to the two passengers, Morgan or Micah. *See* S.D. Pattern Jury Instruction 20-230-10 (citing *Beck v. Wessel*, 237 N.W.2d 905, 907 (S.D. 1976) (stating that there was no evidence the passenger was exercising any control over the operation of the vehicle)).

## H. Irrevocable Reversionary Medical Expense Trust

206.   The United States asks that any award for future medical expenses should be placed into a reversionary trust that only pays for medical care and supplies actually obtained by Morgan that TRICARE does not cover. The reversion of any funds remaining in the trust would revert to the United States upon Morgan's death. A suggested revocable reversionary inter vivos medical expense trust for the benefit of Morgan Ten Eyck was attached to the post-trial brief by the United States.

207.   The claim is that the creation of such a trust is necessary to eliminate the potential for double recovery against the United States—i.e. the United States pays for Morgan's future medical care, as set forth in the damages award, while also continuing to pay for such care through TRICARE. (Doc. 275 at 23974).

208.   The Court finds there will be no double recovery because the Ten Eycks will not use TRICARE if recovery is available from this case, nor can they be mandated to use TRICARE. (Doc. 257-5, Trial Tr. 1218:10-1220:13, 1229:16-1230:2); *see Feeley v. United States*, 337 F.2d 924, 935 (3d Cir. 1964); *see also Molzof v. United States*, 6 F.3d 461, 468 (7th Cir. 1993) ("[W]e share the reluctance of other courts addressing this issue to deny the plaintiff the freedom to choose his medical provider and, in effect, to compel him to undergo treatment from his tortfeasor."). Additionally, as discussed above, TRICARE payments are, in part, a collateral source and should not be deducted in full from the government's liability. Even if the Ten Eycks remained on the

TRICARE plan, whether they will continue paying premiums and cost share and what those will be in the future are unknown to the Court at this time.

209.    Trusts, or other type of oversight, can also be established to ensure that the damage recovery is in the best interests of the victim. The Court is confident that Michelle and Tom Ten Eyck will always act in the best interests of Morgan Ten Eyck, both as parents and as guardians. But given the amount of money involved, plus the fact that Morgan may outlive her parents or their ability to act as her guardians, the Court requires that a state court guardianship with annual accountings be established prior to the payment of any judgment funds. Accordingly, no irrevocable reversionary trust for medical expenses will be established or utilized.

## II.    Micah Roemen Damages

### A. Micah Roemen - Past Medical Expenses and Non-Economic Damages

210.    As a result of the pursuit, Micah Roemen broke his neck in three different locations and was placed in a halo for three to four months to heal. (Doc. 257-2, Trial Tr. 566:19-23; 567:10-12). For the halo, Micah wore a vest collar with four bars that go up around and four bars with a circle and pins that go into his skull that are set with a screw. (Doc. 257-2, Trial Tr. 567:1-5). The halo was very uncomfortable to wear, made taking showers impossible, and affected Micah's ability to sleep. (Doc. 257-2, Trial Tr. 567:13-22).

211.    Micah experienced right side wrist pain and lower leg pain after the incident and a MRI revealed that his wrist was broken. (Doc. 257-2, Trial Tr. 568:1-18).

212.    At some point after the incident, Micah worked backfilling with an excavator for an underground plumbing company, did hydrological work for another company, but struggled on a daily basis because he had so much leg pain. (Doc. 257-2, Trial Tr. 569:1-3, 586:25-11)

213.    Micah was experiencing extreme pain, achiness, heaviness, and weakness in his leg when walking due to increased blood flow restriction to his right leg. (Docs. 241, Dr. Reed Dep. 20:17-19; 257-2, Trial Tr. 569:17-570:4). Dr. Amy Reed diagnosed Micah

with Type V popliteal artery entrapment syndrome in December 2019. (Doc. 252-3 at 20350).

214.   On December 31, 2019, Dr. Reed performed Micah's first of three surgeries to try and correct this condition. (Doc. 252-3 at 20371). Micah returned to running and full exercise over the next year until he started to experience difficulty with tiredness and heaviness of the right leg. (Doc. 241, Dr. Reed Dep. 20:10-19). Micah underwent two more corrective surgeries on April 9, 2021, and in December 2021. (Doc. 241, Dr. Reed Dep. 24:9-10, 30:21-23).

215.   Tests revealed that after Micah's third corrective surgery his artery was no longer entrapped and had returned to normal, but he continued to experience swelling, heaviness and aching in his right leg when standing for prolonged periods. (Doc. 241, Dr. Reed Dep. 35:12-21, 36:10-22).

216.   After extensive testing, Dr. Reed could not identify another vascular issue causing these symptoms and opines that these symptoms are caused by Lymphedema that developed after the incident and surgeries. (Doc. 241, Dr. Reed Dep. 35:12-39:17). Dr. Reed opines that no future surgeries are recommended, that Micah has chronic Lymphedema and that future treatment will consist of physical modifications such as reducing the amount of standing and time on his feet. (Plfs' Ex. 118 at ¶¶ 4, 6-7). Dr. Reed testified that this condition is "going to be something unfortunately I think he is going to have to live with." (Doc. 241, Dr. Reed Dep. 36:10-19).

217.   As a result of the Lymphodema, standing and sitting for long periods of time causes Micah's leg to swell. (Doc. 257-2, Trial Tr. 570:7-19). Micah was prescribed an air compression pump by his physician to help remove the lymphatic fluid that builds up in his legs. (Doc. 257-2, Trial Tr. 570:22-571:2). The compression pump has sleeves that go on Micah's leg, all the way up to his waist and he uses the pump two hours every night. (Doc. 257-2, Trial Tr. 570:22-571:3). Micah also wears medical-grade compression socks daily on his right leg that come up close to the back of his knee to help minimize the swelling in his right leg. (Doc. 257-2, Trial Tr. 580:2-25).

218.    Micah is no longer able to work as an aviation mechanic due to the extensive time it requires him to stand on his feet. (Doc. 257-2, Trial Tr. 566:1-15, 570:5-572:10, 578:17-20).

219.    Micah still experiences intermittent pain from his broken neck sustained in the incident that increases in severity with bad weather. (Doc. 257-2, Trial Tr. 572:16-23).

220.    Micah was a competitive runner during high school, enjoyed running, but is no longer able to run as a result of injuries sustained in the incident. (Doc. 257-2, Trial Tr. 572:24-573:4).

221.    Micah was 20 years old at the date of injury and the Court finds that he has a life expectancy of 74 years (or 54 additional years). (Def. Ex. 237).

222.    The total amount of medical bills that Micah incurred as of trial was $305,871.34. (Doc. 257-2, Trial Tr. 579:3-6; Plfs' Ex. 120). The Court will award Micah past medical expenses in the amount of $305,871.34.

223.    The Court finds that during the first four years after his injury, Micah experienced more intense pain and suffering from the trauma of the injury due to the screws in his head and the halo for his neck broken in three places and the three surgeries on his leg. The Court will award $50,000 in pain in suffering damages over the course of these four years for a total of $200,000 in damages.

224.    Micah's injuries will cause chronic pain and discomfort and will continue to affect his quality of life for the remainder of his life expectancy. Micah's injuries will preclude him from not only running, but also from doing anything that requires him to remain on his feet for prolonged periods of time. Micah testified that even sitting for extended periods of time causes his leg to swell. Micah will continue to have to manage the symptoms from his leg injury by limiting the time on his feet, by wearing medical compression socks, and devoting a couple hours a day to using the compression pump. In addition, Micah will continue to experience neck pain during bad weather. The Court awards Micah $20,000 per year in damages for the remaining 50 years of his life for pain and suffering and loss of enjoyment of life for a total of $1,000,000.

## B. Micah Roemen – Loss of Future Earning Capacity

225.   At the time of the incident, Micah was attending school at Lake Aera Vocational College for aviation maintenance. (Doc. 257-2, Trial Tr. 565:23-566:2, 578:12-16, 603:1-7).

226.   Micah eventually completed this two-year course of study and obtained both his power plant certificate and airframe certificate which authorized him to work as an aviation mechanic on prop planes as well as jets. (Doc. 257-2, Trial Tr. 578:12-16, 603:7-24).

227.   Micah worked for a short time as an aviation mechanic at the Sioux City, Iowa, airport working on Delta Airline planes and others. (Doc. 257-2, Trial Tr. 571:10-14).

228.   Micah is unable to work as an aviation mechanic due to the extensive time it requires him to stand on his feet. (Doc. 257-2, Trial Tr. 566:1-15, 570:5-572:11, 578:17-20).

229.   Micah seeks damages for loss of earning capacity.

230.   "Loss of earning capacity is one of the natural and necessary consequences of a disabling injury." *Byre v. Wieczorek*, 217 N.W.2d 151, 192 (S.D. 1974) (citation omitted). The purpose of an award damages for loss of future earnings is 'to compensate for loss of earning capacity as distinguished from loss of actual earnings." *Id.* (citation omitted). There are no precise rules by which to measure such a loss in every case; it can only be approximated by a factfinder in view of the facts proven, in accordance with the factfinder's common knowledge and experience. *Id.* at 193. Once a plaintiff has established the fact that he has been damaged, uncertainty over the amount is not fatal to recovery. *Weekley v. Prostrollo*, 778 N.W.2d 823, 830 (S.D. 2010). However, in order to recover loss of future earning capacity, a plaintiff must furnish a basis for the determination. *Byre*, 217 N.W.2d at 193.

231.   Frequently, loss of earning capacity is shown by proof of plaintiff's earnings before the injury and what he is capable of earning after the injury. *Id.* However, loss of future

earning capacity may be determined even in the absence of testimony as to plaintiff's earnings prior to the injury. *Allen v. Martley*, 87 N.W.2d 355, 358 (S.D. 1958). What a person has earned in the past is an element which may throw light on what a plaintiff would have been able to earn in the future had his ability to work not been compromised by the injury, and may aid a factfinder in determining the extent of the injury. *Id.* Past earnings are only one of the factors to be taken into consideration. *Id.* at 359. Other factors are the nature and extent of the injury, age, life expectancy, talents, skill, experience, training, education, and industry. *Weidner v. Lineback*, 140 N.W.2d 597, 602 (S.D. 1966).

232.    It is unquestionable that Micah Roemen has suffered a loss of earning capacity. Micah has a high school degree and has a two-year degree in aviation maintenance from a vocational school which he is unable to utilize because of his permanent disabilities. Micah's prior work experience consisted of manual labor jobs which he is also unable to perform due to his injuries.

233.    The more difficult question before the Court is how to approximate Micah's loss of earning capacity.

234.    Plaintiff in both footnote 18 and 19 of his post-trial brief requested the Court to take judicial notice of:

> The U.S. Bureau of Labor Statistics average annual wage for an aviation technician [at] $75,450. (*See* www.bls.gov/oes/current/oes492091.htm#nat)
>
> [and]
>
> The U.S. Bureau of Labor Statistics average annual wage for a receptionist at $33,960. (*See* www.bls.gov/oes/current/oes434171.htm#nat).

(Doc. 263 at 23729). The Court held a hearing on these requests on February 12, 2025, after notice of the requests.

235.    The United States resisted the request primarily on the basis that it was not relevant and that the wage cited was for avionics work on aircraft rather than mechanical and maintenance work, as well as the fact that these issues were not addressed at trial.

65

236. Plaintiff states that under Rule 201(d) of the Federal Rules of Evidence, judicial notice can be taken "at any stage of the proceeding" and argues that these wage statistics are relevant to the contested issue of loss of future earning capacity. Plaintiff requests an award of "$1,000,000 for [Micah's] future lost earnings." South Dakota law considers the question to be loss of future earning capacity. *Byre*, 217 N.W.2d at 192.

237. Micah obtained both his power plant certificate and airframe certificate which authorized him to work as an aviation mechanic on prop planes as well as jets, but there is no evidence that he received any training in avionics. (Doc. 257-2, Trial Tr. 578:12-16, 603:10-24). The U.S. Bureau of Labor Statistics describes airframe and powerplant (A&P) mechanics as being "certified generalist mechanics who repair and maintain most parts of an aircraft, including the engines, landing gear, and brakes," and describes "avionics technicians" as "specialists who repair and maintain a plane's electronic systems, including radio communications equipment and radar." U.S. Bureau of Labor Statistics, *Occupational Outlook Handbook*, https://www.bls.gov/ooh/installation-maintenance-and-repair/aircraft-and-avionics-equipment-mechanics-and-technicians.htm#tab-2.

238. Although Micah worked for a short time as an aviation mechanic at the Sioux City, Iowa, airport, there is no evidence of what he earned before he had to quit because of his injury. The Court will take judicial notice of the U.S. Bureau of Labor Statistics website cited by Plaintiffs in their request. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (citing *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011) (recognizing "the authority of a court to take judicial notice of government websites")); *Institute for Free Speech v. Ravnsborg*, 416 F.Supp.3d 894, 900 (D.S.D. 2019) (concluding that the South Dakota Secretary of State's website was proper subject matter for judicial notice). The Court does not take judicial notice of the salary figure cited by Plaintiffs, $75,450, because the Court cannot find that figure on the website and because Micah's training was not as an avionics technician, but rather in airframe and powerplant (A&P) mechanics.

239.    On its website, the Bureau of Labor Statistics Occupational Handbook showed that as of May 2023, avionics technicians received a mean average salary of $2,400 more per year than aircraft technicians and mechanics which Micah was trained as. The Occupational Handbook lists the annual mean wage range of aircraft mechanics and service technicians in South Dakota as of May 2023 to be $66,640-$71,530. *See* www.bls.gov/oes/2023/may/oes493011.htm. The Court finds that absent his injury, Micah would have earned approximately $69,000 per year working as an aircraft mechanic and service technician in the State of South Dakota.

240.    As Dr. Reed indicated, Micah's injury prevents him from performing any job that requires him to be on his feet for a prolonged period of time. The Court finds that Micah can clearly work as a receptionist despite his permanent disability. The Court will take judicial notice of the U.S. Bureau of Labor Statistics website as it has some relevance to the question of loss of future earning capacity and finds that the annual mean wage of a receptionist in South Dakota as of May 2023 is $34,300. www.bls.gov/oes/current/oes434171.htm#nat.

241.    However, the Court finds that Micah Roemen, despite his permanent disability, can reasonably be expected to earn more than a receptionist salary. Micah had the ability to both work and complete his post-secondary vocational training. He's young, he speaks well, has a positive appearance, is in otherwise good health, and has shown that he is motivated to work. The receptionist salary does provide a base level of what he can earn in the future. Based on these other factors, the Court finds that Micah is capable and will do better than a receptionist salary despite his permanent disability. *See Weidner v. Lineback*, 140 N.W.2d 597, 602 (S.D. 1966) (listing types of factors a court may consider when determining loss of future earning capacity).

242.    Considering Micah as a person and his work ethic, the Court finds that his earning capacity for the future, as now reduced by his disability, is $40,000 per year and his lost earning capacity is $29,000 per year ($69,000-$40,000). $29,000 per year over Micah's work-life expectancy of 45 years, reduced to present value using a discount

rate of four (4) percent compounded annually, results in an award of $600,881.15 for loss of future earning capacity.

## VERDICTS

1. The Court awards to Morgan Ten Eyck, through her guardians, $39,521,540.06 for the following categories of damages:
   a. $15,699,317.28 for future life care;
   b. $643,447.85 for lost future earning capacity;
   c. $178,774.93 for past medical expenses; and
   d. $23,000,000.00 for non-economic damages.

2. Plaintiffs shall file with the Court proof that a state court guardianship with annual accountings has been established for Morgan prior to payment of any judgment funds to Tom Ten Eyck and Michelle Ten Eyck, Guardians of Morgan Ten Eyck.

3. The Court awards to Micah Roemen $2,106,752.49 for the following categories of damages:
   a. $305,871.34 for past medical expenses;
   b. $1,200,000 for non-economic damages; and
   c. $600,881.15 in lost earning capacity.

Dated this 24th day of March, 2025.

BY THE COURT:

Lawrence L. Piersol
United States District Judge